# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| Heights Apartments, LLC, and Walnut Trails, LLLP, | Court File No. 20-CV-02051 (NEB/BRT) |
| Plaintiffs, | |
| v. | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Tim Walz, in his individual and his official capacity as Governor of the State of Minnesota, and Keith Ellison, in his individual and his official capacity as Attorney General of the State of Minnesota, and John Doe, | |
| Defendants. | |

## INTRODUCTION

With this motion, Plaintiffs Heights Apartments and Walnut Trails ("Landlords" or "Plaintiffs") seek to dislodge a crucial piece of Minnesota's response to the COVID-19 puzzle: a temporary limitation on state court evictions. Through a series of emergency executive orders, Governor Tim Walz ("Governor") has limited the spread of COVID-19 by limiting landlords' ability to summarily displace their tenants, with exceptions designed to balance the interests of landlords and tenants. Such measures have allowed tenants to quarantine, adhere to social distancing guidelines, and stay out of settings that increase the risk of infection. Plaintiffs now ask this Court to lift these restrictions, arguing that the Challenged Orders infringe on their constitutional rights. Plaintiffs, however, fail to cite controlling case law that forecloses their arguments. They also fail

to mention that the arguments they advance in support of the extraordinary relief requested have been rejected by every court to have considered them during this pandemic. Further, Plaintiffs cannot show that this Court has jurisdiction to grant their requested relief. This Court should deny Plaintiffs' request for a preliminary injunction.

## FACTS

### I.   THE COVID-19 PANDEMIC.

COVID-19 is an infectious disease caused by a newly discovered coronavirus that spreads rapidly through respiratory transmission. (Goodwin Decl., Ex. 1.) COVID-19 is spread from person-to-person contact through respiratory droplets that are produced when an infected person coughs, sneezes, or talks. (*Id.*, Ex. 2.) Many experts believe that COVID-19 is also spread through airborne transmission caused by the dissemination of aerosols that remain infectious when suspended in air over long distances and time. (*Id.*, Exs. 3, 4, 21.) Asymptomatic individuals may carry and spread the virus and there is currently no known vaccine or effective treatment, making response efforts complex and daunting. (*Id.*, Exs. 4.)

On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. (*Id.*, Ex. 23.) As of October 15, 2020, 117106 Minnesotans have tested positive for COVID-19 and 2,199 have died. (*Id.* ¶ 7.) The virus has claimed over 216,025 lives in the United States since January 24, 2020. (*Id.* ¶ 8.) Minnesota is currently experiencing a surge in cases, reporting a record high of 1,500 newly confirmed cases on Saturday, October 11. (*Id.*, Ex. 5, 18.) And while infection counts in Minnesota continue to set records, they pale in comparison to neighboring states, which one

University of Minnesota epidemiologist described as "houses on fire." (*Id.*)

Public health professionals anticipate that COVID-19 will persist in Minnesota—with intermittent infection rate fluctuations—for the foreseeable future. (*Id.*, Ex. 8 at 6.) Because of the deadly and ongoing threat presented by COVID-19, federal, state, and local officials have taken steps to avoid an exponential infection rate increase that could overwhelm medical providers and ultimately result in a higher rate of death for sickened Minnesotans.

## II.   MINNESOTA'S RESPONSE TO COVID-19.

In response to the COVID-19 public health crisis, Governor Tim Walz declared a peacetime emergency on March 13, 2020.  Emergency Executive Order ("EO") 20-01.[1] That same day, the President declared a National Emergency, and—for the first time in history—the President has approved major disaster declarations in all 50 states. (Goodwin Decl., Exs. 6, 9.)  Minnesota has engaged in a comprehensive plan to combat COVID-19 that includes slowing the spread of the disease, protecting the capacity of the state's medical system to respond to the disease, and ensuring the continued operation of critical sectors to protect the public's access to necessary services and supplies.  *See* EOs 20-02 through 20-92.  The Governor has extended the peacetime emergency each thirty days since March, and that emergency can be terminated by the Legislature. Minn. Stat. 12.31, subd. 2(b).

---

[1]   All of Minnesota's Emergency Executive Orders regarding COVID-19 are available online at www.leg.state.mn.us/lrl/execorders/eoresults?gov=44.

### III.    COVID-19 AND HOUSING STABILITY

Like the federal government and many state governments, Minnesota has temporarily limited the ability of property owners to evict tenants.  Under state law, eviction is "a summary court proceeding to remove a tenant or occupant from or otherwise recover possession of real property" pursuant to a statutory procedure. Minn. Stat. § 504B.001, subd. 4.

On March 13, the Minnesota Judicial Branch suspended housing court hearings for unpaid rent and unlawful detainers.  (Goodwin Decl. Ex. 20.) Ten days later, Governor Tim Walz issued Emergency Executive Order 20-14.[2]  Recognizing the economic consequences of the pandemic as well as the connection between housing stability and control of community spread of the virus, Executive Order 20-14 temporary limited the circumstances in which property owners can terminate residential leases or use the statutory eviction procedure.  Noting similar measures by the federal government and 24 other states, the Governor stated:

> Public health and safety are promoted by stabilizing households which, through no fault of their own, may suddenly have the inability to afford rent. Providing a temporary moratorium on eviction actions allows these households to remain stably housed as they safeguard the health of themselves, their families, and other Minnesotans.

EO 20-14, p. 2.  EO 20-14 excepted evictions cases in which the tenant "seriously endangered the safety of other residents" and for violations of Minnesota Statutes §

---

[2] Emergency Executive Order 20-73 amended Executive Order 20-14. Both EO 20-14 and 20-73 were rescinded when EO 20-79 became effective.  EO 20-14, 20-73, and 20-79 are collectively referred to as the "Challenged Orders."

