# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| Heights Apartments, LLC, and Walnut Trails, LLLP, | Court File No. 20-CV-02051 (NEB/BRT) |
| Plaintiffs, | |
| v. | **DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT** |
| Tim Walz, in his individual and his official capacity as Governor of the State of Minnesota, and Keith Ellison, in his individual and his official capacity as Attorney General of the State of Minnesota, and John Doe, | |
| Defendants. | |

## INTRODUCTION

With this case, Plaintiffs Heights Apartments and Walnut Trails ("Landlords" or "Plaintiffs") seek to dislodge a crucial piece of Minnesota's response to the COVID-19 puzzle: a temporary limitation on state court evictions. Through a series of emergency executive orders, Governor Tim Walz ("Governor") has limited the spread of COVID-19 by limiting landlords' ability to summarily displace their tenants, with exceptions designed to balance the interests of landlords and tenants. Such measures have allowed tenants to quarantine, adhere to social distancing guidelines, and stay out of settings that increase the risk of infection. Plaintiffs' arguments fail under controlling case law, however, and have been rejected by every court to have considered them. Further, the Court lacks jurisdiction over some aspects of Plaintiffs' Complaint because Defendants

are immune from those claims, and should abstain from reaching issues of purely state law. Because each of Plaintiffs' claims fails as a matter of law, this Court should dismiss the Complaint in its entirety and with prejudice.

## FACTS[1]

## I.        THE COVID-19 PANDEMIC.

COVID-19 is an infectious disease caused by a newly discovered coronavirus that spreads rapidly through respiratory transmission. (Goodwin Decl., Ex. 1.) COVID-19 is spread from person-to-person contact through respiratory droplets that are produced when an infected person coughs, sneezes, or talks. (*Id.*, Ex. 2.) Many experts believe that COVID-19 is also spread through airborne transmission caused by the dissemination of aerosols that remain infectious when suspended in air over long distances and time. (*Id.*, Exs. 3, 4, 21.) Asymptomatic individuals may carry and spread the virus and there is currently no known vaccine or effective treatment, making response efforts complex and daunting. (*Id.*, Exs. 4.)

On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. (*Id.*, Ex. 23.) As of October 15, 2020, 117106 Minnesotans have tested positive for COVID-19 and 2,199 have died. (*Id.* ¶ 7.) The virus has claimed over

---

[1] The factual background is taken from the Complaint, the EOs and documents embraced by the Complaint, and matters of public record. These materials are properly considered on a motion to dismiss. *See Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012); *Little Gem Life Sciences, LLC v. Orphan Med., Inc.*, 537 F.3d 913, 916 (8th Cir. 2008); Fed. R. Civ. P. 65. For the Court's convenience, the relevant documents are attached to the Declaration of Michael Goodwin ("Goodwin Decl."). The Goodwin Declaration was submitted in connection with Defendants' opposition to Plaintiff's Motion for a Temporary Injunction. (ECF Doc. 13.)

216,025 lives in the United States since January 24, 2020. (*Id.* ¶ 8.) Minnesota is currently experiencing a surge in cases, reporting a record high of 1,500 newly confirmed cases on Saturday, October 11. (*Id.*, Ex. 5, 18.) And while infection counts in Minnesota continue to set records, they pale in comparison to neighboring states, which one University of Minnesota epidemiologist described as "houses on fire." (*Id.*)

Public health professionals anticipate that COVID-19 will persist in Minnesota—with intermittent infection rate fluctuations—for the foreseeable future. (*Id.*, Ex. 8 at 6.) Because of the deadly and ongoing threat presented by COVID-19, federal, state, and local officials have taken steps to avoid an exponential infection rate increase that could overwhelm medical providers and ultimately result in a higher rate of death for sickened Minnesotans.

## II.    MINNESOTA'S RESPONSE TO COVID-19.

In response to the COVID-19 public health crisis, Governor Tim Walz declared a peacetime emergency on March 13, 2020. Emergency Executive Order ("EO") 20-01.[2] That same day, the President declared a National Emergency, and—for the first time in history—the President has approved major disaster declarations in all 50 states. (Goodwin Decl., Exs. 6, 9.) Minnesota has engaged in a comprehensive plan to combat COVID-19 that includes slowing the spread of the disease, protecting the capacity of the state's medical system to respond to the disease, and ensuring the continued operation of

---

[2]    All of Minnesota's Emergency Executive Orders regarding COVID-19 are available online at www.leg.state.mn.us/lrl/execorders/eoresults?gov=44.

critical sectors to protect the public's access to necessary services and supplies. *See* EOs 20-02 through 20-92. The Governor has extended the peacetime emergency each thirty days since March, and that emergency can be terminated by the Legislature. Minn. Stat. 12.31, subd. 2(b).

### III.   COVID-19 AND HOUSING STABILITY

Like the federal government and many state governments, Minnesota has temporarily limited the ability of property owners to evict tenants. Under state law, eviction is "a summary court proceeding to remove a tenant or occupant from or otherwise recover possession of real property" pursuant to a statutory procedure. Minn. Stat. § 504B.001, subd. 4.

On March 13, the Minnesota Judicial Branch suspended housing court hearings for unpaid rent and unlawful detainers. (Goodwin Decl. Ex. 20.) Ten days later, Governor Tim Walz issued Emergency Executive Order 20-14.[3] Recognizing the economic consequences of the pandemic as well as the connection between housing stability and control of community spread of the virus, Executive Order 20-14 temporary limited the circumstances in which property owners can terminate residential leases or use the statutory eviction procedure. Noting similar measures by the federal government and 24 other states, the Governor stated:

> Public health and safety are promoted by stabilizing households which, through no fault of their own, may suddenly have the inability to afford

---

[3] Emergency Executive Order 20-73 amended Executive Order 20-14. Both EO 20-14 and 20-73 were rescinded when EO 20-79 became effective. EO 20-14, 20-73, and 20-79 are collectively referred to as the "Challenged Orders."

rent. Providing a temporary moratorium on eviction actions allows these households to remain stably housed as they safeguard the health of themselves, their families, and other Minnesotans.

