## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| Heights Apartments, LLC, and Walnut Trails, LLLP, | Case No. 20-cv-2051 NEB-BRT |
| Plaintiffs, | |
| v. | |
| Tim Walz, in his official capacity as Governor of the State of Minnesota, and Keith Ellison, in his official capacity as Attorney General of the State of Minnesota, and John Doe, | **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | |

### Introduction

The parties in this case are arguing two competing but not wholly concurrent issues of law. First, Plaintiffs have moved for a preliminary injunction, which has now been fully briefed by the parties. Defendants have also moved to dismiss Plaintiffs' complaint. The issues raised by these two motions are similar, and thus the briefs are necessarily similar.

### The COVID-19 Pandemic, and the State and Federal Response

As Plaintiffs have already noted, they have brought this suit with full knowledge and agreement that the COVID-19 pandemic has been and continues to be a grave issue that permeates every aspect of the lives of everyone around the globe. Defendants have devoted a substantial portion of their briefing to this proposition. (Def. Br., 1–7.) Plaintiffs accept not just the fact of the pandemic's existence, but the fact that its existence compels

government officials like Defendants here to take active measures to combat it. The constitutional question is not whether, but how.

Defendant Governor Tim Walz has issued three executive orders related to housing: EOs 20-14, 20-73, and 20-79 (collectively, "EOs"). These EOs were expressly intended to keep Minnesotans in their homes regardless of their ability to pay or even whether non-payment was the factor in the termination of the lease. (EO 20-14, at 1–2.) The EOs bar the termination of leases, non-renewal of leases, or the filing of evictions under all but the most extreme circumstances; namely, when a tenant:

    a. Seriously endangers the safety of other residents;
    b. Violates Minnesota Statutes 2019, section 504B.171, subdivision 1;
    c. Remains in the property past the vacate date after receiving a notice to vacate or nonrenewal under paragraph 4 of this Executive Order [allowing property owners to move family members into their property]; or
    d. Materially violates a residential lease by the following actions on the premises, including the common area and the curtilage of the premises:
        i. Seriously endangers the safety of others; or
        ii. Significantly damages property.

(*Id.* at 2 ¶ 2.)  imposing both criminal and civil sanctions on property owners who attempt to do so. (EO 20-79, at 2–3.) By the nature of executive orders, the Legislative and Judicial branches of state government had no voice in these orders. It is the power of the State enacted by one man and ratified by the other executive officials elected on his ticket. Minn. Stat. § 12.31, subd. 2. Plaintiffs do not challenge the Governor's authority in general to issue emergency orders in response to a pandemic.

But entering the sixth month of this situation without any concerted action, Plaintiffs are here requesting that this Court review the EOs at issue and determine that they contravene their Constitutional rights. As the Governor noted in issuing EO 20-79, "[w]e have continued to slowly and safely reopen Minnesota's economy and, in line with those actions, recognize that tenants may begin to move more safely. At the same time, I recognize that COVID-19's economic impact continues to influence the ability of tenants and homeowners to pay their rent and mortgages." (EO 20-79, at 1.) Yet while businesses reopen, bars and restaurants reopen, and sporting events have reopened, the orders prohibiting property owners from bringing evictions because of "COVID-19's economic impact" remains. Plaintiffs have brought a Complaint in the above-captioned action to vindicate these rights.

### Plaintiffs' Allegations Related To Their Businesses

In this posture, the factual basis of Plaintiffs' claim is straightforward. Plaintiffs are the owners of rental properties, comprising a little under 200 rental units. (Compl., ¶¶ 29, 30, 32, 38.) Plaintiffs have laid out a number of examples of how their businesses have been impaired by the EOs. A significant number of their tenants have not paid their rent in full and on time (Compl., ¶¶ 30–32, 39–40), have interfered with proper management of the property including the ability to comply with local ordinances (*id.* at ¶¶ 30–32), or have significantly impaired the use and enjoyment of the properties for other tenants, causing at least one and possibly more tenants to leave. (*id.* at ¶ 30.)

These tenants would normally be subject to eviction, or at least, the termination of their tenancies at the end of the rental period. (Compl., ¶¶ 31, 33, 41.) Despite this, for the

last six months and more the EOs at issue have prevented both evictions and the terminations of tenancies, requiring Plaintiffs to continue the tenancies of renters who have not paid, who have substantially breached their lease agreements, and who continue to interfere with the use and enjoyment of the residencies of other tenants. As a result, Plaintiffs' businesses and their other tenants have been harmed.

## Legal Standard

Under Fed. R. Civ. P. 12, a Complaint must be dismissed if the claim lacks subject matter jurisdiction, or if the Complaint fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(1), (6). To survive a Rule 12 motion to dismiss, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## Argument

As a result of the EOs at issue, Plaintiffs have been denied access to the courts in all but the most extreme circumstances to enforce their lease agreements. They have been denied these rights for almost eight months, without any provision for compensation or access to judicial review, and there is no end in sight. The EOs at issue deny Plaintiffs their basic rights under the First, Fifth, and Fourteenth Amendments, as well as impairing their right to contract under the U.S. Constitution. The denial of these fundamental rights, and the likelihood that these rights will be vindicated at trial, as well as the long line of cases defending these rights, outweighs Defendants' argument that the current emergency grants them *carte blanche* to infringe on Plaintiffs' rights. For these reasons, this Court should deny Defendants' motion to dismiss.

