# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| Heights Apartments, LLC, and Walnut Trails, LLLP, | Court File No. 20-CV-02051 (NEB/BRT) |
| Plaintiffs, | |
| v. | |
| Tim Walz, in his individual and his official capacity as Governor of the State of Minnesota, and Keith Ellison, in his individual and his official capacity as Attorney General of the State of Minnesota, and John Doe, | |
| Defendants. | |

## PROPOSED BRIEF OF *AMICI CURIAE*
## HOME LINE, HOUSING JUSTICE CENTER, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, MID-MINNESOTA LEGAL AID, MINNESOTA ASSISTANCE COUNCIL FOR VETERANS, MINNESOTA ASSOCIATION OF COMMUNITY HEALTH CENTERS, MINNESOTA COALITION FOR THE HOMELESS, SOUTHERN MINNESOTA REGIONAL LEGAL SERVICES, VIOLENCE FREE MINNESOTA, AND VOLUNTEER LAWYERS NETWORK

## IN SUPPORT OF THE DEFENDANTS

# PRELIMINARY STATEMENT

Plaintiffs' preliminary injunction motion is a misguided effort to stop a Minnesota eviction moratorium essential to protecting the health of Minnesotans during the COVID-19 pandemic. The grim reality is that lifting the moratorium now would trigger an avalanche of evictions that would accelerate the spread of COVID-19 through Minnesota. No less an authority than the Centers for Disease Control and Prevention ("CDC")—the leading health protection agency in the United States—has concluded that "in the absence of state and local protections" such as Minnesota's eviction moratorium "as many as 30-40 million people in America" would be forced from their homes by "a wave of evictions" that would multiply the spread of COVID-19 because a "large portion of those who are evicted may move into close quarters in shared housing or . . . become homeless."[1] As the *Star Tribune* reported just this past weekend, "COVID-19 has put Minnesota in a 'desperate and dangerous place' with case counts soaring, the death toll climbing and fears growing that hospitals could become overwhelmed if the trend isn't restrained.[2] Dr. Michael Osterholm, the director of the University of Minnesota's Center for Infectious Disease Research and Policy, has warned Minnesotans: "The dark days of

---

[1] CDC, *Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, 85 Fed. Reg. 55,292 (Sept. 4, 2020), *available at* https://www.federalregister.gov/documents/2020/09/04/2020-19654/temporary-halt-in-residential-evictions-to-prevent-the-further-spread-of-covid-19.

[2] Christopher Snowbeck, *Minnesota in 'Desperate and Dangerous' Place with COVID-19*, *Star Tribune* (November 14, 2020) (quoting Kris Ehresmann, Minnesota's director for infectious diseases), available at https://www.startribune.com/minnesota-in-desperate-and-dangerous-place-with-covid-19/573079741/.

the pandemic are about to descend upon us."[3]  In other words, this is **not** the time to end the eviction moratorium.  This is the time when Minnesota needs the eviction moratorium the most.

Plaintiffs themselves admit that "[t]here can be no doubt that the COVID-19 pandemic facing the country and the State of Minnesota has presented a grave situation for the past six months and will for the foreseeable future."  (Dkt. No. 6 at 1.)  *See also id.* at 34 ("Plaintiffs do not doubt the severity of The Pandemic, its profound effects on the citizens of Minnesota, or the fact that Defendants as officers of the State have reason to make all constitutional efforts to prevent harm to the State's citizens to the extent possible.").  Inexplicably, however, Plaintiffs contend that a preliminary injunction is appropriate because the State's eviction moratorium is "essentially financial" and unrelated to the government's interest in protecting public health.  (*Id.* at 2, 34-35.) Plaintiffs could not be more mistaken.  The Governor's original eviction moratorium order—Emergency Executive Order 20-14 ("EO 20-14")—expressly connects the eviction moratorium with control of the spread of the virus:  "[D]uring the COVID-19 peacetime emergency in particular, losing housing endangers the public peace, health, and safety of all Minnesotans. . . .  Restricting evictions is a vital tool to keep Minnesotans in their homes to mitigate the community spread of COVID-19 in

_____

[3] Jeremy Olson, *Minnesota Officials Hoping for COVID-19 Wake-Up Call*, *Star Tribune* (Oct. 18, 2018), *available at* https://www.startribune.com/minnesota-health-officials-now-hoping-for-a-virus-wakeup-call/572784572/.