504B.171, subd. 1, which provides that a tenant loses the right to possession of the property by engaging in illegal activity related to drugs, firearms, prostitution, or stolen goods on the property. Executive Order 20-14 specifically provided that it did not affect a tenant's continuing obligation to pay rent. *Id*. On June 5, 2020, the Governor issued Executive Order 20-73 to clarify the application of EO 20-14 "to situations where a tenant seriously endangers the safety of others who are not residents." EO 20-73, p. 1.

On July 14, 2020, Governor Walz issued Emergency Executive Order 20-79, which rescinded EO 20-14 and EO 20-73, and which took effect on August 4, 2020. Emergency Executive Order 20-79 created additional exceptions to the eviction moratorium, including an exception for when a tenant violates a lease by "significantly damag[ing] the property." On the same day, the Governor released $100 million in rental assistance to assist both landlords and tenants in meeting financial obligations. *Id*. Local officials have supported the Governor's actions related to housing stability and encouraged the Governor to strengthen protections for tenants. (Ex. 23.)

The federal government has recognized that housing instability likely contributes to spread of the virus. The federal Coronavirus Aid, Relief, and Economic Security Act, P.L. 116-136, ("CARES Act") imposed a 120-day moratorium on most eviction proceedings against residential tenants who live in properties that participate in federal housing assistance programs or are subject to federally-backed loans. The CARES Act moratorium expired on July 24, 2020. Then, on September 1, 2020, the Centers for Disease Control issued an emergency order banning on evictions nationwide ("CDC Moratorium"). *Temporary Halt in Residential Evictions To Prevent the Further Spread*

5

*of COVID-19*, 85 Fed. Reg. 55295 (Sept. 4, 2020) ("CDC Moratorium"). The CDC Moratorium is effective until December 31, 2020, and applies "to any property leased for residential purposes." 85 Fed. Reg. 55293, 55297. To be protected by the CDC Moratorium, a tenant must submit a declaration that states, among other things, that the individual meets income guidelines, has used best efforts to obtain housing assistance and make at least partial rent payments, and would be rendered homeless if evicted. *Id.* at 55293. The CDC Moratorium is in effect "in any State or U.S. territory in which there are documented cases of COVID–19 that provides a level of public-health protections below the requirements listed in this Order." 85 Fed. Reg. 55296.

There is evidence that these measures have been effective in controlling spread of the virus. In issuing the emergency order, the CDC noted that the CARES Act Moratorium and state moratoria had likely contributed to lower infection rates:

> The Federal moratorium, however, did not reach all renters. Many renters who fell outside the scope of the Federal moratorium were protected under State and local moratoria. In the absence of State and local protections, as many as 30–40 million people in America could be at risk of eviction. A wave of evictions on that scale would be unprecedented in modern times. A large portion of those who are evicted may move into close quarters in shared housing or, as discussed below, become homeless, thus contributing to the spread of COVID–19.

*CDC Moratorium*, 85 Fed. Reg. 55295 (Sept. 4, 2020). Eviction rates in Minnesota for the six months in which the Challenged Orders have been in effect are a fraction of what they otherwise would have been. (Goodwin Decl. Ex. 17). This has reduced the strain on programs such as homeless shelters, which has allowed the shelters to remain within their capacity and use their limited resources to protect the health of the populations they

already serve.   Data from elsewhere shows that infection rates in such settings are substantially higher than in Minnesota. (Goodwin Decl. ¶28.)   In Iowa, for example, the positivity rate for clients of homeless shelters is nearly 70 percent, compared to just over seven percent in Minnesota. (*Id*.)

Plaintiffs filed this lawsuit on September 24, 2020, along with the present motion. (ECF Doc. 1.)   Plaintiffs own rental housing in Minnesota. (Compl. ¶¶3-4.)   Plaintiff Walnut Trails claims that ten percent of the units in its 168-unit complex have not paid on time in the last six months.  (Johnson Aff. ¶7.)  Plaintiff Heights Apartments claims that tenants in four of the seventeen units it recently purchased have caused disturbances to other residents and would normally have been subject to lease termination, and that some of its tenants are not regularly paying rent.  (Cullen Aff. ¶¶5-10.)  Heights claims to be unable to terminate the leases of these tenants because of the Challenged Orders. (*Id*. ¶10.)   Plaintiffs now ask this Court to enjoin the Challenged Orders based on their alleged unconstitutionality.[3]

## ARGUMENT

Plaintiffs' motion fails because the Court lacks jurisdiction to grant the requested relief, and also lacks jurisdiction over the Defendants. Further, Plaintiffs cannot demonstrate any likelihood of success on the merits, and they cannot meet any of the

---

[3] Plaintiffs' complaint also includes separate counts for "Ultra Vires" and declaratory judgment.  These counts are meritless and should be dismissed along with the rest of Plaintiff's complaint. Plaintiffs do not, however, seek injunctive relief on these bases, so the claims are addressed in Defendants' Memorandum in Support of Motion to Dismiss.

other *Dataphase* factors.  As a result, Plaintiffs' motion for preliminary injunction must be denied.

## I. THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER SOME ASPECTS OF PLAINTIFF'S CLAIMS.

The motion should be denied because Plaintiffs' purported injuries are not likely to be redressed by the Court's issuance of a preliminary injunction and because Defendants are entitled to immunity.  *See Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1043 (8th Cir. 2000) ("[I]mmunity is a jurisdictional question."); *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002) (standing is jurisdictional).

Subject-matter jurisdiction is a threshold requirement which must be assured in every federal case.  *Kronholm v. F.D.I.C.*, 915 F.2d 1171, 1174 (8th Cir. 1990).  "If the asserted basis of federal jurisdiction is patently meritless, then dismissal for lack of jurisdiction is appropriate."  *Biscanin v. Merrill Lynch & Co., Inc.*, 407 F.3d 905, 907 (8th Cir. 2005).