EO 20-14, p. 2. EO 20-14 excepted evictions cases in which the tenant "seriously endangered the safety of other residents" and for violations of Minnesota Statutes § 504B.171, subd. 1, which provides that a tenant loses the right to possession of the property by engaging in illegal activity related to drugs, firearms, prostitution, or stolen goods on the property. Executive Order 20-14 specifically provided that it did not affect a tenant's continuing obligation to pay rent. *Id*. On June 5, 2020, the Governor issued Executive Order 20-73 to clarify the application of EO 20-14 "to situations where a tenant seriously endangers the safety of others who are not residents." EO 20-73, p. 1.

On July 14, 2020, Governor Walz issued Emergency Executive Order 20-79, which rescinded EO 20-14 and EO 20-73, and which took effect on August 4, 2020. Emergency Executive Order 20-79 created additional exceptions to the eviction moratorium, including an exception for when a tenant violates a lease by "significantly damag[ing] the property." On the same day, the Governor released $100 million in rental assistance to assist both landlords and tenants in meeting financial obligations. *Id*. Local officials have supported the Governor's actions related to housing stability and encouraged the Governor to strengthen protections for tenants. (Ex. 23.)

The federal government has recognized that housing instability likely contributes to spread of the virus. The federal Coronavirus Aid, Relief, and Economic Security Act, P.L. 116-136, ("CARES Act") imposed a 120-day moratorium on most eviction proceedings against residential tenants who live in properties that participate in federal

housing assistance programs or are subject to federally-backed loans. The CARES Act moratorium expired on July 24, 2020. Then, on September 1, 2020, the Centers for Disease Control issued an emergency order banning on evictions nationwide ("CDC Moratorium"). *Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19*, 85 Fed. Reg. 55295 (Sept. 4, 2020) ("CDC Moratorium"). The CDC Moratorium is effective until December 31, 2020, and applies "to any property leased for residential purposes." 85 Fed. Reg. 55293, 55297. To be protected by the CDC Moratorium, a tenant must submit a declaration that states, among other things, that the individual meets income guidelines, has used best efforts to obtain housing assistance and make at least partial rent payments, and would be rendered homeless if evicted. *Id*. at 55293. The CDC Moratorium is in effect "in any State or U.S. territory in which there are documented cases of COVID–19 that provides a level of public-health protections below the requirements listed in this Order." 85 Fed. Reg. 55296.

There is evidence that these measures have been effective in controlling spread of the virus. In issuing the emergency order, the CDC noted that the CARES Act Moratorium and state moratoria had likely contributed to lower infection rates:

> The Federal moratorium, however, did not reach all renters. Many renters who fell outside the scope of the Federal moratorium were protected under State and local moratoria. In the absence of State and local protections, as many as 30–40 million people in America could be at risk of eviction. A wave of evictions on that scale would be unprecedented in modern times. A large portion of those who are evicted may move into close quarters in shared housing or, as discussed below, become homeless, thus contributing to the spread of COVID–19.

*CDC Moratorium*, 85 Fed. Reg. 55295 (Sept. 4, 2020). Eviction rates in Minnesota for the six months in which the Challenged Orders have been in effect are a fraction of what they otherwise would have been. (Goodwin Decl. Ex. 17). This has reduced the strain on programs such as homeless shelters, which has allowed the shelters to remain within their capacity and use their limited resources to protect the health of the populations they already serve. Data from elsewhere shows that infection rates in such settings are substantially higher than in Minnesota. (Goodwin Decl. ¶28.) In Iowa, for example, the positivity rate for clients of homeless shelters is nearly 70 percent, compared to just over seven percent in Minnesota. (*Id*.)

Plaintiffs filed this lawsuit on September 24, 2020. (ECF Doc. 1.) Plaintiffs own rental housing in Minnesota. (Compl. ¶¶3-4.) Plaintiff Walnut Trails claims that ten percent of the units in its 168-unit complex have not paid on time in the last six months. (Johnson Aff. ¶7.) Plaintiff Heights Apartments claims that tenants in four of the seventeen units it recently purchased have caused disturbances to other residents and would normally have been subject to lease termination. (Cullen Aff. ¶¶5-10.) Heights claims to be unable to terminate the leases of these tenants because of the Challenged Orders. (*Id*. ¶10.) However, Plaintiffs' Complaint fails to state any cognizable claim and should be dismissed.

## ARGUMENT

### I.    RULE 12 STANDARDS.

Defendants bring this motion for lack of subject-matter jurisdiction and failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Where, as

here, a Rule 12(b)(1) motion raises a facial challenge "the factual allegations concerning jurisdiction are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction." *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993).

Under Rule 12(b)(6), a motion to dismiss must be granted where the complaint does not allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must accept as true the factual allegations in the complaint and draw all reasonable inferences in plaintiffs' favor. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 858 (8th Cir. 2010). Legal conclusions, however, may be disregarded. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 12(b)(6) also authorizes dismissal "on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

Under these standards, Plaintiff's Complaint should be dismissed. First, the Court lacks jurisdiction over Plaintiffs' official capacity claims, and over Count VI of the Complaint. Alternatively, because Plaintiffs' Count VI raises issues of state law, the Court should abstain from hearing the state law claim. Finally, all of Plaintiff's claims fail as a matter of law and should be dismissed.

## II. THE COURT LACKS JURISDICTION OVER COUNT VI OF PLAINTIFFS' COMPLAINT, AND OVER PLAINTIFFS' OFFICIAL CAPACITY CLAIMS.

Count VI of Plaintiff's Complaint should be dismissed because Defendants are entitled to immunity. *See Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1043 (8th Cir. 2000) ("[I]mmunity is a jurisdictional question."). Alternatively the Court

should abstain from hearing Plaintiffs' claims under *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941).

Subject-matter jurisdiction is a threshold requirement which must be assured in every federal case. *Kronholm v. F.D.I.C.*, 915 F.2d 1171, 1174 (8th Cir. 1990). "If the asserted basis of federal jurisdiction is patently meritless, then dismissal for lack of jurisdiction is appropriate." *Biscanin v. Merrill Lynch & Co., Inc.*, 407 F.3d 905, 907 (8th Cir. 2005).

### A. Defendants are immune from claims alleging violation of Minnesota law.

Count VI of Plaintiff's Complaint alleges that the Governor was without authority under state law to issue the Challenged Orders. (Compl. ¶74-81.) The Court lacks jurisdiction over this state law question. Plaintiff is also just plain wrong.