4

I.    **Defendants Are Not Immune From Suits Alleging That Their Actions Were Completely Without Authority, Nor Does The Eleventh Amendment Bar Official Capacity Suits For Prospective Relief**

Defendants' first argument is that the Court has no jurisdiction to hear the claims brought before it. This is incorrect. While normally federalism concerns prevent federal courts from instructing state officials on how to interpret state law, that same concern does not apply when a state official acts without any authority whatever. Similarly, suits against state officials in their official capacity are permitted when they request prospective injunctive relief, as Plaintiffs' Complaint does.

A. **The Portions Of The EOs Which Are Enactments Of Pure Legislative Or Judicial Power Are *Ultra Vires* And May Be Challenged**

Defendants argue that *Pennhurst State Sch. & Hosp. v. Halderman* prevents Plaintiffs from challenging the EOs as *ultra vires.* 465 U.S. 89, 106 (1984) (Def. Br., 9.) While normally federal courts decline to instruct state officials on state law, *Pennhurst* itself notes an exception. "These and other modern cases make clear that a state officer may be said to act ultra vires only when he acts 'without any authority whatever.' As the Court in *Larson* explained, an ultra vires claim rests on 'the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient.'" *Id.* at 101 n.11 (citations omitted). Thus, the Court in *Pennhurst* acknowledged the distinction between a claim that a state actor had incorrectly applied state law and a claim that the state actor had no power to act based on a lack of delegated power. *Id*. Plaintiffs do not challenge the fact that some emergency powers have been delegated to the Governor, nor do they argue that this delegation was impermissible. The argument here is that the powers

5

delegated to the Governor—to "make, amend, and rescind the necessary orders and rules"—does not delegate to him pure legislative or judicial functions. Minn. Stat. § 12.21, subd. 3(1).

Portions of the EOs at issue do just this. For example, the Minnesota Supreme Court has explained that "[p]ure legislative power, which can never be delegated, is the authority to make a complete law—complete as to the time it shall take effect and as to whom it shall apply—and to determine the expediency of its enactment." *Lee v. Delmont*, 36 N.W.2d 530, 538 (Minn. 1949). So while the Governor can validly make emergency rules and regulations, he cannot substantively change the law—for instance, by adding a seven-day notice period for an eviction when the procedural and substantive requirements for eviction are wholly laid out by the legislature in Minn. Stat. ch. 504B. (*See* EO 20-79, at 3 ¶ 6.) Nor can he simply instruct that the judiciary not to hear cases or controversies it is authorized to hear, any more than he could set up executive courts to hear eviction cases based on his emergency powers. *Pennhurst* does not prevent Plaintiffs from challenging these *ultra vires* acts.

### B. Defendants Are Not Immune From Suit Challenging The EOs They Wrote And Enforce

Defendant Gen. Ellison, who has brought suit to enforce the EOs, and Defendant Governor Walz, who signed each EO into effect, claim they are immune from suit challenging the EOs at issue. (Def. Br., 10.) Here, the Governor has enacted the first EO, 20-14, and continues himself to modify it. It would be a strange reading of immunity to state that the Governor is not a proper party to defend the EOs he himself has signed.

Additionally, the EOs direct Attorney General enforcement against property owners and their attorneys, not only with criminal but also civil penalties. (EO 20-79, 3 ¶ 10.) The Supreme Court has held that "[p]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).

Defendants rely on the claim that there is no allegation that "there is no risk of enforcement action" because "the Attorney General has [n]either threatened Plaintiffs with, or is about to commence, enforcement proceedings." (Def. Br., 11–12.) But Plaintiffs are not required to subject themselves to criminal or civil proceedings in order to have standing. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29, (2007). Defendants are not immune from a suit challenging their EOs.

## II.   The Court Should Not Abstain When The Questions Presented To This Court Are Not Presented In Any State-Court Action

Next, Defendants argue that this Court should abstain from hearing this matter to allow state courts to determine the issues. (Def. Br., 13.) However, Defendants have not cited to any state court which is currently positioned to rule on the issues at question in *this* litigation, and Plaintiffs are aware of none. While the uncertainty over the pandemic and the scope of the Governor's powers has certainly been litigated and continues to be litigated, this Court should not invoke a prudential doctrine so broadly.

### A. *Colorado River* Abstention is Not Appropriate

As Defendants correctly noted, "*Colorado River* permits federal courts to decline to exercise jurisdiction over cases where parallel state court litigation is pending, meaning

that there is a substantial likelihood that the state proceeding will fully dispose of the claims presented in the federal court." *Spectra Commc'ns Grp., LLC v. City of Cameron, Mo.*, 806 F.3d 1113, 1121 (8th Cir. 2015). Where the parties disagree, however, is on whether the litigation cited by Defendants is sufficiently parallel that there is a "substantial likelihood" that the state proceedings will fully dispose of Plaintiffs' claims.