Minnesota and nationwide."[4]  And the CDC has explicitly endorsed eviction moratoria as a critical public health measure for controlling the spread of the virus: "In the context of a pandemic, eviction moratoria—like quarantine, isolation, and social distancing—can be an effective public health measure utilized to prevent the spread of communicable disease."[5]  This is because "evictions threaten to increase the spread of COVID-19 as they force people to move, often in close quarters in new shared housing setting with friends or family, or congregate settings such as homeless shelters."[6]

For the reasons stated in this amicus brief and the State's opposition papers, the eviction moratorium is a proper use of the Governor's powers to protect Minnesotans at a time of an enormous public health emergency.  *See Jacobson v. Mass.*, 197 U.S. 11 (1905) (state has broad regulatory discretion "to protect itself against an epidemic of disease which threatens the safety of its members"); *see also see also Block v. Hirsch*, 256 U.S. 135, 156 (1921) (Holmes, J.) (upholding eviction restrictions against constitutional challenge based on "exigency" of crisis posing a "danger to public health"); *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (Roberts, C.J., concurring) ("[W]hen public officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" (citation

---

[4] State of Minnesota Emergency Executive Order 20-14, *Suspending Evictions and Writs of Recovery During the COVID-19 Peacetime Emergency* (Mar. 23, 2020) ("EO 20-14"), *available at* https://mn.gov/governor/assets/EO%2020-14%20Filed_tcm1055-424508.pdf.

[5] CDC, *Temporary Halt in Residential Evictions*, 85 Fed. Reg. 55,292.

[6] *Id.*

omitted).). *Amici* urge the Court to (1) apply the U.S. Supreme Court's *Jacobson* doctrine to reject Plaintiffs' constitutional claims, (2) apply the public interest and balance of harm factors under *Dataphase* to deny Plaintiffs' preliminary injunction motion, and (3) allow Minnesota's eviction moratorium to stay in place to protect the health of Minnesotans during the COVID-19 pandemic.

## STATEMENT OF INTERESTS OF *AMICI CURIAE*

The *amici curiae* are public interest organizations that advocate for and assist disadvantaged Minnesotans adversely impacted by evictions, homelessness, and the COVID-19 pandemic.

**HOME Line.** HOME Line is a statewide, nonprofit organization that provides free legal advice to residential tenants on all landlord-tenant issues regardless of income and works to improve public and private policies relating to rental housing. Website: https://homelinemn.org/.

**Housing Justice Center (HJC)**. HJC is a nonprofit public interest and legal organization whose primary mission is to preserve and expand the supply of affordable housing for low-income individuals and families. Website: https://www.hjcmn.org/.

**Lawyers' Committee for Civil Rights Under Law (Lawyers' Committee)**. The principal mission of the Lawyers' Committee is to secure equal justice for all through the rule of law, targeting in particular the inequities confronting African Americans and other racial and ethnic minorities. The Lawyers' Committee is a nonpartisan, nonprofit organization, formed in 1963 at the request of President John F. Kennedy to enlist the

private bar's leadership and resources in combating racial discrimination and the resulting inequality of opportunity.  Website: https://lawyerscommittee.org/.

**Mid-Minnesota Legal Aid (MMLA**).  MMLA provides free lawyers to those who cannot afford them in a broad range of civil cases in thirty counties throughout Minnesota, including more than 2,000 families facing eviction from their homes per year. Website:  https://mylegalaid.org/.

**Minnesota Assistance Council for Veterans (MACV)**.  MACV is a statewide non-profit organization with the mission of ending veteran homelessness.  Website: https://mnachc.org/.

**Minnesota Association of Community Health Centers (MNACHC).** MNACHC represents the interests of the state's 17 community health centers who collectively serve nearly 200,000 low-income patients that are adversely impacted by the social drivers of health—including lack of affordable housing—that impact their overall health and wellness.  Website: https://mnachc.org/.

**Minnesota Coalition for the Homeless (MCH).**  The mission of the Minnesota Coalition for the Homeless is to generate policies, community support and local resources for housing and services to end homelessness in Minnesota.  Website: https://www.mnhomelesscoalition.org/.

**Southern Minnesota Regional Legal Services (SMRLS).**  SMRLS is a not-for-profit law office that provides legal advice and representation in civil cases only to low income persons in 33 counties in southern Minnesota, and to agricultural and migrant workers in Minnesota and North Dakota.  Website: https://www.smrls.org/.