### A. PLAINTIFFS LACK STANDING TO SEEK A PRELIMINARY INJUNCTION.

Article III standing is designed "to prevent the judicial process from being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l.*, 133 S. Ct. 1138, 1146 (2013).  The "standing inquiry" is therefore "especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by" another branch of government is unconstitutional.  *Id.* at 1147.  Plaintiffs fail to meet this "especially rigorous" standard.

To demonstrate standing, Plaintiffs bear the burden to show: (1) they have

"suffered an injury-in-fact"; (2) the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  At the pleading stage, "the plaintiff must clearly allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). A plaintiff "must establish standing for each type of remedy sought, including declaratory and injunctive relief." *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 956 (8th Cir. 2015).   Here, Plaintiffs lack standing to seek a preliminary injunction because the order that they seek is unlikely to remedy the injury of which they complain. *In re Operation of Missouri River Sys. Litig.*, 421 F.3d 618, 637 (8th Cir. 2005) (plaintiffs lacked standing because purported injury could not be redressed by requested order).

A party "satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself." *Minn. Citizens Concerned for Life v. FEC*, 113 F.3d 129, 131 (8th Cir.1997).   Standing for a particular remedy requires Plaintiff to show "actual injury" that will be redressed by that remedy. *Lewis v. Casey*, 518 U.S. 343, 349 (1996).   Here, Plaintiffs seek an order enjoining enforcement of Executive Order 20-79, restoring Plaintiffs' ability to evict tenants for nonpayment or for noncompliance with lease terms.   But were the Court to enter such an order, the CDC moratorium would take effect, which would likely prevent Plaintiffs from evicting many of their tenants (at least in cases of nonpayment). *CDC Moratorium*, 85 Fed. Reg. 55296. Because the order that Plaintiffs seek would not redress the injury complained of, Plaintiffs do not have standing to seek a preliminary injunction.   *In re Operation of*

9

*Missouri River Sys. Litig.*, 421 F.3d 618, 637 (8th Cir. 2005) (plaintiffs lacked standing because purported injury could not be redressed by requested order).

**B.     PLAINTIFF'S CLAIMS AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES ARE BARRED BY THE ELEVENTH AMENDMENT.**

A second fatal flaw in Plaintiffs' Complaint is that Defendants are immune from suit in their official capacities.   "The Eleventh Amendment establishes a general prohibition of suits in federal court by a citizen of a state against his state or an officer or agency of that state."   *281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011). Eleventh Amendment immunity applies to official-capacity claims against individuals. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).[4]  No exception applies to allow Plaintiffs' official-capacity claims against the Governor or the Attorney General.

Defendants are state officials sued in their individual and official capacities (Doc. 1, ¶¶ 5-6), and each is immune from suit unless Plaintiffs' claims fit within a recognized exception.   In *Ex parte Young*, the Supreme Court established a limited exception to Eleventh Amendment immunity, allowing suit against a state official for prospective injunctive relief where: (1) the official has "some connection with the enforcement" of the challenged law; and (2) the official threatens and is "about to commence proceedings" to enforce the statute.   209 U.S. 123, 156–57 (1908).  The *Ex parte Young* exception "does not apply when the defendant official has neither enforced nor threatened

---

[4] Count VI of Plaintiffs' Complaint is labeled "Ultra Vires" and claims that Governor Walz exceeded his authority under state law in issuing the Challenged Orders. Plaintiffs do not seek an injunction on this basis.  Count VI is, however, subject to dismissal under *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984), as set forth in Defendants' motion to dismiss.

to enforce the statute challenged as unconstitutional." *281 Care Comm*, 766 F.3d at 797. Plaintiffs are not entitled to sue the State Defendants for prospective injunctive relief under *Ex parte Young*.

### a. The Governor is immune.

The Governor is not connected to enforcement of the EOs. The responsibility for prosecuting crimes in Minnesota has been "delegate[d] . . . to the offices of county attorneys and city attorneys." *State v. Lemmer*, 736 N.W.2d at 661–62. Although the Governor has some criminal authority to prompt prosecutions by the Attorney General, *see* Minn. Stat. §8.01, that authority is merely a "safety-valve alternative[] for use in extreme cases of prosecutorial inaction," *State ex rel. Wild v. Otis*, 257 N.W.2d 361, 365 (Minn. 1977).

Even if the Governor's limited criminal authority were a sufficient connection with the enforcement of EO 20-79, the Governor is still immune from suit because he has neither threatened Plaintiffs with nor is about to commence enforcement proceedings. Plaintiffs do not allege otherwise. Since there is no risk of enforcement action by the Governor, Plaintiffs' claims do not satisfy *Ex parte Young*. *See Advanced Auto Transp., Inc. v. Pawlenty*, No. 10-159, 2010 WL 2265159, at *3 (D. Minn. June 2, 2010) (Governor immune because plaintiffs did not allege the Governor had "threatened a suit or [is] about to commence proceedings against [the plaintiff]").

### b. The Attorney General is immune.

The Attorney General is also immune. Although the Attorney General does have civil enforcement authority pursuant to Minnesota Statutes 8.31, Plaintiffs do not allege

that the Attorney General has either threatened Plaintiffs with, or is about to commence, enforcement proceedings.  Thus, the Attorney General is immune and Plaintiffs' official claims against him must be dismissed.

## II.   PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008).  When deciding a motion for preliminary injunctive relief, a court considers: (1) the moving party's probability of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) the public interest in the issuance of the injunction.  *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).  The court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," with particular regard for the "public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 7 (internal citations omitted). "The burden on the movant 'is a heavy one where, as here, granting the preliminary injunction will give [the movant] substantially the relief it would obtain after a trial on the merits.'" *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co*., 997 F.2d 484, 486 (8th Cir. 1993) (quoting *Dakota Indus., Inc. v. Ever Best Ltd*., 944 F.2d 438, 440 (8th Cir.1991)); *Brooks v. Roy*, 881 F. Supp. 2d 1034, 1049 (D. Minn. 2012).