First, the Eleventh Amendment does not allow a federal court to grant "relief against state officials on the basis of state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). In other words, the *Pennhurst* doctrine bars "a claim that state officials violated ***state*** law in carrying out their official responsibilities," *In re Abbott*, 956 F.3d 696, 720-21 (5th Cir. 2020), because "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 104.

Applying *Pennhurst* in a case challenging a different executive order, a federal district court in the District of Minnesota recently determined that it "lack[ed] jurisdiction to resolve plaintiffs' claims that [the executive order] violates the Minnesota

Constitution." *Minnesota Voters All. v. Walz*, No. 20-CV-1688 (PJS/ECW), 2020 WL 5869425, at *7 (D. Minn. Oct. 2, 2020). Numerous federal courts throughout the country have rejected similar attempts by plaintiffs to seek redress from federal courts for grievances grounded in the application of state law. *See, e.g.*, *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 344 (7th Cir. 2020); *PCG-SP Venture I LLC v. Newsom*, No. EDCV20-1138, 2020 WL 4344631, at *11 (C.D. Cal. June 23, 2020); *Hartman v. Acton*, No. 2:20-cv-1952, 2020 WL 1932896, at *3 (S.D. Ohio Apr. 21, 2020). This is a state law claim against state officials over which this Court lacks jurisdiction. *See Elmsford Apartment Assocs., LLC v. Cuomo*, No. 20-cv-4062, 2020 WL 3498456, at *6 (S.D.N.Y. June 29, 2020) (finding no jurisdiction over claim that governor "abused [his] power" in responding to the COVID-19 emergency and therefore improperly asked the court "to police the boundaries of [state law]"); *see also Auracle Homes, LLC v. Lamont*, -- F. Supp. 3d. --, 2020 WL 4558682 (D. Conn. Aug. 7, 2020) (same). This Court should do the same.

Count VI of the Complaint also fails because Plaintiffs are incorrect that the Challenged Orders violate Article 3, §1 of the Minnesota Constitution, which establishes separation of powers. Under the Minnesota Emergency Management Act, the Governor has authority to declare a "peacetime emergency" and "to make, amend, and rescind the necessary orders and rules to carry out the provisions of [Chapter 12]." Minn. Stat. §§ 12.31, subd. 2; 12.21, subd. 3(1). Discretionary authority delegated by the legislature satisfies separation of powers and does not amount to a delegation of pure legislative power, when the law furnishes "a reasonably clear policy or standard" for the executive

branch to implement. *City of Richfield v. Local No. 1215, Int'l Ass'n of Fire Fighters*, 276 N.W.2d 42, 45 (Minn. 1979). As a district court judge in Ramsey County recently determined, the Minnesota Emergency Management Act "provides clear standards for the Governor's exercise of this authority." Order and Memorandum, *Free Minnesota Small Business Coalition, et al. v. Walz*, Case No. 62-CV-20-3507, p. 29. And nothing in the Challenged Orders "adjudicates upon the rights of persons or property, and to that end declares, construes and applies the law," and is therefore not an exercise of judicial power. *State v. M.D.T.*, 831 N.W.2d 276, 285 (Minn. 2013). Thus, the Governor was not "wield[ing] the powers granted under the Minnesota Constitution to the Legislative and Judicial Branches" in issuing the Challenged Orders, but rather was exercising his statutory authority under the Minnesota Emergency Management Act. (Compl. ¶76.)

B. **Plaintiff's claims against Defendants in their official capacities are barred by the Eleventh Amendment.**

A second fatal flaw in Plaintiffs' Complaint is that Defendants are immune from suit. "The Eleventh Amendment establishes a general prohibition of suits in federal court by a citizen of a state against his state or an officer or agency of that state." *281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011). Eleventh Amendment immunity applies to official-capacity claims against individuals. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). No exception applies to allow Plaintiffs' official-capacity claims against the Governor or the Attorney General.

Defendants are state officials sued in their individual and official capacities (Doc. 1, ¶¶ 5-6), and each is immune from suit unless Plaintiffs' claims fit within a recognized

exception. In *Ex parte Young*, the Supreme Court established a limited exception to Eleventh Amendment immunity, allowing suit against a state official for prospective injunctive relief where: (1) the official has "some connection with the enforcement" of the challenged law; and (2) the official threatens and is "about to commence proceedings" to enforce the statute. 209 U.S. 123, 156–57 (1908). The *Ex parte Young* exception "does not apply when the defendant official has neither enforced nor threatened to enforce the statute challenged as unconstitutional." *281 Care Comm*, 766 F.3d at 797. Plaintiffs are not entitled to sue the State Defendants for prospective injunctive relief under *Ex parte Young*.

### a. The Governor is immune.

The Governor is not connected to enforcement of the EOs. The responsibility for prosecuting crimes in Minnesota has been "delegate[d] . . . to the offices of county attorneys and city attorneys." *State v. Lemmer*, 736 N.W.2d at 661–62. Although the Governor has some criminal authority to prompt prosecutions by the Attorney General, *see* Minn. Stat. §8.01, that authority is merely a "safety-valve alternative[] for use in extreme cases of prosecutorial inaction," *State ex rel. Wild v. Otis*, 257 N.W.2d 361, 365 (Minn. 1977).

Even if the Governor's limited criminal authority were a sufficient connection with the enforcement of EO 20-79, the Governor is still immune from suit because he has neither threatened Plaintiffs with nor is about to commence enforcement proceedings. Plaintiffs do not allege otherwise. Since there is no risk of enforcement action by the Governor, Plaintiffs' claims do not satisfy *Ex parte Young*. *See Advanced Auto Transp.,*

*Inc. v. Pawlenty*, No. 10-159, 2010 WL 2265159, at *3 (D. Minn. June 2, 2010) (Governor immune because plaintiffs did not allege the Governor had "threatened a suit or [is] about to commence proceedings against [the plaintiff]").

### b.     The Attorney General is immune.

The Attorney General is also immune.  Although the Attorney General does have civil enforcement authority pursuant to Minnesota Statutes 8.31, Plaintiffs do not allege that the Attorney General has either threatened Plaintiffs with, or is about to commence, enforcement proceedings.  Thus, the Attorney General is immune and Plaintiffs' official claims against him must be dismissed.

### III.   ALTERNATIVELY, THE COURT SHOULD ABSTAIN FROM EXERCISING SUBJECT-MATTER JURISDICTION OVER THIS STATE LAW DISPUTE.