Here, the four cases cited by Defendants will not fully dispose of Plaintiffs' claims; indeed, they are likely to have little impact. The closest case to resolving any of the issues before the Court is *Free Minnesota Small Business Coalition v. Walz*, where the plaintiffs argued generically that Minnesota Emergency Management Act ("MEMA") violated the non-delegation doctrine solely with regard to the delegation of legislative powers. (Def. Br., 14; *see* Goodwin Decl., Ex. 10, at 27.) Judicial powers were never addressed. (*See generally, id.*) More importantly, however, that case addressed non-delegation, arguing the Governor's actions were improper because the statute was an impermissible delegation of legislative power. (*Id.*) Plaintiffs' argument is the opposite: accepting that the statute is not impermissibly broad, the Governor has nonetheless violated the separation of powers in his exercise of those powers. (*See* Compl., ¶¶ 74–78; *see* also, e.g., EO 20-79, at 3 ¶ 6 (making substantive changes to the law by imposing a new seven-day notice period on property owners)). Put simply, Plaintiffs could accept the holding of the state court completely without changing a word of their Complaint.

*Ellison v. Schiffler et al*, and *Buzzell v. Walz*, both cited by Defendants, bear a resemblance to the case at bar. (Def. B.r, 14–15; *see* Goodwin Decl., Exs. 11–12, 16.) Neither addressed several issues at the heart Plaintiffs' case: violations of the right of

access to the courts, or violations of the Contracts Clause. (*See id.*) As the court noted in *Buzzell*, a Takings Clause analysis may be "case-specific"; at the very least, it involves an analysis—as the court conducted—of the specific harm to the specific plaintiff. (Goodwin Decl., Ex. 16, at 4–5.) An analysis of the partial closure of a bar has little bearing on Plaintiffs' Takings Clause claims. Even the substantive due process counterclaim in *Schiffler* gives little indication that it overlaps in any meaningful way with the claims before this Court. (*Id.*, at ¶¶ 216–22.) And the recall petitions cited by Defendants have no relevance here at all. (Def. Br., 15.)

### B. *Pullman* Abstention Is Not Applicable Here

"As a rule, federal courts are required to exercise their jurisdiction when invoked to redress alleged constitutional deprivations by state administrative actions; it is only in exceptional circumstances that a federal court may abstain from decision for state resolution of preliminary issues." *Coley v. Clinton*, 635 F.2d 1364, 1372 (8th Cir. 1980). *Pullman* abstention is not an exercise of federalism, but of judicial restraint. When state-law questions are unclear, such that a decision regarding the state law might preclude the need to rule on the federal questions, abstention is appropriate. *Cf. Torres v. Precision Indus., Inc.*, 938 F.3d 752, 754 (6th Cir. 2019) (Courts should not decide "questions of a constitutional nature unless absolutely necessary to a decision of the case or formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied") (internal quotations omitted) (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)). Thus, *Pullman* abstention is applicable when the state law is unclear. Here, the question is not the proper interpretation of the EOs at

issue, but whether the plain language of the EOs, which no party disputes, is unconstitutional. *Pullman* is therefore not applicable here.

### III.   Defendants' Repeated Citations to *Jacobson* Are Not Well-Founded

Defendants make several references to Plaintiffs' failure to cite their preferred case on this issue, *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). Rather than examine why the case is important to this analysis, however, Defendants simply cherry-pick a sentence from the opinion in support of their position. The case is worth a full analysis in light of the heavy emphasis Defendants (and many courts) place on it.

#### A.  Factual Basis of Case and Holding

*Jacobson* was a challenge to a Massachusetts statute allowing local governments to mandate vaccinations during the smallpox outbreak at the turn of that century, if they considered it necessary in their locality. 197 U.S. at 12. Jacobson, who had been criminally convicted for refusing and subjected to the $5 fine, challenged this law under the preamble to the U.S. Constitution and the "spirit of the Constitution," as well as the Fourteenth Amendment. *Id.* at 13–14. Essentially, this challenge was the equivalent to similar challenges today to mask mandates: The question presented was one of individual liberty versus a legislative determination related to public health.

The Court in *Jacobson* analyzed the case as one of police powers, allowing that such power encompassed "such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety." 197 U.S. at 25 (citing cases). The Court noted the tension between the role of the Legislature—"[t]he good and welfare of the commonwealth, of which the legislature is primarily the judge, is the basis

10

on which the police power rests in Massachusetts," *id.* at 27—and the Judiciary—to protect against "police power" laws passed "in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons." *Id*. at 28 (citing cases when "under the guise of exerting a police power, [health laws] invaded the domain of Federal authority, and violated rights secured by the Constitution, [and] this court deemed it to be its duty to hold such laws invalid." *Id.*) It is in this context that the only quoted sentence of *Jacobson* in Defendants' brief appears.