**Violence Free Minnesota (VFMN)**: VFMN is a statewide coalition of over 90 member programs that works to end relationship abuse through several avenues, including advocating for housing access and tenant protections, providing direct financial support to survivors facing housing instability, and supporting service providers. Website: https://www.vfmn.org/.

**Volunteer Lawyers Network (VLN).** VLN provides civil legal services to low-income people through volunteer attorneys. Its mission is to protect and promote the basic human needs of people in poverty through the power of legal volunteers. Website: https://www.vlnmn.org/.

## DISCUSSION

### I. LIFTING MINNESOTA'S EVICTION MORATORIUM WOULD TRIGGER AN AVALANCHE OF EVICTIONS AND COVID-19 INFECTIONS.

#### A. Minnesota's Eviction Moratorium Is an Essential Public Health Tool for Controlling the COVID-19 Pandemic.

Minnesota's eviction moratorium is directly connected to the public health emergency caused by the COVID-19 pandemic, and Plaintiffs' assertion to the contrary is contradicted by the Governor's executive order and science. Executive Order 20-14 is crystal clear: "Restricting evictions is a vital tool to keep Minnesotans in their homes to mitigate the community spread of COVID-19 in Minnesota and nationwide." The Center for Disease Control agrees, having issued its own federal eviction moratorium for the exact same reason: "In the context of a pandemic, eviction moratoria—like quarantine, isolation, and social distancing—can be an effective public health measure utilized to

prevent the spread of communicable disease."[7]  In its agency order *Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19*, the CDC provides a detailed explanation as to why eviction moratoria like Minnesota's have prevented a series of "multiple outcomes that increase the risk of COVID-19 spread"[8]:

- "In the context of the current pandemic, large increases in evictions could have at least two potential negative consequences. One is if homeless shelters increase occupancy in ways that increase the exposure risk to COVID-19. The other is if homeless shelters turn away the recently homeless, who could become unsheltered, and further contribute to the spread of COVID-19. Neither consequence is in the interest of the public health."[9]

- "A large portion of those who are evicted may move into close quarters in shared housing or, as discussed below, become homeless, thus contributing to the spread of COVID-19."[10]

- "Eviction moratoria facilitate self-isolation by people who become ill or who are at risk for severe illness from COVID-19 due to an underlying medical condition."[11]

---

[7] CDC, *Temporary Halt in Residential Evictions*, 85 Fed. Reg. 55,292.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

- "[Eviction moratoria] also allow State and local authorities to more easily implement stay-at-home and social distancing directives to mitigate the community spread of COVID-19."[12]

- "[H]ousing stability helps protect public health because homelessness increases the likelihood of individuals moving into congregate settings, such as homeless shelters, which then puts individuals at higher risk to COVID-19. The ability of these settings to adhere to best practices, such as social distancing and other infection control measures, decreases as populations increase."[13]

- "Unsheltered homelessness also increases the risk that individuals will experience severe illness from COVID-19."[14]

- "These public health risks may increase seasonally. Each year, as winter approaches and the temperature drops, many homeless move into shelters to escape the cold and the occupancy of shelters increases."[15]

These CDC findings about the public health efficacy of eviction moratoria track closely with findings by Minnesota's own Department of Health explaining the risk of COVID-19 caused by housing instability and displacement:

- "Housing instability and frequent mobility increase the risk of exposure to

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

infectious diseases."[16]

- "The prevalence of transmissible diseases is greatest among people experiencing homelessness in unsheltered settings."[17]

- "In the context of COVID-19, the risks associated with sleeping outdoors in an encampment setting are different than with staying indoors in a congregate setting such as an emergency shelter or other congregate living facility."[18]

- "Outdoor settings may allow people to increase distance between themselves and others. However, sleeping outdoors often does not provide protection from the environment, quick access to hygiene and sanitation facilities, or connection to health care."[19]

Finally, the conclusions of these public health agencies are confirmed by extensive real-time reporting on the surge of infections and deaths in homeless shelters and encampments, which frequently describes these settings as a public health "time bomb" because of their extreme risk for spreading the virus.[20]   The fundamental purpose of the eviction moratoria is to defuse these COVID-19 time bombs.