The most important factor of the four is likelihood of success. *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013).  The moving party must demonstrate a

"fair chance of prevailing." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).  Plaintiffs cannot show a fair chance of prevailing on the merits of their claims because their claims fail under the *Jacobson* framework, and do not violate their constitutional rights in any event.

### A.   THE CHALLENGED ORDERS EASILY SURVIVE UNDER THE *JACOBSON* FRAMEWORK.

"The Constitution does not compel courts to turn a blind eye to the realities of the COVID-19 crisis." *Cassell v. Snyders*, 20 C 50153, 2020 WL 2112374, at *6 (N.D. Ill. May 3, 2020).   Thus, requests to declare invalid executive orders issued during a public health crisis are not evaluated under "traditional tiers of constitutional scrutiny."   *Id.* Instead, courts give significant deference to emergency measures instituted during such crises under the standard from *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905).  *See S. Bay United Pentecostal Church v. Newsom*, 590 U.S. __, 140 S. Ct. 1613, 1614 (2020) (Roberts, C.J., concurring). "[T]he majority of courts across the country have relied on *Jacobson's* framework to analyze emergency public health measures enacted to combat the spread of COVID-19." *Lewis v. Walz.*, No. CV 20-1212 (DWF/HB), 2020 WL 5820549, at *4 n 5 (D. Minn. Sept. 30, 2020).

*Jacobson* "requires courts to examine whether a measure adopted to address a public-health crisis has a 'real or substantial relation' to the crisis and, assuming that it has such a relation, whether it is 'beyond all question, a plain, palpable invasion' of a constitutional right." *Minnesota Voters All. v. Walz*, No. 20-CV-1688 (PJS/ECW), 2020 WL 5869425, at *12 (D. Minn. Oct. 2, 2020) (quoting *Jacobson*, 197 U.S. at 31).  Just

weeks into this crisis, the Eighth Circuit confirmed that *Jacobson* applies to emergency orders issued to combat COVID-19.  It described *Jacobson* as "the Supreme Court's framework for reviewing constitutional challenges to state actions taken in response to a public health crisis."  *In re Rutledge*, 956 F.3d 1018, 1027 (8th Cir. 2020).  *Rutledge* then outlined the *Jacobson* test and its high level of deference to state policy makers as follows:

> [W]hen faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  Courts may ask whether the state's emergency measures lack basic exceptions for "extreme cases," and whether the measures are pretextual—that is, arbitrary or oppressive.  At the same time, however, courts may not second-guess the wisdom or efficacy of the measures.

*Id.* at 1028 (8th Cir. 2020) (quoting approvingly *In re Abbott*, 954 F.3d 772, 784-85 (5th Cir. 2020), which quoted *Jacobson*).  Because the Challenged Orders are the same sort of emergency measures at issue in *Jacobson* and *Rutledge*, precedent requires the Court to analyze their constitutionality using the *Jacobson* test. *Minnesota Voters All.*, 2020 WL 5869425, at *12;  *Lewis,* 2020 WL 5820549, at *4 n 5.

Application of *Jacobson* is dispositive and demonstrates that Plaintiffs' claims cannot succeed on the merits.  Plaintiffs do not even cite *Jacobson* in arguing that the Challenged Orders violate their constitutional rights.

### 1.    The Challenged Orders have a real and substantial relation to protecting public health.

Courts across the country have concluded that "[t]he COVID-19 pandemic

constitutes the sort of public health crisis—or epidemic of disease which threatens the safety of [a community's] members—contemplated by the *Jacobson* court." *Amato*, 2020 WL 2542788 at *10; *see Spell v. Edwards*, No. 20-00282, 2020 WL 2509078, at *4 (M.D. La. May 15, 2020). At least four court federal courts have recognized that eviction moratoria are an effective means of controlling the spread of COVID-19 because such measures "keep tenants in place" and allow for social distancing. *Baptiste v. Kennealy*, No. 1:20-CV-11335-MLW, 2020 WL 5751572, at *25 (D. Mass. Sept. 25, 2020) (Applying *Jacobson* to deny preliminary injunction regarding Massachusetts' eviction moratorium). *See also HAPCO v. City of Philadelphia*, No. CV 20-3300, 2020 WL 5095496, at *9 (E.D. Pa. Aug. 28, 2020) (recognizing the city had a "significant and legitimate purpose" in enacting eviction moratorium due to economic circumstances caused by pandemic); *Auracle Homes, LLC v. Lamont*, No. 3:20-CV-00829 (VAB), 2020 WL 4558682, at *21 (D. Conn. Aug. 7, 2020) (finding executive order prohibiting evictions did not violate constitutional rights of landlords); *Elmsford Apartment Assocs., LLC v. Cuomo*, No. 20-CV-4062 (CM), 2020 WL 3498456, at *14 (S.D.N.Y. June 29, 2020). Finally, in issuing a nationwide ban on evictions, the CDC noted that state and federal restrictions on evictions had likely prevented an eviction wave that would have decreased the efficacy of social distancing measures and forced people into either congregate settings or homelessness. *Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19*, 85 Fed. Reg. 55295. The Challenged Orders have a "real and substantial relationship to public health."