Even if this Court finds that *Pennhurst* does not bar Plaintiffs' claims and that Defendants are not immune under the *Ex Parte Young* doctrine, principles of federalism dictate that this Court should abstain from at least the state law claims, if not the entire matter.

### A.  The Court should abstain under *Pullman*.

*Pullman* abstention applies to actions to enjoin state officers from enforcing an allegedly unconstitutional state law.  *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941).  "[T]he purpose of *Pullman* abstention in such cases is to avoid resolving the federal question by encouraging a state-law determination that may moot the federal controversy."  *San Remo Hotel, L.P. v. City & Cnty. of San Francisco, Cal.*, 545 U.S. 323, 349 (2005).  Thus, in situations "[w]here resolution of the federal constitutional

question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal[-]state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication." *Harman v. Forssenius*, 380 U.S. 528, 534 (1965).

*Pullman* abstention requires: (1) an unsettled issue of state law, and (2) "a possibility that the state law determination will moot the federal constitutional question raised." *Nat'l City Lines, Inc. v. LLC Corp.*, 687 F.2d 1122, 1126 (8th Cir. 1982). Both conditions are met here. First, Plaintiffs' Complaint raises novel questions regarding the scope of the Governor's authority during a public-health emergency. (Compl. ¶74-81.) These are important questions of state law that had not been considered by Minnesota courts before 2020, but are at issue in pending state court actions challenging EOs. In particular, four state court proceedings raise similar issues:

- In *Free Minnesota Small Business Coalition v. Walz*, Court File No. 62-CV-20-3507 (Ramsey Cnty. Dist. Ct.) (attached as Goodwin Decl., Ex. 39.), plaintiffs sought to enjoin enforcement of the EOs on two of the same bases raised here: the non-delegation doctrine and "legislative veto". The district court granted the Governor's motion to dismiss on September 1, 2020. The plaintiffs appealed the district court's order on September 10, 2020. (Goodwin Decl., ¶ 10.)

- In *Ellison v. Schiffler et al,* Case No. 73-CV-20-3556, the Stearns County District Court has counter-claims before it that raise similar issues of the

Governor's authority to declare a peacetime emergency and issue executive orders with enhanced criminal penalties. That court already ruled on a motion for temporary injunction and heard the authority issues again on a motion to dismiss on August 28, 2020. (*Id.*, Ex. 11-12.)

- In *Buzzell v. Walz*, 62-CV-20-3623 (Ramsey County Dist. Ct), the court dismissed claims that plaintiff was entitled to compensation under the Takings Clause of the Minnesota Constitution because of restrictions imposed by Emergency Executive Orders 20-04, 20-48, 20-62, and 20-63. (Order and Memorandum, *Buzzell v. Walz*, 62-CV-20-3623 (Ramsey County Dist. Ct Oct. 9, 2020), p. 4-7) (Goodwin Decl. Ex. 16). Plaintiff's appeal period has not expired.

- Finally, the Chief Justice of the Minnesota Supreme Court has thrice dismissed proposed recall petitions on issues of the Governor's emergency authority. (*Id.*, Exs. 13-15.)

Second, resolution of the state constitutional question could substantially alter or limit the nature of this Court's inquiry with respect to Plaintiffs' federal claims. For example, if the state courts hold that the Governor lacked authority to issue the EOs, such a ruling would obviate entirely the need for this Court to enjoin enforcement of the EO on the basis that they violate Plaintiffs' constitutional rights. *See, e.g.*, *Doe v. McCulloch*, 835 F.3d 785, 788 (8th Cir. 2016). Under these circumstances, the Court should abstain from exercising jurisdiction pending the conclusion of the state court proceedings. *See*

*Growe v. Emison*, 507 U.S. 25, 32 n.1 (1993).[4]

**B. The principles of *Colorado River* also support abstention from deciding Plaintiffs' state law claims.**

"*Colorado River* permits federal courts to decline to exercise jurisdiction over cases where parallel state court litigation is pending, meaning that there is a substantial likelihood that the state proceeding will fully dispose of the claims presented in the federal court." *Spectra Commc'ns Grp., LLC v. City of Cameron, Mo.*, 806 F.3d 1113, 1121 (8th Cir. 2015).

A threshold determination is whether the federal and state proceedings are parallel. Proceedings are parallel when there is "a substantial likelihood that the state proceedings will fully dispose of the claims presented in the federal court." *Cottrell v. Duke*, 737 F.3d 1238, 1245 (8th Cir. 2013). Considerations include "the sources of law, remedies sought, elements of proof, review on appeal, and events giving rise to each cause of action." *Fru-Con Constr. Corp. v. Controlled Air, Inc.*, 574 F.3d 527, 537 (8th Cir. 2009).

Here, *Free Minnesota* raises similar issues regarding the Governor's authority to issue the EOs that Plaintiffs challenge here in Count VI. Count VI and *Free Minnesota* arise out of the same events (the Governor's issuance of EOs in response to COVID-19),

---

[4] Alternatively, this Court could stay remaining claims under its "inherent powers." *Kreditverein Der Bank Austria Creditanstalt Fur Niederosterreich Und Bergenland v. Nejezchleba*, 477 F.3d 942, 945 (8th Cir. 2007) (recognizing the inherent powers of a district court); *Garcia v. Target Corp.*, 276 F. Supp. 3d 921, 924 (D. Minn. 2016) (listing factors to consider in connection with a motion for a stay); *Kemp v. Tyson Foods Group, Inc.*, 19 F. Supp. 2d 961, 964 (D. Minn. 1998) (considering factors and granting a stay); see also *Casiano-Montenez v. State Ins. Fund Corp.*, 707 F.3d 124, 128-29 (1st Cir. 2013) (staying all proceedings when *Pullman* abstention applied to one claim out of "[c]onsiderations of federalism, comity, and sound judicial administration").

the same statutes and law (the Minnesota Constitution, U.S. Constitution, and Minnesota Emergency Management Act), and seek the same relief (enjoining enforcement of one or more EOs).

After establishing that the matters are parallel, courts look at several factors to assess whether abstention is appropriate, including whether maintaining separate actions may result in piecemeal litigation, the relative progress made in the cases, whether state or federal law controls, and the adequacy of the state forum to protect the federal plaintiff's rights. *See Spectra Commc'ns Grp.*, 806 F.3d at 1121.