> If there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Id*. at 31 (citing *Mugler v. Kansas*, 123 U. S. 623, 661 (1887); *Minnesota v. Barber*, 136 U. S. 313, 320; *Atkin v. Kansas*, 191 U. S. 207, 223 (1903)). In each of the cited cases, just as in the cited passage above and the several pages of analysis preceding it, the Court was trying to avoid substituting its own judgment for that of the fully-formed factfinding of a legislature. *See Mugler* 123 U. S. at 661 ("Under our system that power is lodged with the legislative branch of the government"); *Barber*, 136 U. S. at 320 ("The rule is general, with reference to the enactments of all legislative bodies, that the courts cannot inquire into the motives of the legislators in passing them") (quoting *Soon Hing v. Crowley*, 113 U.S. 703, 710 (1885)); *Atkin*, 191 U. S. at 223 ("No evils arising from such legislation could be more

far-reaching than those that might come to our system of government if the judiciary, abandoning the sphere assigned to it by the fundamental law, should enter the domain of legislation, and, upon grounds merely of justice or reason or wisdom, annul statutes that had received the sanction of the people's representatives.") Executive power was not mentioned; the Court's deference was to legislative fact-finding about medical issues.

### B. Jacobson Was Often Cited, But Historically For The Simple Proposition That Individual Liberty Is Not Absolute

Despite Defendants' assertions of the far-reaching scope of this new formulation of law, for well over a century *Jacobson* was often cited, but for the fairly unremarkable principle that individual liberty was not absolute, and the state possessed the police power to regulate the health of its citizens. *See*, e.g., *Roe v. Wade*, 410 U.S. 113, 154 (1973) ("The privacy right involved, therefore, cannot be said to be absolute. In fact, it is not clear to us that the claim asserted by some amici that one has an unlimited right to do with one's body as one pleases bears a close relationship to the right of privacy previously articulated in the Court's decisions. The Court has refused to recognize an unlimited right of this kind in the past. *Jacobson v. Massachusetts*"); *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 857 (1992) (cited for the same principle); *Washington v. Glucksberg*, 521 U.S. 702, 742 (1997) (citing *Jacobson* in examples recognizing "that this common-law right to refuse treatment is neither absolute nor always sufficiently weighty to overcome valid countervailing state interests"); *Wisconsin v. Yoder*, 406 U.S. 205, 230 (1972) (citing *Jacobson* as part of the argument that religious actions are "not totally free from legislative restrictions"); *Employment Div., Dept. of Human Res. of State of Or. v. Smith*, 485 U.S.

660, 670 n.13 (1988) (same). Indeed, the same Court which issued *Jacobson* issued *Lochner* two months later and noted that *Jacobson* was "related to compulsory vaccination, and the law was held valid as a proper exercise of the police powers with reference to the public health . . . . That case is also far from covering the one now before the court." *Lochner v. New York*, 198 U.S. 45, 56 (1905), abrogated in subsequent cases. "There is, in our judgment, no reasonable foundation for holding this to be necessary or appropriate as a health law to safeguard the public health, or the health of the individuals who are following the trade of a baker. The case differs widely, as we have already stated, from the expressions of this court in regard to laws of this nature." *Id*. at 58 (citing *Jacobson*). Even the Court which issued both opinions did not regard *Jacobson's* scope as broad enough to extend police powers from a doctor's office to a bakery.

When *Jacobson* has been cited by the high court in the context of emergency powers, the references have been spare, passing, or in dissent. *See*, e.g. *Hamdi v. Rumsfeld*, 542 U.S. 507, 592 (2004) (Thomas, J., dissenting) (citing *Jacobson* as part of the argument that the President's decision for indefinite detention of U.S. citizens as enemy combatants "is necessary to protect the public need not and should not be subjected to judicial second-guessing"). It was not cited, for instance, in *Blaisdell*, which invoked a national emergency to limit the rights of property owners to recover property by foreclosure. *See Home Bldg. & Loan Ass'n v. Blaisdell*, 209 U.S. 398 (1934).

### C.  In The Closest Analogous Case, *Jacobson* Was Cited Only To Show That A Governor's Executive Powers During An Emergency Should Be Limited Despite *Jacobson*

The closest the case has ever come to being used by the Supreme Court in an analogous case was in *Sterling v. Constantin*. In that case, the governor of Texas had declared a state of emergency due to civil unrest and issued executive orders to the Texas National Guard "regulating and restricting the production of oil from complainants' wells." 287 U.S. 378, 386–87 (1932). Naming the governor, adjutant general, and the brigadier general of the Texas National Guard as defendants, the plaintiffs (private companies whose wells were subject to interference by these executive orders) requested an injunction. *Id*. The Court quickly dismissed the defendants' arguments—also made in this case—that it lacked jurisdiction on Eleventh Amendment immunity grounds. *Id*. at 393. The Court then abstained on the argument—not made by Plaintiffs in this context—that Texas law did not grant the governor the emergency powers he claimed. *Id.* at 396. The Supreme Court then addressed the crux of the question presented by Defendants here, and unanimously and roundly rejected it at some length.