---

[16] Minnesota Department of Health, *Interim Guidance About People Experiencing Homelessness and Encampment Settings* (Aug. 7, 2020), *available at* https://www.health.state.mn.us/diseases/coronavirus/unsheltered.pdf.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Coronavirus Outbreak Has America's Homeless at Risk of 'Disaster,' N.Y. Times*, Mar. 10, 2020, *available at* https://www.nytimes.com/2020/03/10/us/coronavirus-

**B.    The Eviction Moratorium Holds Back an Avalanche of Evictions That Would Endanger Public Health in Minnesota.**

It has become increasingly clear since spring that Governor Walz's eviction moratorium is the only thing holding back an avalanche of evictions that would bury Minnesota in COVID-19 cases and homelessness.  The CDC has concluded that without state measures like Minnesota's eviction moratorium, the pandemic would have triggered a "wave of evictions on a scale that is unprecedented in modern times" across the country involving "30 to 40 million people."[21]

The numbers in Minnesota confirm the massive scale of the eviction threat.  In 2019, there were 611,160 renter households in Minnesota.[22]  Census Bureau data from

---

homeless.html; Nikita Steward, *'It's a Time Bomb': 23 Die as Virus Hits Crowded Shelters*, *N.Y. Times*, Apr. 13, 202), *available at* https://www.nytimes.com/2020/04/13/nyregion/new-york-coronavirus-homeless.html; Alyse D. Oneto, Samantha Batko, *Why Homeless Encampment Sweeps Are Dangerous During COVID-19*, Urb. Inst. (May 12, 2020), *available at* https://www.urban.org/urban-wire/why-homeless-encampment-sweeps-are-dangerous-during-covid-19#:~:text=Because%20it%20is%20more%20likely,access%20to%20resources%20and%20services; Daniella Silva, Ed Ou, *Homeless and Facing Winter in Minneapolis: Racial Inequality, Skyrocketing Housing Prices and Stagnating Wages Have Created a Dire Problem Here and Across the Nation*, *NBC News* (Oct. 9, 2020), *available at* https://www.nbcnews.com/specials/homeless-and-facing-winter-in-minneapolis/.

[21] CDC, *Temporary Halt in Residential Evictions*, 85 Fed. Reg. 55,292; *see also* Emily Benfer, *Coronavirus Rent Freezes Are Ending — and A Wave of Evictions Will Sweep America*, NBC News (June 22, 2020), *available at* https://www.nbcnews.com/think/opinion/coronavirus-rent-freezes-are-ending-wave-evictions-will-sweep-america-ncna1230916.

[22] *State of the State's Housing 2019 - Biennial report of the Minnesota Housing Partnership* at 4, 6, *available at*

October shows that with a similar sample of the 666,277 adults tenants surveyed in Minnesota, 245,003 (36.8%) reported they were unemployed, while 334,258 (50.2%) reporting loss of employment income.[23]  57,509 (8.6%) tenants reported that they were not currently caught up on rent payments.[24]  Only 52.5% of Minnesota tenants reported high confidence in the ability to pay rent while 124,628 (18.7%) reported no or slight confidence in the ability to pay rent.[25]

With a sample less than 10% of the above Census Bureau 666,277 sample, of the 57,509 adult tenants who responded to the question about the likelihood of leaving this home due to eviction in next two months, 30,367 (52.8%) responded very likely or somewhat likely.[26]  When multiplied by 10 to account for the number of tenants in Minnesota, the number of adult tenants at risk of eviction is 303,670.[27]  The Census data

---

http://www.mhponline.org/images/stories/images/research/SOTS-2019/2019FullSOTSFinal-small.pdf.

[23] U.S. Dept. of Commerce, *Census Bureau Pulse Survey*, Table 1b. Last Month's Payment Status for Renter Occupied Housing Units, by Select Characteristics: Minnesota (Oct. 21, 2020), *available at* https://www.census.gov/data/tables/2020/demo/hhp/hhp16.html#tables.

[24] *Id.*

[25] *Id.*, Table 2b.Confidence in Ability to Make Next Month's Payment for Renter Occupied Housing Units, by Select Characteristics: Minnesota, available at *available at* https://www.census.gov/data/tables/2020/demo/hhp/hhp16.html#tables.

[26] *Id.*, Table 3b. Likelihood of Having to Leave this House in Next Two Months Due to Eviction, by Select Characteristics: Minnesota, *available at* https://www.census.gov/data/tables/2020/demo/hhp/hhp16.html#tables.