In addition to completely ignoring the *Jacobson* framework, Plaintiff's argument

that the Challenged Orders are "unconstitutionally arbitrary" misses the point. (Pl. Mem. at p. 17.) Plaintiffs argue that the Challenged Orders are arbitrary because they protect tenants "whose tenancy might be justifiably terminated for reasons wholly unrelated to the pandemic." (Pl. Mem. at p. 27.) The Challenged Orders, however, are not just intended to protect individuals who are experiencing economic hardship because of the pandemic, nor is the purpose only to protect renters. The Challenged Orders have the effect of allowing tenants to shelter and adhere to social distancing guidelines, whatever their economic circumstances. This is an important purpose in and of itself, as it reduces the likelihood that individuals would need to seek shelter with friends or in homeless shelters, thereby increasing the risk of transmission of the disease to others. Overall, the Challenged Orders are one of many measures to control the spread of the virus, a goal that courts throughout the country have acknowledged as being related to public health. Plaintiffs do not seriously argue otherwise. Thus, the Challenged Orders have a demonstrable relationship to public health.

### 2. The Challenged Orders do not plainly or palpably infringe upon any fundamental rights.

There is no basis to conclude that the Challenged Orders plainly or palpably invade Plaintiffs' fundamental rights. "[F]or the court to have the authority to intervene in the State's response to the public health crisis, the [challenged regulation] must, 'beyond all question,' violate" a fundamental right of the plaintiff. *Rutledge*, 956 F.3d at 1030. "Jacobson instructs that all constitutional rights may be reasonably restricted to combat a public health emergency." *Lewis v. Walz*, No. CV 20-1212 (DWF/HB), 2020 WL

5820549, at *4 (D. Minn. Sept. 30, 2020) (quoting *In re Abbott*, 954 F.3d 772, 786 (5th Cir. 2020) (emphasis in original)).

The Challenged Orders do not invade Plaintiffs' fundamental rights.  First, none of the rights identified by Plaintiffs are fundamental.  The only interests identified by Plaintiffs are business interests.  The United States Supreme Court has repeatedly held that there is no fundamental right to own a business or to work in a particular profession. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 721 (2010) ("The liberties protected by substantive due process do not include economic liberties."); *Henry*, 2020 WL 2479447, at *7 ("Time and again, the Supreme Court has determined that there is no fundamental right to a job, or right to work").  And there is no constitutional right whatsoever to evict tenants.  *Elmsford Apartment Assocs., LLC,* 2020 WL 3498456, at *14.

Second, and more importantly, the Orders do not infringe on the rights that Plaintiffs identify. The rights identified by Plaintiffs are discussed in turn.

### A.   The Challenged Orders do not infringe on Plaintiff's rights under the Petition Clause

Plaintiffs cannot show that the Challenged Orders infringe on their First Amendment rights under the Petition Clause.  The right of access to courts is burdened when state officials take systemic action to frustrate a plaintiff or class of plaintiffs from preparing and filing lawsuits.  *Christopher v. Harbury*, 536 U.S. 403, 413 (2002). "[T]he right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher*, 536 U.S. at 415.  To succeed on such a

claim, the plaintiff must show that the state action "hindered his efforts to pursue a legal claim." *Lewis v. Casey*, 518 U.S. 343, 351 (1996).

The constitutional right of access to the courts, however, does not confer a right to bring a particular cause of action or to bring an action at a preferred time. *Elmsford,* 2020 WL 3498456, at *17. Delay in obtaining one's preferred remedy does not infringe on one's right to access the courts. *See Sosna v. Iowa*, 419 U.S. 393, 410, 95 S. Ct. 553, 563 (1975). "In a nutshell, while there is a constitutional right to court access, there is no complementary constitutional right to receive or be eligible for a particular form of relief." *Baptiste*, 2020 WL 5751572, at *25 (citing *Suffolk Cnty. Jail*, 129 F.3d at 160).

The Challenged Orders temporarily limit Plaintiff's ability to bring a statutory cause of action to recover possession of the premises. Executive Order 20-14 authorized evictions in cases of substantial endangerment and violations of Minnesota Statutes § 504B.171, and Executive Order 20-79 further expanded the grounds upon which leases could be terminated. As Plaintiffs acknowledge, they can still sue their tenants to obtain a money judgment for any debt. (Pl. Mem. p. 9-11.) "Plaintiffs can still sue their tenants for arrearages through a breach of contract action in the New York Supreme Court – and the fact that is not their preferred remedy is of no moment." *Elmsford,* 2020 WL 3498456, at *16 (noting the availability of suits for tenant debts in rejecting access to courts claim). Every court to have considered such a challenge to a COVID eviction moratorium has rejected it. *E.g., Baptiste*, 2020 WL 5751572, at *25; *Auracle Homes,* 2020 WL 4558682. This Court should join those courts in rejecting the claim that the Challenged Orders infringe on Plaintiff's right of access to the court. Plaintiffs have no

likelihood of success on their First Amendment claim.

### B. The Challenged Orders do not violate the Contracts Clause.

To prove an unconstitutional contract impairment, Plaintiffs must first show that the Challenged Orders substantially impaired a contractual obligation they can enforce. *Sveen v. Melin*, —— U.S. ——, 138 S.Ct. 1815, 1821-22 (2018); *Energy Reserves Group, Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 411 (1983). If such a substantial impairment exists, the state law is nevertheless constitutional if it serves "a significant and legitimate public purpose" and is "of a character appropriate to the public purpose justifying [the legislation's] adoption." *Sveen,* 138 S.Ct. at 1821-22 (citation omitted). "[T]he implied contractual rights conferred by state laws, including judicial remedies such as eviction, may be the subject of a Contracts Clause claim 'only when those laws affect the validity, construction, and enforcement of contracts.'" *Elmsford*, 2020 WL 3498456, at *14 (S.D.N.Y. June 29, 2020) (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 189 (1992)).