Those factors all weigh in favor of abstention from deciding Plaintiffs' state law claims. The "predominant factor"—the risk of piecemeal litigation—is present because there is a risk that this Court's decision would conflict with the state court decisions regarding the Governor's authority to issue the EOs and create uncertainty regarding the enforceability of the EOs. The relative progress factor also weighs in favor of abstention, because the state court actions are further along. Judge Gilligan of the Ramsey County District Court granted the Governor's motion to dismiss in *Free Minnesota*, and that case is now before the Minnesota Supreme Court. (Goodwin Decl., Ex. 10.)

Perhaps most importantly, abstention is warranted because Plaintiffs' claims raise novel issues of state law and there is no indication that state courts are an inadequate forum to address these uniquely state-law issues. *See, e.g., Godfrey v. Branstad*, 56 F. Supp. 3d 976, 985-86 (S.D. Iowa 2014) (existence of state-law issues weighed "heavily in favor" of abstention where "Iowa courts have a particularly important interest in the outcome of this action because it requires a determination of an important

state law issue regarding . . . the powers of the current and future Governors"). Throughout this pandemic, federal courts have properly deferred to state courts where plaintiffs go beyond constitutional challenges and challenge the very authority of a governor to act under state law. *See Midwest Inst. of Health, PLLC v. Whitmer*, No. 1:20-cv-414, 2020 WL 3248785, at *3 (W.D. Mich. June 16, 2020) (declining to "interpret a novel question of state law for the first time—particularly a question of state law that might affect every citizen in the state of Michigan"); *Open Our Oregon v. Brown*, No. 6:20-cv-773, 2020 WL 2542861, at *3 (D. Or. May 19, 2020) (declining to exercise supplemental jurisdiction where "the Oregon Supreme Court will soon rule on the novel issue of state law").

In short, Plaintiffs ask this federal Court to wade into issues of first impression impacting the state law authority of the state's highest executive to act in times of emergency at a time when numerous Minnesota state courts are reviewing identical issues. The Court should decline that invitation and abstain from exercising jurisdiction over Plaintiffs' Count VI.

## IV.     ALL OF PLAINTIFFS' CLAIMS FAIL AS A MATTER OF LAW.

Plaintiffs Counts under the Contracts Clause and the First, Fifth, and Fourteenth Amendments of the United States Constitution each fail as a matter of law. First, precedent requires this Court to analyze each of these claims under the framework of *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905), a case the Plaintiffs failed to even cite in their motion for a preliminary injunction. The claims in Plaintiffs' complaint have been rejected by each court to have considered them, and this Court should join those

courts in finding the claims raised by Plaintiffs to be without merit.[5]

A.    **The Challenged Orders easily survive under the *Jacobson* Framework.**

"The Constitution does not compel courts to turn a blind eye to the realities of the COVID-19 crisis." *Cassell v. Snyders*, 20 C 50153, 2020 WL 2112374, at *6 (N.D. Ill. May 3, 2020). Thus, requests to declare invalid executive orders issued during a public health crisis are not evaluated under "traditional tiers of constitutional scrutiny." *Id.* Instead, courts give significant deference to emergency measures instituted during such crises under the standard from *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905). *See S. Bay United Pentecostal Church v. Newsom*, 590 U.S. __, 140 S. Ct. 1613, 1614 (2020) (Roberts, C.J., concurring). "[T]he majority of courts across the country have relied on *Jacobson's* framework to analyze emergency public health measures enacted to combat the spread of COVID-19." *Lewis v. Walz.*, No. CV 20-1212 (DWF/HB), 2020 WL 5820549, at *4 n 5 (D. Minn. Sept. 30, 2020).

*Jacobson* "requires courts to examine whether a measure adopted to address a public-health crisis has a 'real or substantial relation' to the crisis and, assuming that it has such a relation, whether it is 'beyond all question, a plain, palpable invasion' of a constitutional right." *Minnesota Voters All. v. Walz*, No. 20-CV-1688 (PJS/ECW), 2020

---

[5] Plaintiffs plead each constitutional violation as a separate count against the Governor, and then add a fifth count for "Section 1983 Claims" that merely incorporates the constitutional claims. (Compl. ¶70-73). Count V should be dismissed for the same reasons as Counts I-IV. Further, Count VII purports to state a separate claim for "Declaratory and Injunctive Relief," but the claim is redundant of its other claims. (Compl. ¶82-86.) "A redundant declaratory judgment claim is not a proper declaratory judgment claim and should be dismissed." *Mille Lacs Band of Chippewa Indians v. State of Minn.*, 152 F.R.D. 580, 582 (D. Minn. 1993).

WL 5869425, at \*12 (D. Minn. Oct. 2, 2020) (quoting *Jacobson*, 197 U.S. at 31). Just weeks into this crisis, the Eighth Circuit confirmed that *Jacobson* applies to emergency orders issued to combat COVID-19. It described *Jacobson* as "the Supreme Court's framework for reviewing constitutional challenges to state actions taken in response to a public health crisis." *In re Rutledge*, 956 F.3d 1018, 1027 (8th Cir. 2020). *Rutledge* then outlined the *Jacobson* test and its high level of deference to state policy makers as follows:

> [W]hen faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." Courts may ask whether the state's emergency measures lack basic exceptions for "extreme cases," and whether the measures are pretextual—that is, arbitrary or oppressive. At the same time, however, courts may not second-guess the wisdom or efficacy of the measures.

*Id.* at 1028 (8th Cir. 2020) (quoting approvingly *In re Abbott*, 954 F.3d 772, 784-85 (5th Cir. 2020), which quoted *Jacobson*). Because the Challenged Orders are the same sort of emergency measures at issue in *Jacobson* and *Rutledge*, precedent requires the Court to analyze their constitutionality using the *Jacobson* test. *Minnesota Voters All. v. Walz*, 2020 WL 5869425, at \*12; *Lewis*, 2020 WL 5820549, at \*4.

Application of *Jacobson* is dispositive and demonstrates that Plaintiffs' claims cannot succeed. Plaintiffs do not even cite *Jacobson* in arguing that the Challenged Orders violate their constitutional rights.