> Third. The existence and nature of the complainants' rights are not open to question. Their ownership of the oil properties is undisputed. Their right to the enjoyment and use of these properties, subject to reasonable regulation by the state in the exercise of its power to prevent unnecessary loss, destruction, and waste, is protected by the due process clause of the Fourteenth Amendment. [citing cases] . . . [A]ppellants assert that the court was powerless thus to intervene, and that the Governor's order had the quality of a supreme and unchallengeable edict, overriding all conflicting rights of property and unreviewable through the judicial power of the federal government.

> If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases, the futility of which the state may at any time disclose by the simple process of transferring powers of legislation to the Governor to be exercised by him, beyond control, upon his assertion of necessity. Under our system of government, such a conclusion is obviously untenable. There is no such avenue of escape from the paramount authority of the Federal Constitution.

As the dagger in Defendants' position, the Court went on in the very next paragraph to note that its decision was taken in full recognition of the precedent of *Jacobson*. *Id.* at 398–99.[1]

---

[1] Unlike *Jacobson*, *Sterling* has been cited often by the majority or concurrence in cases involving executive authority in times of conflict. *See*, e.g., *Duncan v. Kahanamoku*, 327 U.S. 304, 335 (1946) (Stone, C.J., concurring) (despite the attack on Pearl Harbor, "the exercise of the [executive] power may not extend beyond what is required by the exigency which calls it forth"); *Cooper v. Aaron*, 358 U.S. 1, 18 (1958) (holding that a governor and school board could not "war against the Constitution" by resisting school integration); *Hamdi v. Rumsfeld*, 542 U.S. 507, 535 (2004) (plurality opinion) (in the War on Terror, affirming right to impartial adjudicator of government's claim of enemy combatant status). *See also Toyosaburo Korematsu v. United States*, 140 F.2d 289, 297 (9th Cir. 1943), aff'd sub nom. *Korematsu v. United States*, 323 U.S. 214 (1944) (Denman, J, dissenting in part from internment of Japanese-Americans).

### D. Jacobson's New Life During The COVID-19 Pandemic

The Supreme Court has not had the occasion as yet to issue a final opinion on the COVID-19 pandemic as it relates to *Jacobson*'s new interpretation in the last six months, but has cited the case in three opinions concurring or dissenting from the denial of an application or stay of an injunction related to the pandemic. In only one of them was Defendants' position addressed directly. Justice Alito, writing for three justices who dissented from the denial of the application for an injunction against certain executive orders by the Governor of Nevada, cautioned that

> [l]anguage in *Jacobson* must be read in context, and it is important to keep in mind that *Jacobson* primarily involved a substantive due process challenge to a local ordinance requiring residents to be vaccinated for small pox. It is a considerable stretch to read the decision as establishing the test to be applied when statewide measures of indefinite duration are challenged under the First Amendment or other provisions not at issue in that case.

*Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (2020) (Alito, J., dissenting).

This is the correct analysis. For more than a century after it was issued *Jacobson* lived an uneventful life, standing for a principle so unremarkable that it was frequently mentioned and rarely examined. Now the effects of the recent emergency have breathed into it not new life, but a different life. It is no longer cited for the principle it was cited for in *Roe* and *Casey*, and *Glucksburg*, and *Yoder* and *Smith*: that a person's individual liberty

is not absolute, but must bow to reasonable restrictions based on valid uses of police power. It no longer gives the gentler guidance it was read to hold in the years following its issuance. *See German All. Ins. Co. v. Hale*, 219 U.S. 307, 317 (1911) (citing Jacobson to hold that "the state may, in the exercise of its police power, *and in harmony with its own and the Federal Constitution*, prescribe for the public convenience and the general good") (emphasis added). It no longer is subject to the warnings in *Jacobson* itself, which the Eighth Circuit interpreted to mean that "[t]he reserved police power of the state must stop when it encroaches on the protection accorded the citizen by the Federal Constitution." *Women's Kansas City St. Andrew Soc. v. Kansas City, Mo.,* 58 F.2d 593, 598 (8th Cir. 1932) (citing *Jacobson* and similar cases). Instead, a flood of cases during the pandemic have given it exactly the inverse reading and a scope that is almost boundless.