[27] Lawrence McDonough, *Housing Issues in the Justice Tsunami: Legal Issues Now and When Minnesota Reopens*, at 22 (Nov. 12, 2020,) *available at*

is consistent with academic estimates. Stout Risius Ross estimates that 127,000-160,000 Minnesota tenants currently are at risk of eviction due to unpaid rent.[28]

Estimates vary on how many eviction cases could be filed if the eviction suspension ended December 31, 2020. The Aspen Institute concluded the risk of eviction at 30% renter unemployment for Minnesota on December 31, 2020 would be 281,085 tenants.[29] As noted above, the Census survey found a 36.8% unemployment rate for Minnesota tenants.[30] Stout Risius Ross estimated 59,000-74,700 evictions.[31] Even a more conservative calculation puts the number of potential eviction cases at 13,330.[32]

---

http://povertylaw.homestead.com/files/Reading/Housing_Issues_in_the_Justice_Tsunami.pdf.

[28] Stout Risius Ross, LLC, *Estimation of Households Experiencing Rental Shortfall and Potentially Facing Eviction*, *available at* https://app.powerbi.com/view?r=eyJrIjoiNzRhYjg2NzAtMGE1MC00NmNjLTllOTMtYjM2NjFmOTA4ZjMyIiwidCI6Ijc5MGJmNjk2LTE3NDYtNGE4OS1hZjI0LTc4ZGE5Y2RhZGE2MSIsImMiOjN9.

[29] K. McKay, Z. Neumann & S. Gilman, *20 Million Renters Are at Risk of Eviction; Policymakers Must Act Now to Mitigate Widespread Hardship* (The Aspen Institute June 19, 2020) https://www.aspeninstitute.org/blog-posts/20-million-renters-are-at-risk-of-eviction/.

[30] U.S. Dept. of Commerce, *Census Bureau Pulse Survey*, Table 1b. Last Month's Payment Status for Renter Occupied Housing Units, by Select Characteristics: Minnesota (Oct. 21, 2020), *available at* https://www.census.gov/data/tables/2020/demo/hhp/hhp16.html#tables.

[31] Stout Risius Ross, LLC, *Estimation of Households Experiencing Rental Shortfall and Potentially Facing Eviction*, *available at* https://app.powerbi.com/view?r=eyJrIjoiNzRhYjg2NzAtMGE1MC00NmNjLTllOTMtYjM2NjFmOTA4ZjMyIiwidCI6Ijc5MGJmNjk2LTE3NDYtNGE4OS1hZjI0LTc4ZGE5Y2RhZGE2MSIsImMiOjN9.

[32] Lawrence McDonough, *Housing Issues in the Justice Tsunami: Legal Issues Now and When Minnesota Reopens*, at 28 (Nov. 12, 2020,) *available at*

These estimates are profound because even experts' lower estimates are equivalent to nearly ten months' worth of eviction actions filed in the space of just a few weeks.

Equally alarming, the wave of evictions and increased infections would disproportionately impact communities of color, who are more likely to rent than any other group. As of 2018, Minnesota has "the 5th highest homeownership disparity between white/non-Hispanic households and households of color."[33] Minnesota is comprised of 20% people of color,[34] and of that group, 58% are renters.[35]

People of color are faring poorly in the pandemic economy. In September 2020, the 6-month moving average unemployment rate for Minnesota was 7.8%, up from 2.8% in September 2019. The rate for Minnesota African Americans was 16.5%, twice the overall rate and over three times higher the 5.1% rate for African Americans in

---

http://povertylaw.homestead.com/files/Reading/Housing_Issues_in_the_Justice_Tsunami.pdf.

[33] Minnesota Housing, *Affordable Housing Plan: October 2018-September 2019*, at 8, *available at* http://www.mnhousing.gov/sites/Satellite?blobcol=urldata&blobheadername1=Content-Type&blobheadername2=Content-Disposition&blobheadername3=MDT-Type&blobheadervalue1=application%2Fpdf&blobheadervalue2=attachment%3B+filename%3DMHFA_1044198.pdf&blobheadervalue3=abinary%3B+charset%3DUTF-8&blobkey=id&blobtable=MungoBlobs&blobwhere=1533150601602&ssbinary=true.

[34] Minnesota State Demographic Center, *Age, Race, & Ethnicity*, *available at* https://mn.gov/admin/demography/data-by-topic/age-race-ethnicity/.'

[35] Minnesota Housing Partnership, *State of the State's Housing 2019: Biennial Report of the Minnesota Housing Partnership* (2019), at 8, *available at* http://www.mhponline.org/images/stories/images/research/SOTS-2019/2019FullSOTSPrint_Final.pdf.