Here, even if rights under the Contracts Clause were fundamental rights (and they are not),[5] the Challenged Orders do not substantially impair Plaintiff's contractual rights. To determine whether a law "substantially impairs" contract rights the court considers "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen,* 138 S. Ct. at 1822. The Challenged Orders do not affect a tenant's

---

[5] Plaintiffs cite no case establishing that the Contracts Clause creates fundamental rights.

obligation to pay rent or change any other term of the lease.  "As the tenants are still bound to their contracts, the contractual bargain is not undermined and landlord rights are safeguarded." *HAPCO v. City of Philadelphia*, No. CV 20-3300, 2020 WL 5095496, at *8 (E.D. Pa. Aug. 28, 2020).  In fact, the only contractual or statutory right it affects at all is the landlord's right to recover possession of the premises, and that right is only affected temporarily.  "The eviction moratorium does not eliminate the suite of contractual remedies available to the Plaintiffs; it merely postpones the date on which landlords may commence summary proceedings against their tenants." *Elmsford*, 2020 WL 3498456 at *15.  As the courts in *Elmsford* and *HAPCO* found, Plaintiffs cannot show the Challenged Orders substantially impair their residential leases.  There is therefore no likelihood of success on Plaintiff's Contracts Clause claim.

The analysis could end there, as Plaintiff's failure to establish a substantial impairment is fatal to its Contracts Clause claim. But the Challenged Orders unquestionably serve a "significant and legitimate purpose" and are designed to meet that purpose.  The relevant inquiry is "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S. Ct. at 1822.  Controlling the spread of COVID-19 is unquestionably a significant and legitimate purpose. *Rutledge*, 956 F.3d 1018, 1027; *HAPCO*, 2020 WL 5095496 at *9 (City had a "significant and legitimate purpose" for imposing eviction moratorium).  The Challenged Orders serve that purpose by protecting housing security, which provides individuals with a place to shelter if they are ill, a means of socially distancing, and reduction in the likelihood that they will be forced into homelessness or congregate

20

housing. The Challenged Orders also are one measure to control the spread of a deadly disease in the population at large. The Contracts Clause claim fails and provides no basis for a preliminary injunction.

### C.   Plaintiffs' property has not been taken, and the Court cannot enjoin a taking in any event.

Plaintiffs' takings claim has at least three fatal defects.  First, even if Plaintiffs could establish a taking, their remedy would be an action sounding in damages, meaning that they cannot show "irreparable harm" for purposes of the present motion. Second, contrary to Plaintiffs' arguments, there has been no physical taking as a matter of law. Finally, Plaintiffs' claims fail under *Penn Central*.

#### 1.   *Injunctive relief is not available for a taking*.

First, even if Plaintiffs could make out a claim for a taking, that would not be a basis to enter a preliminary injunction – because Plaintiffs would have a remedy at law in the form of a damages claim.  "As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Knick v. Township of Scott*, 139 S. Ct. 2162, 2176-77 (2019).  Here, Plaintiffs' right of relief, if any, for their loss of income is a damages claim, not an injunction. *Baptiste*, 2020 WL 5751572 at *23.  Plaintiffs' do not have a right of relief, however, because there has been no taking as a matter of law.

#### 2.   *The Challenged Orders do not effect physical takings*.

Contrary to Plaintiffs' argument, the Challenged Orders have not resulted in a physical taking of their property. "The government effects a physical taking only where it

requires the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992).  "The Supreme Court has ruled that a state does not commit a physical taking when it restricts the circumstances in which tenants may be evicted." *Elmsford Apartment Assocs., LLC v. Cuomo*, No. 20-CV-4062 (CM), 2020 WL 3498456, at *7 (S.D.N.Y. June 29, 2020) (citing *Yee*, 503 U.S. at 527).  Plaintiffs chose to purchase their properties for the express purpose of renting them, and any restriction on their right to evict tenants is only temporary.  It therefore is not a physical taking as a matter of law.  *Baptiste*, 2020 WL 5751572, at *20.

### 3.  The Challenged Orders are not regulatory takings

Similarly, the Challenged Orders do not amount to a regulatory taking. Federal analyze regulatory takings under the three-part *Penn Central* test.  Under *Penn Central,* a court considering a takings claim must review: (1) the economic impact of the regulation on the person suffering the loss; (2) the extent to which the regulation interferes with distinct investment backed expectations; and (3) the character of the government action to assess whether the complained of action effected a taking of private property for public use. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). "Because of the ad-hoc nature of regulatory takings analysis, facial challenges brought under the Takings Clause 'face an uphill battle ... made especially steep" when the parties seeking relief "have not claimed ... that [government action] makes it commercially impracticable' for them to continue business operations on their property." *Elmsford Apartment Assocs., LLC,* 2020 WL 3498456, at *9 (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495–96 (1987)).

First, the Supreme Court has repeatedly made clear that the Takings analysis focuses on the "parcel as a whole." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 517 n 5 (1987) (quoting *Penn Central*). But both Plaintiffs focus their takings claim on a subset of their property – that which is occupied by tenants who are not paying rent. Plaintiff Heights complains that an five of the seventeen units it recently purchased are not "regularly" paying rent. (Compl. ¶ 30.) Plaintiff Walnut Trails states that 10 percent of the units in a 168-unit complex have not paid "regularly or on time" since March. (Compl. ¶39.) But in addition to being vague, neither of these claims alleges sufficient economic impact as a matter of law to satisfy the first prong of the *Penn Central* test. *Elmsford,* 2020 WL 3498456, at *10 (S.D.N.Y. June 29, 2020) (rejecting takings claim because "vague" allegations that a subset of tenants are not paying is not enough to be a taking under the first prong of *Penn Central*).