**1.  The Challenged Orders have a real and substantial relation to protecting public health.**

Courts across the country have concluded that "[t]he COVID-19 pandemic constitutes the sort of public health crisis—or epidemic of disease which threatens the safety of [a community's] members—contemplated by the *Jacobson* court." *Minnesota Voters All.,* 2020 WL 5869425, at *12. *See also Amato,* 2020 WL 2542788 at *10; *see Spell v. Edwards*, No. 20-00282, 2020 WL 2509078, at *4 (M.D. La. May 15, 2020).  At least four court federal courts have recognized that eviction moratoria are an effective means of controlling the spread of COVID-19 because such measures "keep tenants in place" and allow for social distancing.  *Baptiste v. Kennealy*, No. 1:20-CV-11335-MLW, 2020 WL 5751572, at *25 (D. Mass. Sept. 25, 2020) (Applying *Jacobson* to deny preliminary injunction regarding Massachusetts' eviction moratorium). *See also HAPCO v. City of Philadelphia*, No. CV 20-3300, 2020 WL 5095496, at *9 (E.D. Pa. Aug. 28, 2020) (recognizing the city had a "significant and legitimate purpose" in enacting eviction moratorium due to economic circumstances caused by pandemic); *Auracle Homes, LLC v. Lamont*, No. 3:20-CV-00829 (VAB), 2020 WL 4558682, at *21 (D. Conn. Aug. 7, 2020) (finding executive order prohibiting evictions did not violate constitutional rights of landlords); *Elmsford Apartment Assocs.*, 2020 WL 3498456, at *14.  Finally, in issuing a nationwide ban on evictions, the CDC noted that state and federal restrictions on evictions had likely prevented an eviction wave that would have decreased the efficacy of social distancing measures and forced people into either congregate settings or homelessness. *CDC Moratorium*, 85 Fed. Reg. 55295. The

Challenged Orders have a "real and substantial relationship to public health."

In addition to completely ignoring the *Jacobson* framework, Plaintiff's argument that the Challenged Orders are "unconstitutionally arbitrary" misses the point. (Pl. Mem. at p. 17.) Plaintiffs argue that the Challenged Orders are arbitrary because they protect tenants "whose tenancy might be justifiably terminated for reasons wholly unrelated to the pandemic." (Pl. Mem. at p. 27.) The Challenged Orders, however, are not just intended to protect individuals who are experiencing economic hardship because of the pandemic. The Challenged Orders have the effect of allowing tenants to shelter and adhere to social distancing guidelines, whatever their economic circumstances. This is an important purpose in and of itself, as it reduces the likelihood that individuals would need to seek shelter with friends or in homeless shelters, thereby increasing the risk of transmission of the disease to others. Overall, the Challenged Orders are one of many measures to control the spread of the virus, a goal that courts throughout the country have acknowledged as being related to public health. Plaintiffs do not seriously argue otherwise. Thus, the Challenged Orders have a demonstrable relationship to public health.

> **2.      The Challenged Orders do not plainly or palpably infringe upon any fundamental rights.**

There is no basis to conclude that the Challenged Orders plainly or palpably invade Plaintiffs' fundamental rights. "[F]or the court to have the authority to intervene in the State's response to the public health crisis, the [challenged regulation] must, 'beyond all question,' violate" a fundamental right of the plaintiff. *Rutledge*, 956 F.3d at 1030.

"Jacobson instructs that all constitutional rights may be reasonably restricted to combat a public health emergency." *Lewis*, 2020 WL 5820549, at *4 (quoting *In re Abbott*, 954 F.3d 772, 786 (5th Cir. 2020) (emphasis in original)).

The Challenged Orders do not invade Plaintiffs' fundamental rights. First, none of the rights identified by Plaintiffs are fundamental. The only interests identified by Plaintiffs are business interests. The United States Supreme Court has repeatedly held that there is no fundamental right to own a business or to work in a particular profession. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 721 (2010) ("The liberties protected by substantive due process do not include economic liberties."); *Henry*, 2020 WL 2479447, at *7 ("Time and again, the Supreme Court has determined that there is no fundamental right to a job, or right to work"). And there is no constitutional right whatsoever to evict tenants. *Baptiste,* 2020 WL 5751572, at *26.

Second, and more importantly, the Challenged Orders do not infringe on the rights that Plaintiffs identify. The rights identified by Plaintiffs are discussed in turn.

### A. The Challenged Orders do not infringe on Plaintiffs' rights under the Petition Clause

The Challenged Orders do not infringe on Plaintiffs' First Amendment rights under the Petition Clause. The right of access to courts is burdened when state officials take systemic action to frustrate a plaintiff or class of plaintiffs from preparing and filing lawsuits. *Christopher v. Harbury*, 536 U.S. 403, 413 (2002). "[T]he right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher*, 536 U.S. at 415. To succeed on such a claim, the plaintiff

must show that the state action "hindered his efforts to pursue a legal claim." *Lewis v. Casey*, 518 U.S. 343, 351 (1996).

The constitutional right of access to the courts, however, does not confer a right to bring a particular cause of action or to bring an action at a preferred time. *Elmsford,* 2020 WL 3498456, at *17. Delay in obtaining one's preferred remedy does not infringe on one's right to access the courts. *See Sosna v. Iowa*, 419 U.S. 393, 410, 95 S. Ct. 553, 563 (1975). "In a nutshell, while there is a constitutional right to court access, there is no complementary constitutional right to receive or be eligible for a particular form of relief." *Baptiste*, 2020 WL 5751572, at *25 (citing *Suffolk Cnty. Jail*, 129 F.3d at 160).

The Challenged Orders temporarily limit Plaintiff's ability to bring a statutory cause of action to recover possession of the premises. Executive Order 20-14 authorized evictions in cases of substantial endangerment and violations of Minnesota Statutes § 504B.171, and Executive Order 20-79 further expanded the grounds upon which leases could be terminated. As Plaintiffs acknowledge, they can still sue their tenants to obtain a money judgment for any debt. (Pl. Mem. 9-11.) "Plaintiffs can still sue their tenants for arrearages through a breach of contract action in the New York Supreme Court – and the fact that is not their preferred remedy is of no moment." *Elmsford,* 2020 WL 3498456, at *16 (noting the availability of suits for tenant debts in rejecting access to courts claim). Every court to have considered such a challenge to a COVID eviction moratorium has rejected it. *E.g., Baptiste*, 2020 WL 5751572, at *25; *Auracle Homes,* 2020 WL 4558682. This Court should join those courts in rejecting the claim that the Challenged Orders infringe on Plaintiff's right of access to the court, and dismiss

Plaintiff's First Amendment Claim.