As of October 19, 2020, of the 453 times *Jacobson* has been cited by the federal courts, 154 have come since the start of the pandemic; that is, over one-third of all federal citations to *Jacobson* over the previous one hundred and fifteen years have come in the last six months. Twenty of the citations came between the filing of Plaintiffs' initial memorandum and Defendants' response. Now, some courts are interpreting *Jacobson* to hold that "[d]uring an epidemic, the *Jacobson* court explained, the traditional tiers of constitutional scrutiny do not apply."[2] *Cassell v. Snyders*, 20 C 50153, 2020 WL 2112374,

---

[2] This argument ignores the fact that, in 1905, even the idea of "tiers" of constitutional scrutiny would not exist for another 33 years. *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938).

at *6 (N.D. Ill. May 3, 2020), *on appeal* to Seventh Circuit (cited in Def. Br., 13). This Court, following the Fifth Circuit, has taken the position that "*Jacobson* instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency." *Lewis v. Walz*, CV 20-1212 (DWF/HB), 2020 WL 5820549, at *4 (D. Minn. Sept. 30, 2020) (quoting *In re Abbott*, 954 F.3d 772, 786 (5th Cir. 2020)) (emphasis in original). The Eighth Circuit in *In re Rutledge* held that in the face of a crisis, *Jacobson* imposes a higher standard than any known to law: that only "fundamental" rights are subject to protection from abuse of police powers, and even then only on a showing "*beyond all question*" that there is a "plain, palpable" invasion of that right, or a showing that the state lacks a "real and substantial relation" to the crisis. 956 F.3d 1018, 1028 (8th Cir. 2020) (emphasis added).

As this Court has noted, other district courts have not taken such a sweeping view of *Jacobson.* 2020 WL 5820549 at *4, n.5 (citing *Cnty. of Butler v. Wolf*, —F.3d—, Civ. No. 20-677, 2020 WL 5510690, at *9-10 (W.D. Penn. Sept. 14, 2020)); *see also Bayley's Campground, Inc. v. Mills,* — F. Supp. 3d —, 2020 WL 2791797 (D. Me. May 29, 2020). The sudden onslaught in the last few months of this new interpretation of *Jacobson* as a sweeping emergency-powers decision should show the Court that this is an example of an analysis seeking a precedent, rather than precedent driving analysis.

## IV.   Plaintiffs' Rights Have Been Substantially Infringed By The EOs At Issue

Finally, Defendants argue simply that "all of Plaintiffs' claims fail as a matter of law." (Def. Br., 18.) However, Plaintiffs have presented the Court with a Complaint which

validly asserts multiple violations of their constitutional rights by the EOs at issue. Therefore, Defendants' motion must be denied.

### A.  The EOs at Issue Violate The First Amendment

While Defendants do appear to concede that the right of access to the courts is a fundamental right, they argue that the EOs at issue do not infringe on Plaintiffs' rights under the First Amendment. (Def. Br., 23–25.) Defendants attempt to argue that they have not denied access to the courts in *all* case, only the overwhelming majority, and that property owners are still free to pursue the meaningless exercise of suing for money damages for past-due rent.[3] (Def. Br., 24.) This does nothing to help their argument.

The Supreme Court has called this right "among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967). More pointedly, it went on to directly refute Defendants' argument here.

> The First Amendment would, however, be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech, press, petition, or assembly as such. We have therefore repeatedly held that laws which actually affect the exercise of these vital rights cannot be sustained merely because they were enacted for the purpose of dealing with some evil within the State's legislative competence, or even because the laws do in fact provide a helpful means of dealing with such an evil.

---

[3] This begs the question: When? Every month as rent is unpaid? Only when their ability to recover possession of the property has been reinstated to property owners have any measure of the total damages which would be claimed in an action for money damages.

*Id.* (citing cases). Defendants' argument that relief can still be sought in cases of "substantial endangerment" or for illegal activities glosses over the fact that the majority of eviction actions are not brought for these purposes, and those causes of action still exist without remedy. (Def. Br., 24.) It is not what Defendants dismissively refer to as Plaintiffs' "preferred remedy" which has been cut off, it is the *only* meaningful remedy. Worse, not only do the EOs prevent Plaintiffs from seeking redress in the Courts, but they threaten both criminal prosecution and civil fines for even attempting to seek redress. (EO 20-79, at 3 ¶ 10.) The broad infringement on Plaintiffs' right to seek redress in the courts is in clear violation of the First Amendment.

### B.  The EOs at Issue Violate The Contracts Clause

Next, Defendants argue that contract rights have not been impaired, and if they have, such rights are not fundamental. (Def. Br., 24–26.) Under Art. 1, Sec. X, clause 1 of the Constitution, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." Under current precedent, the Contract Clause analysis follows a two-pronged test. The first question is whether the state law has operated as a substantial impairment of a contractual relationship. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). Second, the court examines whether the impairment "is reasonable and necessary to serve an important public purpose." *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 25 (1977).

#### 1.  The EOs at issue substantially impair the contractual relationship between Plaintiffs and their tenants

The first question before the Court on this issue is whether the EOs at issue impair Plaintiffs' contracts with their tenants. Courts should consider, in analyzing this factor, "the

extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018).

By their express terms, the EOs cut off Plaintiffs from not only the rights to regain possession, but also cut off the statutory rights on which the contracts are based. "It is manifest that the obligation of the contract, and the rights of a party under it, may, in effect, be destroyed by denying a remedy altogether." *Bronson v. Kinzie*, 42 U.S. 311, 317 (1843). Minn. Stat. § 504B.291, subd. 1 explicitly allows for eviction of a tenant for non-payment or breach of a lease. The leases at issue also specifically provide for termination of the leases on proper notice. (Compl. ¶¶ 26, 36.) The EOs at issue, just as specifically, deny those rights to property owners except under narrow circumstances—a limitation not supported in statute. (*See* EO 20-14, at 2–3.) This impairment of the right to regain possession similarly impairs every other provision in the contract—e.g. a tenant's duty to comply with management of the property, to respect the rights of other tenants, and to comply with reasonable rules and regulations—since it cuts off the only remedy for a tenant's misbehavior available to a property owner.