September 2019.[36]  Moreover, Census Bureau data from October show that only 23.1% of African American renters had high confidence about ability to pay next month's rent,[37] and 63.3% of Hispanic or Latino Americans responded they were very likely or somewhat likely to leave home due to eviction in the next two months.[38]

Already the CDC reports that COVID-19 has a disproportionate impact on racial and ethnic minorities.[39]  African Americans, Hispanics and Latinos contract the disease at over 2.5 times the rate of Whites and require hospitalization over 4.5 times as often.[40] The mortality rate for African-Americans is 2.1 times higher than it is for Whites.[41] Factors contributing to this disparity include: (1) jobs that require close personal contact;

---

[36] *Alternative Measures of Unemployment,* Table 5 (Minnesota Department of Employment and Economic Development - viewed Nov.12, 2020), *available at* https://mn.gov/deed/data/current-econ-highlights/alternative-unemployment.jsp.

[37] U.S. Dept. of Commerce, *Census Bureau Pulse Survey*, Table 2b. Confidence in Ability to Make Next Month's Payment for Renter Occupied Housing Units, by Select Characteristics: Minnesota (Oct. 21, 2020), *available at* https://www.census.gov/data/tables/2020/demo/hhp/hhp16.html#tables.

[38] *Id.*, Table 3b. Likelihood of Having to Leave this House in Next Two Months Due to Eviction, by Select Characteristics: Minnesota (United States Department of Commerce Oct. 21, 2020), *available at* https://www.census.gov/data/tables/2020/demo/hhp/hhp16.html#tables.

[39] CDC, *Health Equity Considerations and Racial and Ethnic Minority Groups* (July 24, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html.

[40] CDC, *COVID-19 Hospitalization and Death by Race/Ethnicity* (Aug. 18, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html.

[41] *Id.*

(2) jobs that do not provide paid sick days, so workers "cannot afford to miss work, even if they're sick;" and (3) higher rates of COVID-related unemployment.[42]

In Minnesota, the *Star Tribune* reports that "nearly 16,000 of the confirmed cases of COVID-19 have been in Black residents.  That means African Americans account for 6% of the state population and 19% of the confirmed cases. Hispanic residents account for 5% of the state population but 17% of confirmed cases."[43]  A statistical analysis conducted by the *New York Times* in June shows that in Hennepin and Ramsey Counties Black and Latino residents had infection rates over 4 times higher than infection rates among white residents.[44]

In sum, Minnesota's eviction moratorium is preventing a disastrous increase in evictions and COVID-19 infections that would disproportionately impact renters of color. It is hard to imagine a state action more important to the public health and the public interest —and less deserving to be a target of a preliminary injunction motion.

## C.    Lifting the Eviction Moratorium Would Overwhelm Housing Courts.

In addition to the devastating public health impact lifting the eviction moratorium

---

[42] *Id.*

[43] Joe Carlson, *COVID Widens Racial Gap in Minnesota's Health Care System*, *Star Tribune* (Sept. 14, 2020), *available at* https://www.startribune.com/covid-widens-racial-gap-in-minnesota-s-health-care-system/572402602/.

[44] Richard A. Oppel, Jr. et al., *The Fullest Look Yet at the Racial Inequity of Coronavirus*, *N.Y. Times* (Jul. 5, 2020), *available at* https://www.nytimes.com/interactive/2020/07/05/us/coronavirus-latinos-african-americans-cdc-data.html.

would have on Minnesotans, Minnesota's housing court system would be overwhelmed by an abrupt end to the eviction moratorium. The effects would include increased chance of COVID-19 exposure for those attending housing court, and unfair technology challenges for those disadvantaged tenants participating remotely.[45]

In pre-pandemic times the Fourth Judicial District—which covers Hennepin County—heard and decided around 6,500 cases per year, or around 120 cases per week.[46] *Amici* know from their experience representing tenants that the Fourth District processed families facing eviction in 45-case increments. It convened "cattle call" eviction calendars, with one judicial officer hearing all 45 cases in the space of an afternoon. Often, nearly 100 people vied for fewer than 50 chairs in the same courtroom. Obviously, this cattle call approach to eviction proceedings is untenable during a pandemic that turns any significant inside gathering into a potential superspreader event.