Plaintiffs fair no better under the second prong of *Penn Central*. "[R]easonable investment-backed expectations cannot operate apart from 'public programs adjusting the benefits and burdens of economic life to promote the common good.'" *Auracle Homes*, 2020 WL 4558682, at *15 (D. Conn. Aug. 7, 2020) (quoting *Penn Central*, 438 U.S. at 124). *See also Elmsford,* 2020 WL 3498456, at *11-12 (S.D.N.Y. June 29, 2020). As in *Auracle Homes* and *Elmsford*, residential rental property in Minnesota is governed by a complex regulatory scheme that includes restrictions on the unfettered ability to conduct business free from government oversight. *See* Minn. Stat. Ch. 504B. The temporary restrictions of the Challenged Orders do not, therefore, interfere with Plaintiffs' reasonable, investment-backed expectations.

23

Finally, the third factor of the *Penn Central* test is dispositive and fatal to Plaintiffs' takings claim. Where "'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land," there is no Fifth Amendment Taking. *Penn Cent.*, 438 U.S. at 125; *Baptiste*, 2020 WL 5751572, at *22 (temporary eviction moratorium was a "public program adjusting the benefits and burdens of economic life to promote the common good" and therefore not a *Penn Central* taking as a matter of law). Here, as conceded by Plaintiffs, the Challenged Orders have a clear purpose to prevent harm to the public. (Pl. Mem. at p. 16.) This third factor of the Penn Central analysis carries even greater weight in light of *Jacobson*, which affords elected officials substantial latitude to protect public health. *Jacobson*, 197 U.S. at 25. The allegations in Plaintiffs' Complaint do not satisfy any part of the *Penn Central* test. The claim therefore fails as a matter of law and provides no basis for an injunction.

### D.    Plaintiff's Substantive Due Process claim fails as a matter of law.

Plaintiffs claim a Due Process violation based on "the amalgam of violations already complained of," an argument that the Supreme Court has rejected time and time again. (Pl. Mem. at p. 25.) "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Stop the Beach Renourishment, Inc.*, 560 U.S. at 721 (internal quotations omitted). As discussed above, there is no "amalgam" of constitutional violations, and even if there was, Plaintiffs cite no authority that would allow them to aggregate the constitutional violations into "a Due Process violation greater

than the sum of its parts." (Pl. Mem. at p. 25.) Such a result would be inconsistent with decades of Supreme Court precedent. *Stop the Beach Renourishment, Inc*., 560 U.S. at 721.

Moreover, Plaintiffs are required to identify a liberty or property interest that Defendants have infringed upon. "Merely labeling a governmental action as arbitrary and capricious, in the absence of the deprivation of life, liberty, or property, will not support substantive due process claim." *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999) (affirming dismissal of substantive due process claim because of failure to identify a liberty interest).  Plaintiffs have not identified a protected interest different from that which they have discussed above.  "[T]he Due Process Clause cannot do the work of the Takings Clause." *Auracle Homes*. 2020 WL 4558682 at *19 (requiring landlords to identify a property interest independent of that identified in their takings claim to pursue substantive due process claim related to eviction moratorium).  Therefore, there is no likelihood of success on their substantive due process claim.

***

For all of the foregoing reasons, the Challenged Orders are well within the State's authority under *Jacobson*.  Because Plaintiffs have not demonstrated that any of their fundamental rights are plainly violated by the Challenged Orders, the court "may not second-guess the wisdom or efficacy of the measures," *In re Rutledge*, 2020 WL 1933122, at *5, and Plaintiffs cannot succeed on their claims.  The motion should be denied.

### B.    EVEN WITHOUT *JACOBSON*, THE ORDER IS CONSTITUTIONAL

Assuming *arguendo* that the deferential *Jacobson* standard does not apply, none of Plaintiffs' constitutional claims are cognizable and therefore not likely to succeed.

As explained *supra*, the United States Supreme Court has repeatedly held that there is no fundamental right to own a business or to work in a particular profession, nor is there a fundamental right to evict.  *Supra* p. 17.  As discussed above, Complaint identifies only business and economic interests.  (Compl. ¶27.)  To the extent the court finds *Jacobson* inapposite, Plaintiffs' claims are subject to rational basis review. "Because all that must be shown is any reasonably conceivable state of facts that could provide a rational basis for the classification, it is not necessary to wait for further factual development." *Carter v. Arkansas*, 392 F.3d 965, 968 (8th Cir. 2004) (dismissing Equal Protection claim) (internal quotations and citations omitted).

Under a federal constitution rational basis analysis, courts do not second guess the wisdom of a law, nor do they require that distinctions among unprotected classes be precisely tailored.  *See*, *e.g.*, *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 316 (1976); *Stiles v. Blunt,* 912 F.2d 260, 267 (8th Cir.1990).   Further, whether the identified legitimate state interests were actually considered in establishing the prohibition is irrelevant.  *See Flemming v. Nestor,* 363 U.S. 603, 612 (1960).  Likewise, whether a state actor "was unwise in not choosing a means more precisely related to its primary purpose is irrelevant." *See Vance v. Bradley*, 440 U.S. 93, 109 (1979) *citing California v. Jobst*, 434 U.S. 47, 56–58 (1977).  Here, the Challenged Orders are supported by more than a rational basis. As the Governor explained in issuing Executive Order 20-

14, public health is promoted by stabilizing households.  Losing shelter has the effect of decreasing individuals' ability to comply with other orders and increases the risk that individuals will get sick.  Plaintiffs identify a number of policy choices they believe would have been more prudent, but identify no authority requiring the Governor to adopt them.  (Pl Mem. 16-17.)  Because the Challenged Orders are supported by a rational basis, Plaintiffs' constitutional claims fail as a matter of law even without the *Jacobson* analysis.

### III.   NONE OF THE OTHER *DATAPHASE* FACTORS SUPPORT ISSUING AN INJUNCTION.

None of the other *Dataphase* considerations support granting Plaintiffs' motion. The Court should deny it.