**B. The Challenged Orders do not violate the Contracts Clause.**

To prove an unconstitutional contract impairment, Plaintiffs must first show that the Challenged Orders substantially impaired a contractual obligation they can enforce. *Sveen v. Melin*, ⸺ U.S. ⸺, 138 S.Ct. 1815, 1821-22 (2018); *Energy Reserves Group, Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 411 (1983).   If such a substantial impairment exists, the state law is nevertheless constitutional if it serves "a significant and legitimate public purpose" and is "of a character appropriate to the public purpose justifying [the legislation's] adoption."  *Sveen,* 138 S.Ct. at 1821-22 (citation omitted). "[T]he implied contractual rights conferred by state laws, including judicial remedies such as eviction, may be the subject of a Contracts Clause claim 'only when those laws affect the validity, construction, and enforcement of contracts.'" *Elmsford*, 2020 WL 3498456, at *14 (S.D.N.Y. June 29, 2020) (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 189 (1992)).

Here, even if rights under the Contracts Clause are fundamental rights,[6] the Challenged Orders do not substantially impair Plaintiff's contractual rights. To determine whether a law "substantially impairs" contract rights the court considers "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen,* 138 S. Ct. at 1822.  The Challenged Orders do not affect a tenant's obligation to pay rent

---

[6] Plaintiffs cite no case establishing that the Contracts Clause creates fundamental rights.

or change any other term of the lease. "As the tenants are still bound to their contracts, the contractual bargain is not undermined and landlord rights are safeguarded." *HAPCO v. City of Philadelphia*, No. CV 20-3300, 2020 WL 5095496, at *8 (E.D. Pa. Aug. 28, 2020). In fact, the only contractual or statutory right it affects at all is the landlord's right to recover possession of the premises, and that right is only affected temporarily. "The eviction moratorium does not eliminate the suite of contractual remedies available to the Plaintiffs; it merely postpones the date on which landlords may commence summary proceedings against their tenants." *Elmsford*, 2020 WL 3498456 at *15. As the courts in *Elmsford* and *HAPCO* found, Plaintiffs cannot show the Challenged Orders substantially impair their residential leases. The Contracts Clause claim therefore fails as a matter of law.

The analysis could end there, as Plaintiff's failure to establish a substantial impairment is fatal to its Contracts Clause claim. But the Challenged Orders unquestionably serve a "significant and legitimate purpose" and are designed to meet that purpose. The relevant inquiry is "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S. Ct. at 1822. Controlling the spread of COVID-19 is unquestionably a significant and legitimate purpose. *Rutledge*, 956 F.3d 1018, 1027; *HAPCO*, 2020 WL 5095496 at *9 (City had a "significant and legitimate purpose" for imposing eviction moratorium). The Challenged Orders serve that purpose by protecting housing security, which provides individuals with a place to shelter if they are ill, a means of socially distancing, and reduction in the likelihood that they will be forced into homelessness or congregate

housing. The Challenged Orders also are one measure to control the spread of a deadly disease in the population at large. The Contracts Clause claim should be dismissed.

### C. Plaintiffs' property has not been taken as a matter of law.

Plaintiffs' takings claim has at least two fatal defects. First, contrary to Plaintiffs' arguments, there has been no physical taking as a matter of law. Second, government exercises of police powers to prevent harm do not give rise to regulatory takings under *Penn Central*.

#### 1. The Challenged Orders do not effect physical takings.

First, contrary to Plaintiffs' argument, the Challenged Orders have not resulted in a physical taking of their property. "The government effects a physical taking only where it requires the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992) (emphasis in original). "The Supreme Court has ruled that a state does not commit a physical taking when it restricts the circumstances in which tenants may be evicted." *Elmsford Apartment Assocs., LLC v. Cuomo*, No. 20-CV-4062 (CM), 2020 WL 3498456, at *7 (S.D.N.Y. June 29, 2020) (citing *Yee*, 503 U.S. at 527). Plaintiffs chose to purchase their properties for the express purpose of renting them, and any restriction on their right to evict tenants is only temporary. It therefore is not a physical taking as a matter of law. *Baptiste*, 2020 WL 5751572, at *20.

#### 2. The Challenged Orders are not regulatory takings

Similarly, the Challenged Orders do not amount to a regulatory taking. Federal analyze regulatory takings under the three-part *Penn Central* test. Under *Penn Central,* a court considering a takings claim must review: (1) the economic impact of the regulation

27

on the person suffering the loss; (2) the extent to which the regulation interferes with distinct investment backed expectations; and (3) the character of the government action to assess whether the complained of action effected a taking of private property for public use. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). "Because of the ad-hoc nature of regulatory takings analysis, facial challenges brought under the Takings Clause 'face an uphill battle ... made especially steep" when the parties seeking relief "have not claimed ... that [government action] makes it commercially impracticable' for them to continue business operations on their property." *Elmsford Apartment Assocs., LLC,* 2020 WL 3498456, at *9 (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495–96 (1987)).

First, the Supreme Court has repeatedly made clear that the Takings analysis focuses on the "parcel as a whole." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 517 n 5 (1987) (quoting *Penn Central*). But both Plaintiffs focus their takings claim on a subset of their property – that which is occupied by tenants who are not paying rent. Plaintiff Heights complains that an five of the seventeen units it recently purchased are not "regularly" paying rent. (Compl. ¶ 30.) Plaintiff Walnut Trails states that 10 percent of the units in a 168-unit complex have not paid "regularly or on time" since March. (Compl. ¶39.) But in addition to being vague, neither of these claims alleges sufficient economic impact as a matter of law to satisfy the first prong of the *Penn Central* test. *Elmsford,* 2020 WL 3498456, at *10 (rejecting takings claim because "vague" allegations that a subset of tenants are not paying is not enough to be a taking under the first prong of *Penn Central*).