2. *The EOs at issue cannot be justified as reasonable and necessary to an important public purpose in light of the purpose of the Contracts Clause*

The second issue is whether an executive order which impairs contracts by indefinitely cutting off a party from meaningful remedies envisioned under the contract, without any demonstration of need, mechanism for judicial review, or provision to secure compensation, is reasonable and necessary an important public purpose.

21

Plaintiffs, of course, do not disagree that stopping the spread of COVID-19 is an important public purpose. But the purpose is only half the analysis: Defendants must also show that "the state law is drawn in an 'appropriate' and 'reasonable' way" to advance that purpose. *Sveen*, 138 S. Ct. at 1822. Here, Defendants' actions draw no lines at all between protections appropriate to the pandemic and the virtually universal prohibition on evictions under the EOs. This is best illustrated by the fact that while the EOs invoke the financial hardship of the pandemic on Minnesota citizens, the provisions of the EOs themselves do nothing to relate the protections to hardship imposed by the pandemic. The EOs stand in stark contrast to the recent CDC moratorium. The CDC moratorium only provides protections when

> 1) The individual has used best efforts to obtain all available government assistance for rent or housing;
> (2) The individual either (i) expects to earn no more than $99,000 in annual income for Calendar Year 2020 (or no more than $198,000 if filing a joint tax return),[6] (ii) was not required to report any income in 2019 to the U.S. Internal Revenue Service, or (iii) received an Economic Impact Payment (stimulus check) pursuant to Section 2201 of the CARES Act;
> (3) the individual is unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary [7] out-of-pocket medical expenses;
> (4) the individual is using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses; and
> (5) eviction would likely render the individual homeless—or force the individual to move into and live in close quarters in a new congregate or shared living setting— because the individual has no other available housing options.

*Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19*, 85 Fed. Reg. 55292, 55293. The EOs cover everyone regardless of circumstance. (EO 20-79.)

Additionally, it is notable that while Defendants have cited to $100 million in emergency assistance made available by Defendant Gov. Walz, the state agency directing that aid itself draws the very lines the EOs refuse to do, by providing assistance only to those who (like "covered persons" under the CDC moratorium) are below income thresholds and who have been financially burdened due to COVID-19. (State of Minnesota, "COVID-19 Housing Assistance Program," available at

http://www.mnhousing.gov/sites/np/covid19housingassistanceprogramFAQ, last accessed Nov. 06, 2020) ("To qualify for housing assistance, households must meet **all** of the criteria listed below . . . . Be a renter or homeowner with an income at or below 300% of federal poverty guidelines, with a preference for those at or below 200% of federal poverty guidelines [and] . . . . Be unable to make the payment(s) owed because of the public health emergency due to unemployment, illness, or another COVID-19 related issue") (emphasis in original).

Defendants' response to the very real concerns related to the COVID-19 pandemic has not been tailored to be reasonable and appropriate to the pandemic; it has not been tailored at all. It therefore cannot be said to fit under an exception to the Contracts Clause's absolute prohibition on the impairment of contracts.

### C.  The EOs At Issue Violate The Takings Clause Of The Fifth Amendment

Next Defendants argue that there has been no taking of Plaintiffs' property. (Def. Br., 27–29.) Notably, Defendants do not attempt to argue that there has been just compensation, focusing entirely on the first prong of the analysis. At issue here is the provision of the EOs which, through government regulation, deprive Plaintiffs of full use of their private property.

> *1.  The EOs at issue involve physical takings because they require property owners to allow exclusive use of their properties to others without their consent*

Defendants argue that the EOs' requirement that Plaintiffs continue to accept the physical presence of tenants over Plaintiffs' objections is not a physical taking. (Def. Br., 27.) Quoting *Yee v. City of Escondido, Cal.*, Defendants argue that "The government effects a physical taking only where it requires the landowner to submit to the physical occupation of his land." 503 U.S. 519, 527 (1992). But in *Yee*, the Court held that the that the statute at issue there did not because it "provides that a park owner who wishes to change the use of his land may evict the tenants." 503 U.S. at 527 (quoting *FCC v. Florida Power Corp.*, 480 U.S. 245, 252 (1987)) (emphasis in original). Here, the difference is crucial, since property owners are indefinitely prevented from evicting their tenants. Defendants' argument fails.