Yet state law gives courts little room to process the predicted wave of eviction cases in a more humane or procedurally fair way. Minnesota currently has one of the fastest eviction process in the country. State law requires cases be heard between seven

---

[45] "Data from the last American Community Survey show more than 330,000 Minnesotans lack home internet connectivity—and a similar number don't even have computers—making remote work, continuing education and accessing basic government services in a time of pandemic even more challenging." Jeff Hargarten, *A Look at Minnesota's Digital Divide During a Pandemic*, *Star Tribune* (Apr. 15, 2020), *available a*t https://www.startribune.com/covid-19-isolation-hits-harder-for-300-000-minnesotans-who-don-t-have-internet/568966911/.

[46] HOME Line, *Evictions in Greater Minnesota*, at 4 (May 2018), *available at* https://homelinemn.org/wp-content/uploads/2018/06/Evictions-in-Greater-Minnesota-Report-with-Appendix.pdf.

and 14 days after filing. Minn. Stat. § 504B.321, subd. 1(d) (2018). The statute presumes cases will be decided at the same cattle call hearing when people arrive. *Id.* § 504B.335(a). At most, a family facing eviction can get a six-day continuance to prepare for trial. *Id.* § 504B.341(a). Most families do not have access to legal counsel. After the eviction summons appears there is no time to access emergency financial resources, even if the family qualifies: That process takes, on average, more than 24 days to complete. The turnaround time on applications would surely skyrocket if governments are required to process thousands more applications.

The moratorium has also kept at bay a specific group of landlords who evict nearly every tenant who rents from them.[47] These landlords collect large money deposits from families desperate for housing—a price of admission they often need to scrape together from families, friends, churches, nonprofit organizations, and government entities. Evicting one family allows them to illegally keep the deposit and then re-run the cycle with another, and another. In Hennepin County, home-churning scams disproportionately impact communities of color.[48] In North Minneapolis, for example a historically low-income community of color, over 45% of renters had eviction filings

---

[47] *See* Minneapolis Innovation Team, *Evictions in Minneapolis*, at 17 (July 2016) (showing eviction filing rates per year in excess of total number of rental units), *available at* https://www.housinglink.org/docs/default-source/MainLibrary/evictionsinminneapolis2016.pdf.

[48] *See* Brittany Lewis, *The Illusion of Choice: Eviction and Profit in North Minneapolis*, *available at* http://evictions.cura.umn.edu/illusion-choice-evictions-and-profit-north-minneapolis-full-report.

brought against them between 2013 and 2015.[49]  The eviction moratorium has stalled the usual business practice, providing protection to communities like the North Minneapolis from practices that would cause displacement and exposure to the virus.

## II.     PLAINTIFFS' INJUNCTION MOTION IS UNTENABLE GIVEN THE ENORMOUS PUBLIC HEALTH BENEFIT OF THE EVICTION MORATORIUM.

Below, *amici* put into legal context the enormous public health benefit of Minnesota's eviction moratorium:

First, the U.S. Supreme Court long ago recognized in *Jacobson v. Massachusetts* that a state government has broad constitutional latitude "to protect itself against an epidemic of disease which threatens the safety of its members." 197 U.S. 11, 25 (1905). As the Eighth Circuit recently stated in *In re Rutledge* in affirming an emergency state law enacted in response to the COVID-19 pandemic under *Jacobson*:  "[T]he bottom line is this: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" 956 F.3d 1018, 1028 (8th Cir. 2020) (citing *In re Abbott*, 954 F.3d 772, 784-85 (5th Cir. 2020)). Just last month, Chief Justice Roberts issued a concurring opinion citing *Jacobson* in upholding a California COVID-19 regulation in which he stated that "[w]hen public officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,'

---

[49] *Evictions in Minneapolis*, at 6.

their latitude 'must be especially broad.'" *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (quoting *Marshall* v. *United States*, 414 U. S. 417, 427 (1974)). He also emphasized that this principle "is especially true where, as here, a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground." *Id.* at 1614.

In this case, there can be no question that the eviction moratorium has "some real or substantial relation to the public health crisis" under *Jacobson*.[50] As explained above, EO 20-14 is explicit about this relationship—stating that the moratorium is "a vital tool to keep Minnesotans in their homes to mitigate the community spread of COVID-19." Moreover, as detailed above, both the CDC and the Minnesota Department of Health have issued findings that fully support Minnesota's rationale for issuing the eviction moratorium. Thus, the eviction moratorium easily passes constitutional muster under *Jacobson*, and the preliminary injunction can be promptly rejected because Plaintiffs "seek[] emergency relief in an interlocutory posture[]" while state officials "are actively shaping their response to changing facts on the ground." *S. Bay United Pentecostal Church*, 140 S. Ct. at 1614.