#### A.   Plaintiffs Have Suffered No Irreparable Harm.

Plaintiffs do not face irreparable harm.  "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 914–15 (8th Cir. 2015) (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir.2009)).  As discussed above, the harms identified by Plaintiffs are, at base, economic harms.  (Cullen Aff. ¶¶ 5-10; Johnson Aff. ¶ 8).  Plaintiffs' speculation that any money judgment it could obtain against their tenants for unpaid rent would be an "illusory" remedy is insufficient to demonstrate the irreparable harm require to support an preliminary injunction. (Pl. Mem. at 12.) *Goff v. Harper*, 60 F.3d 518, 521 (8th Cir. 1995) (reversing preliminary injunction because harm was "speculative" and "remote"); *Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1227 (8th Cir. 1987) (requiring

"sufficient evidence" of insolvency to support irreparable harm). *See also Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1531 (11th Cir. 1994) ("The test of the inadequacy of a remedy at law is whether a judgment could be obtained, not whether, once obtained it will be collectible"); *Sentry Select Ins. Co. v. LBL Skysys*., Inc., No., 2007 WL 1854801, at *4 (E.D. Pa. June 26, 2007) (holding that the 'concern' that the other party 'might become insolvent  or otherwise unable to return funds' was 'too speculative to constitute irreparable harm'). And nothing in the record indicates whether any of Plaintiff's tenants have sought the $100 million in rental assistance that the Governor has made available to ease the financial burden on both renters and landlords.

Likewise, Plaintiffs' evidence of damage to their "goodwill" is not sufficient to constitute irreparable harm. "Conclusory" statements about harm to goodwill cannot support a finding of irreparable injury. *Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1055 (D. Minn. 2019) (quoting *Mgmt. Registry, Inc. v. A.W. Cos*., No. 17-CV-5009 (JRT/FLN), 2018 WL 461132, at *6 (D. Minn. Jan. 16, 2018); *Dotster, Inc. v. Internet Corp. For Assigned Names & Numbers*, 296 F. Supp. 2d 1159, 1163 (C.D. Cal. 2003) (rejecting statements of four executives about harm to goodwill as insufficient to establish irreparable injury). Plaintiff Heights[6] has identified the conduct of tenants of four of the seventeen units it recently purchased as evidence of irreparable harm to their goodwill. (Cullen Aff. ¶5-10.) Heights claims that one tenant has moved out because of the disruptive conduct of another tenant, and Heights itself has

---

[6] Plaintiff Walnut Trails does not appear to allege any harm to goodwill. (See generally Johnson Aff.)

chosen not to re-rent the former tenant's apartment.  (Cullen Aff. ¶ 7.)  In another of Heights' examples, the tenant conduct of which it complains predates the imposition of the Challenged Orders. (Cullen Aff. ¶9.) It is not clear from any of these anecdotes that the exceptions to the Challenged Orders do not apply, such that Heights could, in fact, regain possession of the property in these cases.  In any event, these isolated incidents, affecting a small percentage of Heights' property, do not, as a matter of law, establish irreparable harm to goodwill.  *See Midwest Sign*, 386 F. Supp. 3d at 1055.

Further, Plaintiffs' lack of urgency in bringing this motion demonstrates there is no need for emergency relief.  *Travel Tags, Inc. v. UV Color, Inc*., 690 F. Supp. 2d 785, 801 (D. Minn. 2010) (Finding plaintiff's delay in bringing this lawsuit weighs against a finding of irreparable harm); *Andrew Wommack Ministries, Inc v. Polis*, No. 20-CV-02922-CMA-KMT, 2020 WL 5810525, at *3 (D. Colo. Sept. 29, 2020) (delay in initiating litigation months after COVID regulations went into effect weighed against preliminary injunction).  Executive Order 20-14 went into effect six months ago. Executive Order 20-79 replaced EOs 20-14 and 20-73 four months later.  Two months after that, Plaintiffs got around to filing this action.  Their own conduct demonstrates that they will not suffer irreparable harm without an injunction.

**B.**      **The Balance of Equities and the Public Interest Favor State Defendants.**

The balance of equities and the public interest factors merge when the government is the party opposing the motion for an injunction.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Those factors favor Defendants where the scientific and medical evidence clearly

indicate a temporary limitation on the eviction remedy is a critical public health measure that saves lives and protects the capacity of Minnesota's medical system to respond to the pandemic and routine health emergencies.  The need to stem the harm to the public due to the pandemic easily outweighs the speculative harms cited by Plaintiffs. *Auracle Homes, LLC*, 2020 WL 4558682, at *21 (holding the balance of equities and the public interest favor denying a preliminary injunction of statewide eviction moratorium in light of the public health consequences of granting the injunction).

### CONCLUSION

Defendants understand that the measures necessitated by the pandemic have not been easy or painless.  Nevertheless, Defendants respectfully request that Plaintiffs' motion be denied in its entirety.  The Court lacks jurisdiction to enjoin enforcement of the Challenged Orders.  Even if the Court had jurisdiction, Plaintiff has not shown a fair chance of prevailing on any of its claims, and has not made the showing required to obtain a preliminary injunction.  For these reasons, the Court should not enjoin enforcement of the Challenged Orders.

Dated:  October 16, 2020                    Respectfully submitted,

                                            KEITH ELLISON
                                            Attorney General
                                            State of Minnesota

                                            s/ Michael Goodwin
                                            LIZ KRAMER (#0325089)
                                            Solicitor General

                                            MICHAEL GOODWIN (#0390244)
                                            Assistant Attorney General

30

445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
liz.kramer@ag.state.mn.us
(651) 757-1010 (Voice)
michael.goodwin@ag.state.mn.us
(651) 757-1456 (Voice)

Attorneys For Defendants

|#4818994-v1

31