Plaintiffs fair no better under the second prong of Penn Central. "[R]easonable investment-backed expectations cannot operate apart from 'public programs adjusting the benefits and burdens of economic life to promote the common good.'" *Auracle Homes*, 2020 WL 4558682, at *15 (quoting *Penn Central*, 438 U.S. at 124). *See also Elmsford,* 2020 WL 3498456, at *11-12 (S.D.N.Y. June 29, 2020). As in *Auracle Homes* and *Elmsford*, residential rental property in Minnesota is governed by a complex regulatory scheme that includes restrictions on the unfettered ability to conduct business free from government oversight. *See* Minn. Stat. Ch. 504B. The temporary restrictions of the Challenged Orders do not, therefore, interfere with Plaintiffs' reasonable, investment-backed expectations.

Finally, the third factor of the *Penn Central* test is dispositive and fatal to Plaintiffs' takings claim. Where "'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land," there is no Fifth Amendment Taking. *Penn Cent.*, 438 U.S. at 125; *Baptiste*, 2020 WL 5751572, at *22 (temporary eviction moratorium was a "public program adjusting the benefits and burdens of economic life to promote the common good" and therefore not a *Penn Central* taking as a matter of law). Here, as conceded by Plaintiffs, the Challenged Orders have a clear purpose to prevent harm to the public. (Pl. Mem. at p. 16.) This third factor of the Penn Central analysis carries even greater weight in light of *Jacobson*, which affords elected officials substantial latitude to protect public health. *Jacobson*, 197 U.S. at 25.

The allegations in Plaintiffs' Complaint do not satisfy any part of the *Penn Central* test. The claim therefore fails as a matter of law and should be dismissed.

### D. Plaintiff's Substantive Due Process claim fails as a matter of law.

Plaintiffs claim a Due Process violation based on "the amalgam of violations already complained of," an argument that the Supreme Court has rejected time and time again. (Compl. Count IV; Pl. Mem. at 25.) "Where a particular Amendment provides an explicit textual source of constitutional protection' against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Stop the Beach Renourishment, Inc.*, 560 U.S. at 721 (internal quotations omitted). As discussed above, there is no "amalgam" of constitutional violations, and even if there was, Plaintiffs cite no authority that would allow them to aggregate the constitutional violations into "a Due Process violation greater than the sum of its parts." (Pl. Mem. at p. 25.) Such a result would be inconsistent with decades of Supreme Court precedent. *Stop the Beach Renourishment, Inc.*, 560 U.S. at 721.

Moreover, Plaintiffs are required to identify a liberty or property interest that Defendants have infringed upon. "Merely labeling a governmental action as arbitrary and capricious, in the absence of the deprivation of life, liberty, or property, will not support substantive due process claim." *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999) (affirming dismissal of substantive due process claim because of failure to identify a liberty interest). Plaintiffs have not identified a protected interest different from that which they have discussed above. "[T]he Due Process Clause cannot do the work of the Takings Clause." *Auracle Homes*, 2020 WL 4558682 at *19 (requiring landlords to identify a property interest independent of that identified in their takings claim to pursue

substantive due process claim related to eviction moratorium).  Therefore, there is no likelihood of success on their substantive due process claim.

***

For all of the foregoing reasons, the Challenged Orders are well within the State's authority under *Jacobson*.  Because Plaintiffs have not demonstrated that any of their fundamental rights are plainly violated by the Challenged Orders, the court "may not second-guess the wisdom or efficacy of the measures," *In re Rutledge*, 2020 WL 1933122, at *5, and Plaintiffs cannot succeed on their claims as a matter of law.

### B.    EVEN WITHOUT *JACOBSON*, THE ORDER IS CONSTITUTIONAL

Assuming *arguendo* that the deferential *Jacobson* standard does not apply, none of Plaintiffs' constitutional claims are cognizable and therefore not likely to succeed.

As explained *supra*, the United States Supreme Court has repeatedly held that there is no fundamental right to own a business or to work in a particular profession, nor is there a fundamental right to evict.  *Supra* p. 23.  As discussed above, Complaint identifies only business and economic interests.  (Compl. ¶27.)  To the extent the court finds *Jacobson* inapposite, Plaintiffs' claims are subject to rational basis review. "Because all that must be shown is any reasonably conceivable state of facts that could provide a rational basis for the classification, it is not necessary to wait for further factual development." *Carter v. Arkansas*, 392 F.3d 965, 968 (8th Cir. 2004) (dismissing Equal Protection claim) (internal quotations and citations omitted).

Under a federal constitution rational basis analysis, courts do not second guess the wisdom of a law, nor do they require that distinctions among unprotected classes be

precisely tailored. *See*, *e.g.*, *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 316 (1976); *Stiles v. Blunt,* 912 F.2d 260, 267 (8th Cir.1990). Further, whether the identified legitimate state interests were actually considered in establishing the prohibition is irrelevant. *See Flemming v. Nestor,* 363 U.S. 603, 612 (1960). Likewise, whether a state actor "was unwise in not choosing a means more precisely related to its primary purpose is irrelevant." *See Vance v. Bradley*, 440 U.S. 93, 109 (1979) *citing Califano v. Jobst*, 434 U.S. 47, 56–58 (1977). Here, the Challenged Orders are supported by more than a rational basis. As the Governor explained in issuing Executive Order 20-14, public health is promoted by stabilizing households. Losing shelter has the effect of decreasing individuals' ability to comply with other orders and increases the risk that individuals will get sick. This, in turn, increases community spread of the virus. Plaintiffs identify a number of policy choices they believe would have been more prudent, but identify no authority requiring the Governor to adopt them. (Pl Mem. p. 16-17.) Because the Challenged Orders are supported by a rational basis, Plaintiffs' constitutional claims fail as a matter of law even without the *Jacobson* analysis.

# CONCLUSION

As discussed in Defendant's opposition to Plaintiffs' motion for injunctive relief, Defendants understand that the measures necessitated by the pandemic have not been easy or painless. Plaintiffs' Complaint, however, presents a number of jurisdictional issues and simply fails to state a claim for which relief can be granted. For the foregoing reasons, Defendants respectfully request that Plaintiffs' complaint be dismissed in its entirety and with prejudice.

Dated:  October 16, 2020

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota


/s/ Michael Goodwin
LIZ KRAMER (#0325089)
Solicitor General

MICHAEL GOODWIN (#0390244)
Assistant Attorney General

445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
liz.kramer@ag.state.mn.us
(651) 757-1010 (Voice)
michael.goodwin@ag.state.mn.us
(651) 757-1456 (Voice)

Attorneys For Defendants
Tim Walz and Keith Ellison

|#4818994-v1