> *2.  The EOs at issue are also regulatory takings*

The Supreme Court has recognized that partial, regulatory takings are still takings. *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 137–38 (1978). The Supreme

Court in *Lingle v. Chevron U.S.A. Inc.* further explained that the *Penn Central* Court had "identified 'several factors that have particular significance.' Primary among those factors are '[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.'" 544 U.S. 528, 538–39 (2005) (quoting *Penn Central*, 438 U.S. at 124). It additionally identified the "character of the governmental action" as another factor which "may be relevant." *Id.*

As to the first factors, the economic impact and the distinct investment-backed expectations, both of these are heavily implicated by the EOs at issue. The ownership of rental property is unquestionably an investment, purchasing and paying for the cost and maintenance of a rental building explicitly for the purpose of recouping rental payments. By cutting off the ability of property owners to enforce the collection of rents, the EOs have are causing adverse economic impact and impairing the investment-backed expectations of Plaintiffs.

As to the character of the governmental taking here,

> [t]he Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.

*Armstrong v. United States*, 364 U.S. 40, 49 (1960). The *Armstrong* Court perfectly sums up the character of the action at issue here. Where, as here, a sub-group of the population is forced to bear the burden of a statewide interest in preventing homelessness during a pandemic, the regulation has the character of a taking. This conclusion is supported by the language of EO 20-14 itself, which emphasizes the statewide nature of the issue the EO is

designed to address. (EO 20-14, at 1–2) ("this pandemic . . . threatens the lives of Minnesotans." "Housing insecurity . . . is a subject of general concern . . . losing housing endangers the public peace, health, and safety of all Minnesotans.")

The EOs at issue are clear on this point. "[A]ll residential landlords must cease terminating residential leases during the pendency of the emergency." (EO 20-14, at 2.) Terminations under the EOs also includes non-renewal of leases, meaning that all leases are automatically and indefinitely renewed even after the lease terms have ended. (EO 20–79, at 2, ¶ 3.) Thus, the EOs enact a regulatory taking.

### D. The EOs at Issue Violate Due Process Under the Fifth and Fourteenth Amendments

Finally, Defendants rely on *Singleton v. Cecil* to argue that "merely labeling a governmental action as arbitrary and capricious, in the absence of the deprivation of life, liberty, or property, will not support substantive due process claim." 176 F.3d 419, 424 (8th Cir. 1999); (Def. Br., 30.) Here, however, Plaintiffs' substantive due process claim does not occur in a vacuum devoid of any violations of other rights. Rather, it accentuates the violations already complained of. Because substantive due process "is protection of the individual against arbitrary action of government" and is violated when the government interferes with rights "implicit in the concept of ordered liberty," the EOs here cannot be reduced down to their component violations and argued as separate and discrete infringements. (Pl. Prelim. Inj. Br., 25) (citing *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974); *Palko v. Connecticut*, 302 U.S. 319, 325–26 (1937) overruled on other grounds by *Benton v. Maryland*, 395 U.S. 784 (1969)). EOs which violate the First Amendment and

the Fifth Amendment and the Contracts Clause must be show that they are narrowly tailored in light of *all* of the violations, not each of them.

The purpose of this argument is shown best by Defendants' responsive brief on Plaintiffs' preliminary injunction motion. Defendants argued that the infringement on the Petitions Clause is merely a minor, temporary delay in a particular statutory (not constitutional) right, ignoring the constitutional violations of the Contracts Clause and the Fifth Amendment. They then argue that there has been no Contracts Clause violation because "landlord rights are still safeguarded" by their eventual right to bring claims, and therefore property owners will eventually be compensated. This is essentially an argument that there can be no Contracts Clause violation because Plaintiffs haven't, really, lost their Right to Petition. Finally, Defendants argue that there can be no Takings Clause violation if "an adequate provision for obtaining just compensation exists," ignoring the fact that the safeguards of that compensation, provided for by the Contracts Clause, and the ability to enforce them, provided for by the Petitions Clause, have both been extinguished by the EOs. But cutting down the EOs into their component violations and analyzing them piecemeal, Defendants attempt to justify each violation without ever addressing whether the EOs as a whole violate substantive due process by infringing on Plaintiffs' fundamental rights without as a whole being narrowly tailored to meet the government interest.

## Conclusion

Plaintiffs fully acknowledge that the actions of Defendants were and continue to be taken in a most uncertain and chaotic time. The ebb and flow of the pandemic continues, the facts about this disease are still not fully known, and millions of Minnesotans are

relying on their government to take action to combat its spread. However, their actions must not only be made in good faith; they must pass constitutional muster. Here, eight months into the pandemic, the EOs at issue continue to infringe on the constitutional rights of Plaintiffs and all Minnesota landlords, and need to be replaced with actions which both protect Minnesota citizens and are valid exercised of executive authority. Therefore, Defendants' motion to dismiss Plaintiffs' Complaint must be denied.

Respectfully submitted,

Dated:  November 06, 2020                 HANSEN, DORDELL, BRADT, ODLAUG & BRADT, P.L.L.P.

By: _/s/  Michael Kemp_____
    Michael Kemp #390426
Attorneys for Plaintiff
3900 Northwoods Drive, Suite 250
St. Paul, MN 55112-6973
651/332-8734
mkemp@hansendordell.com