Second, the foregoing discussion leaves no doubt that the *Dataphase* factors of balance of harms and public interest require denial of Plaintiffs' preliminary injunction motion. The balance of harms and the public interest factors "merge when the

---

[50] The State's opposition brief comprehensively explains why there are no constitutional violations in the first place, and certainly no "plain, palpable invasion of rights secured by the fundamental law." (Dkt. No. 12, at 16-21.)

Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009). The Eighth Circuit has also emphasized that courts should issue a preliminary injunction only after paying particular attention to the "public consequences in employing the extraordinary remedy of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 7 (8th Cir. 2008). As discussed above, the public consequence of enjoining the eviction moratorium would be an avalanche of evictions causing a surge of infections in vulnerable communities in the middle of winter at a time when Minnesota is already entering the "dark days of the pandemic." In other words, the difference between having an eviction moratorium and not having one is literally a matter of life and death. As one district court aptly put it: "The harm to plaintiffs if the Order is enforced pales in comparison to the dangers to society if it is not. The record clearly reveals how virulent and dangerous COVID-19 is, and how many people have died and continue to die from it." *Elim Romanian Pentecostal Church v. Pritzker,* No. 20 C 2782, 2020 U.S. Dist. LEXIS 84348, at *16 (N.D. Ill. May 13, 2020).[51]

---

[51] *See Cassell v. Snyders*, No. 20 C 50153, 2020 U.S. Dist. LEXIS 77512, at *41-44 (N.D. Ill. May 3, 2020) ("Taking into account COVID-19's virulence and lethality, together with the State's efforts to protect avenues for religious activity, the Court finds that equitable considerations, including the promotion of the public interest, weigh heavily against the entry of the temporary restraining order and preliminary injunction that Plaintiffs seek."); *Hayes v. Oregon*, No. 1:20-cv-01332-CL, 2020 U.S. Dist. LEXIS 144813, at *4-9 (D. Or. Aug. 12, 2020) ("The harm to the public in granting such a TRO, which may result in more transmissions of COVID-19 and more cases of serious illness and death, far outweighs any potential harm identified in the complaint."); *Auracle Homes, LLC v. Lamont*, No. 3:20-cv-00829 (VAB), 2020 U.S. Dist. LEXIS 141500, at *53-54 (D. Conn. Aug. 7, 2020) ("given the nature of this pandemic, the balance of the equities and the public interest favor denying a preliminary injunction" against the Connecticut eviction moratorium).

**CONCLUSION**

For the foregoing reasons, *Amici curiae* respectfully ask the Court to (1) apply the U.S. Supreme Court's *Jacobson* doctrine to reject Plaintiffs' constitutional claims, (2) apply the public interest and balance of harm factors under *Dataphase* to deny Plaintiffs' preliminary injunction motion. and (3) allow Minnesota's eviction moratorium to stay in place to protect the health of Minnesotans during the COVID-19 pandemic.

Dated:  November 16, 2020

By  /s/ *James W. Poradek*
    James W. Poradek (#0290488)
    Housing Justice Center
    Northwestern Building
    275 East Fourth Street, Suite 605
    Saint Paul, MN 55101
    Phone: 612-723-0517
    jporadek@hjmcmn.org

    Attorney for *Amici Curiae*

By  /s/ *Lawrence R.  McDonough*
    Lawrence R. McDonough (#151373)
    1161 Palace Avenue
    Saint Paul, MN 55105
    Phone: 651-398-8053
    mcdon056@umn.edu

    Attorney for Lawyers' Committee for
    Civil Rights Under Law

**WORD COUNT COMPLIANCE CERTIFICATE**

I certify that this memorandum complies with the type-volume limitation of Local Rule 7.1(f) and the type-size limitation of Local Rule 7.1(h). The memorandum has 5041 words of type, in size 13 font. The memorandum was prepared using Microsoft Word Version 16.42, and the word count includes all text, including headings, footnotes, and quotations.

Dated:  November 16, 2020

By  /s/ *James W. Poradek*
      James W. Poradek (#0290488)
      Housing Justice Center
      Northwestern Building
      275 East Fourth Street, Suite 605
      Saint Paul, MN 55101
      Phone: 612-723-0517
      jporadek@hjmcmn.org

      Attorney for *Amici Curiae*