## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| HEIGHTS APARTMENTS, LLC and WALNUT TRAILS, LLLP, <br><br> Plaintiffs, <br><br> v. <br><br> TIM WALZ, in his individual and official capacity as Governor of the State of Minnesota, KEITH ELLISON, in his individual and office capacity as Attorney General of the State of Minnesota, and JOHN DOE, <br><br> Defendants. | Case No. 20-CV-2051 (NEB/BRT) <br><br><br> ORDER ON MOTION TO DISMISS AND MOTION FOR PRELIMINARY INJUNCTION |

In response to the COVID-19 pandemic, Minnesota Governor Tim Walz ("Governor Walz") has issued a series of executive orders designed to slow the spread of the disease. Several of these executive orders ("EOs") limit landlords' ability to file eviction actions against residential tenants. Plaintiffs Heights Apartments, LLC and Walnut Trails, LLLP (collectively, the "Landlords") filed this suit against Governor Walz and Minnesota Attorney General Keith Ellison ("Attorney General Ellison"; collectively, "the Government"), seeking to vacate and enjoin enforcement of the EOs affecting landlords' ability to remove tenants. The matter is now before the Court on the Landlords' motion for preliminary injunction (ECF No. 5) and the Government's motion

to dismiss (ECF No. 15). For the reasons that follow, the Court grants the Government's

motion to dismiss, and denies the Landlords' motion for preliminary injunction as moot.

## BACKGROUND

The Court draws the following background primarily from the Complaint and

exhibits attached to the Complaint, accepting the factual allegations as true and drawing

all reasonable inferences in the Landlords' favor. *Topchian v. JPMorgan Chase Bank, N.A.*,

760 F.3d 843, 848 (8th Cir. 2014). In doing so, the Court disregards any conclusory

allegations or legal conclusions. *See Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th

Cir. 2019).

### I.     The COVID-19 Pandemic

In December 2019, individuals in Wuhan, China identified a novel coronavirus.

(ECF No. 13-6 at 1.) In the ensuing months, the disease spread across the world. (*Id.*) The

novel coronavirus came to be known as SARS-CoV-2, and the disease that it causes is

called COVID-19. (*Id.*) The virus is highly transmissible and is primarily spread through

exchange of respiratory droplets emitted when a person talks, breathes, coughs, or

sneezes. (ECF No. 13-1 at 2; ECF No. 13-2 at 1.) The virus transmits more easily indoors,

especially in crowded, enclosed spaces. (ECF No. 13-3 at 1.)

Minnesota's first case of COVID-19 was confirmed on March 6, 2020. *Health

Officials Confirm First Case of Novel Coronavirus in Minnesota*, Minn. Dep't of Health (Mar.

6, 2020), https://www.health.state.mn.us/news/pressrel/2020/covid19030620.html. As of

late-December 2020, the state has confirmed more than 413,000 COVID-19 cases, and over 5,200 Minnesotans have died from the disease. *Situation Update for COVID-19*, Minn. Dep't of Health, https://www.health.state.mn.us/diseases/coronavirus/situation.html (last visited Dec. 30, 2020).

## II.    Eviction Moratoria

### A.  Walz's Executive Orders

On March 13, 2020, Governor Walz declared a peacetime emergency due to COVID-19. (ECF No. 1 ("Compl.") ¶ 8); Exec. Order No. 20-01.[1] Soon after, Governor Walz issued Executive Orders closing schools, (Exec. Order No. 20-02), closing bars and restaurants, (Exec. Order No. 20-04), delaying elective surgical procedures, (Exec. Order No. 20-09), and implementing a stay-at-home order, (Exec. Order No. 20-20).

Most relevant here, Governor Walz has issued several executive orders preventing landlords from evicting residential tenants except in delineated circumstances.[2] The first

---

[1]    All Minnesota Executive Orders are available at https://mn.gov/governor/news/executiveorders.jsp.

[2] These are Executive Orders 20-14, 20-73, and 20-79 (collectively, "Eviction Moratorium EOs" or "EOs"). Although only Executive Order 20-79 is currently in effect, the Landlords challenge all three EOs. (*See* Compl. ¶ 13 (establishing the term "EOs" to collectively refer to Executive Orders 20-14, 20-73, and 20-79); *e.g.*, *id.* ¶¶ 48, 53, 55, 59–60, 66–68 (alleging that the "EOs" are unconstitutional); *see also* ECF No. 1-3 ("EO 20-79") ¶ 1 (rescinding EOs 20-14 and 20-73).)

of these was EO 20-14, instituted on March 23, 2020.[3] (ECF No. 1-1 ("EO 20-14").) EO 20-14 suspended landlords' ability to file eviction actions and prevented landlords from terminating residential leases, with some exceptions. (EO 20-14 ¶¶ 1–2.) Under the exceptions, landlords were permitted to terminate a lease or file an eviction action when a tenant "seriously endanger[ed] the safety of other residents" or violated a state statute that prevents tenants from allowing drugs, prostitution, unlawful use of a firearm, or stolen property on the premises. (*Id.* ¶ 2); *see* Minn. Stat. § 504B.171, subd. 1. Nothing in EO 20-14 relieved tenants of their obligation to pay rent. (*Id.* ¶ 1.) A violation of EO 20-14 was a misdemeanor, punishable by a fine of up to $1,000 or imprisonment for up to ninety days. (*Id.* ¶ 5.) EO 20-14 was to remain in effect until the peacetime emergency ended or until EO 20-14 was rescinded. (*Id.* at 3.)

The intention of EO 20-14 and the orders that followed was to allow tenants who had been affected by the pandemic to remain stably housed, thus promoting public health and safety. (EO 20-14 at 2.) The Centers for Disease Control and Prevention ("CDC") has also issued an eviction moratorium, which further explains the rationale behind

---

[3] The Court refers to EOs 20-14, 20-73, and 20-79 as eviction moratoria, but it is perhaps more appropriate to call them partial eviction moratoria, since under all three EOs, landlords still retain the ability to evict tenants in certain circumstances, such as where they seriously endanger the safety of others. (*E.g.*, EO 20-14 ¶ 2.) Recognizing these exceptions, for simplicity's sake, the Court will continue to refer to these EOs as eviction moratoria.

suspending evictions during the COVID-10 pandemic.[4] Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292 (Sept. 4, 2020) ("CDC Moratorium"). Keeping tenants in their homes helps prevent the spread of COVID-19 by making it easier for them to abide by stay-at-home orders, socially distance, and to quarantine and recover if diagnosed with COVID-19. *Id.* Additionally, tenants who are evicted may experience homelessness, which may cause them to move into crowded, shared living spaces, such as homeless shelters, where the risk of transmission of coronavirus is higher. *Id.* at 55,294. Research has confirmed that limiting evictions helps mitigate the spread of COVID-19. (ECF No. 35 (summarizing two studies of evictions and COVID-19 transmission).)

In early June, Governor Walz issued Executive Order 20-73, which clarified EO 20-14 and expanded the circumstances under which a landlord may terminate a lease or evict a tenant. (ECF No. 1-2 ("EO 20-73").) Specifically, EO 20-73 permits termination of a lease or eviction not only when a tenant endangers the safety of another resident, but also when a tenant seriously endangers the safety of a non-resident on the premises. (*Id.* ¶¶ 1–2.)

Executive Order 20-79, which Governor Walz signed in July, is the eviction moratorium currently in effect. (EO 20-79.) Recognizing that Minnesota's economy was slowly reopening and "that tenants may begin to move more safely," EO 20-79 made

---

[4] See *infra* Background II.B for more information on the CDC's eviction moratorium.

several changes to Minnesota's eviction moratorium scheme. (*Id.* at 1.) First, EO 20-79 rescinded the two previous eviction moratorium EOs. (*Id.* ¶ 1.) Second, it expanded protection for tenants; EO 20-79 restricts not only lease termination and eviction, but also landlords' ability to decline to renew a tenant's lease. (*Id.* ¶ 2.) Third, EO 20-79 slightly expanded the circumstances under which landlords can terminate or choose not to renew a lease. Under EO 20-79, lease termination or nonrenewal are permitted when the property owner wishes to move into the unit or have family members live in the unit. (*Id.* ¶ 4.) Fourth, EO-20-79 permits evictions when the tenant "significantly damages property" on the premises, provided that the damage violates a term in the tenant's lease. (*Id.* ¶ 2(d)(ii).) Fifth, EO 20-79 requires landlords to give seven day's written notice to the tenant before filing an eviction action. (*Id.* ¶ 6.) Aside from these changes, EO 20-79 is more or less the same as EOs 20-14 and 20-73; EO 20-79 reiterates that it does not relieve tenants of their obligation to pay rent, and a violation of EO 20-79 is still punishable as a misdemeanor. (*Id.* ¶¶ 2, 10.)

Since initially declaring a peacetime emergency in March, Governor Walz has extended it monthly. *See* Exec. Orders Nos. 20-35, 20-53, 20-75, 20-78, 20-83, 20-89, 20-92, 20-97, 20-100. Currently, the peacetime emergency is in effect until January 13, 2021. Exec. Order No. 20-100 ¶ 4. Governor Walz has not rescinded EO 20-79, so it remains in effect. (EO 20-79 at 3 (declaring that EO 20-79 remains in effect until the peacetime emergency is terminated or until rescinded).)

### B. CDC Eviction Moratorium

Minnesota's eviction moratorium is not the only current restriction on a landlord's ability to file an eviction action. In September, the CDC issued its own eviction moratorium. CDC Moratorium, 85 Fed. Reg. 55,292. The CDC Moratorium generally forbids landlords from evicting tenants from residential property, but like the Minnesota moratorium, the CDC Moratorium provides a number of exceptions under which a landlord may evict a tenant. The circumstances permitting eviction are generally broader in the CDC moratorium than in Minnesota's moratorium. Under the CDC Moratorium, evictions are permitted where the tenant has (1) engaged in criminal activity on the property; (2) threatened the health or safety of other residents; (3) damaged property or posed an immediate and significant risk of damaging property; (4) violated any applicable building code, health ordinance, or other health and safety regulation; or (5) violated any other contractual obligation, aside from late payment of rent. *Id.* at 55,294. Landlords who violate the CDC Moratorium face fines of up to $250,000 or jail time, or both. *Id.* at 55,296. Currently, the CDC Moratorium does not apply in Minnesota because the state has its own moratorium that offers at least as much public health protection as the CDC Moratorium.[5] *See id.* at 55,294 (explaining that the CDC Moratorium does not

---

[5] To the best of the Court's knowledge, no court has decided whether EO 20-79 offers "the same or greater level of public-health protection" than the CDC Moratorium, 85 Fed. Reg. at 55,294, and thus whether the CDC Moratorium or EOs apply in Minnesota. As discussed in more detail in the standing section below, *see infra* Analysis III.A, the Court concludes that the eviction moratorium EOs offer more robust protection to tenants

apply in jurisdictions that have a moratorium on residential evictions that offers as much or more public health protection as the CDC Moratorium). If the eviction moratorium EOs were declared invalid or rescinded before the CDC Moratorium expires, the CDC Moratorium would then apply in Minnesota. The CDC Moratorium is currently in effect until January 31, 2021. Consolidated Appropriations Act, 2021, H.R. 133, § 502 (enacted Dec. 27, 2020).

### C.  Procedural History

The Landlords, both business entities, own and rent real estate. (Compl. ¶¶ 25, 35.) They own several residential rental properties in the Twin Cities metro area. (*Id.* ¶¶ 28–30, 32, 38.) The Landlords allege that they have troublesome tenants who they would seek to evict or whose leases they would not renew if not for the EOs at issue here. (*Id.* ¶¶ 30–33, 40–41.) Due to EO 20-79, the Landlords claim they are either unable to evict these tenants, or, for cases where it is unclear whether the exceptions apply, unwilling to attempt to evict the tenant for fear of facing criminal penalties if an exception does not apply. (*Id.* ¶¶ 31, 33, 41.)

The Landlords filed this suit in September, challenging the constitutionality of the eviction moratorium EOs under the Contracts Clause, the First Amendment, the Fifth Amendment Takings Clause, and the Fifth and Fourteenth Amendments' Due Process

---

compared to the CDC Moratorium. Thus, as of now, the EOs apply in Minnesota and the CDC Moratorium does not.

Clause. (Compl. ¶¶ 44–69.) They also bring an *ultra vires* claim against Governor Walz, claiming that the EOs are impermissible legislative and judicial acts. (*Id.* ¶¶ 74–81.) Among other things, the Landlords seek a declaration that Governor Walz and Attorney General Ellison's actions are unconstitutional, an order vacating the eviction moratorium EOs, and an order enjoining Governor Walz and Attorney General Ellison from enforcing the EOs. (*Id.* at 17–19.)

The day after filing the Complaint, the Landlords filed a motion for preliminary injunction. (ECF No. 5.) Several weeks later, the Government filed a motion to dismiss. (ECF No. 15.)

## ANALYSIS

The Government moves to dismiss the Complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

### I.    Rule 12(b)(1) Standard

Under Rule 12(b)(1), a party may move to dismiss an action for lack of subject-matter jurisdiction. If this Court finds it lacks subject-matter jurisdiction over the case, it must dismiss it. *Bueford v. Resolution Tr. Corp.*, 991 F.2d 481, 485 (8th Cir. 1993). A Rule 12(b)(1) motion may either challenge a complaint on its face or challenge the "factual truthfulness" of its assertions. *ARRM v. Piper*, 367 F. Supp. 3d 944, 950 (D. Minn. 2019) (citing Fed. R. Civ. P. 12(b)(1) and *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993)). The Government has brought a facial challenge, so "all of the factual allegations concerning

jurisdiction are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction." *Titus*, 4 F.3d at 593. The burden of proving subject matter jurisdiction falls on the party asserting jurisdiction. *See V S Ltd. P'ship v. Dep't of Hous. & Urban Dev.*, 235 F.3d 1109, 1112 (8th Cir. 2000).

## II.      Rule 12(b)(6) Standard

Rule 12(b)(6) requires that the Court dismiss a complaint for failure to state a claim upon which relief can be granted if it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When reviewing a Rule 12(b)(6) motion, a court must "tak[e] all facts alleged in the complaint as true, and mak[e] reasonable inferences in favor of the nonmoving party." *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014). Although the factual allegations need not be detailed, they "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facial plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, where a complaint alleges "facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

10

### III.   Jurisdictional Issues

The Court must first address several jurisdictional issues. The Government argues that the Landlords lack standing, Governor Walz and Attorney General Ellison are entitled to sovereign immunity, the Landlords' *ultra vires* claim must be dismissed based on the *Pennhurst* doctrine, and the Court should abstain under either the *Pullman* or *Colorado River* abstention doctrines. (ECF No. 12 at 8–12; ECF No. 18 at 11–18; ECF No. 33 at 2–5.) Although the Government is correct that the *ultra vires* claim must be dismissed under *Pennhurst,* its other jurisdictional arguments are without merit, and the Court will not abstain or dismiss the Complaint on any of those bases.

### A.  Standing

The Government raised the issue of standing in response to the motion for preliminary injunction, but not in its brief in support of the motion to dismiss.[6] Because standing is jurisdictional and federal courts have an independent obligation to assess it, the Court must consider whether the Landlords have standing. *Int'l Ass'n of Fire Fighters, Local 2665 v. City of Clayton*, 320 F.3d 849, 850 (8th Cir. 2003).

The jurisdiction of federal courts is limited to cases and controversies. U.S. Const. art III, § 2; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). Standing is a jurisdictional requirement "rooted in the traditional understanding of a case or controversy." *Spokeo,*

---

[6] The Government does, however, argue that the Landlords lack standing in the Government's brief in opposition to the Landlords' motion for preliminary injunction. (ECF No. 12 at 8–10.)

*Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Under the familiar three-part standing inquiry, plaintiffs must show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560–61).

The Government does not contest that the Landlords suffered an injury caused by Governor Walz and Attorney General Ellison. Instead, it argues that the Landlords' injury would not be redressed with a favorable ruling. The Government contends that even if the Landlords are successful here, their ability to evict tenants would still be restricted by the CDC Moratorium. (ECF No. 12 at 9.) But the CDC Moratorium offers narrower protections for tenants and provides for broader circumstances under which a landlord may evict a tenant. For instance, the CDC Moratorium allows evictions when a tenant has "[e]ngag[ed] in criminal activity while on the premises." CDC Moratorium, 85 Fed. Reg. at 55,294. Under EO 20-79, only certain types of criminal behavior on the premises— namely possession of controlled substances, prostitution, unlawful possession of a firearm, or possession of stolen property—would permit the landlord to evict a tenant. (EO 20-79 ¶ 2(b)); Minn. Stat. § 504B.171 subd. 1. If a tenant engages in criminal activity that is not enumerated in Minnesota Statutes section 504B.171, does not endanger the safety of others, and does not significantly damage property, a landlord would be able to evict the tenant under the CDC Moratorium, but not EO 20-79.

More significantly, the CDC Moratorium permits evictions when the tenant has violated any contractual obligation other than the obligation to pay rent. CDC Moratorium, 85 Fed. Reg. at 55,294. The Landlords wish to evict several tenants who are allowing additional people to live in their units in violation of their leases. (Compl. ¶¶ 30, 32.) The Landlords would be able to evict these tenants if the CDC Moratorium were in effect, but under the EOs, they may not. Another crucial difference between the CDC Moratorium and the EOs is that the CDC Moratorium permits landlords to start eviction proceedings, but merely prevents them from executing the eviction. *HHS/CDC Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19: Frequently Asked Questions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/downloads/eviction-moratoria-order-faqs.pdf (last visited Dec. 30, 2020). Therefore, if the Landlords were subject only to the CDC Moratorium, they would be able to commence an eviction action now and could immediately evict the tenant when the CDC Moratorium lapses or is rescinded. *Brown v. Azar*, No. 20-CV-3702-JPB, 2020 WL 6364310, at *17 (N.D. Ga. Oct. 29, 2020). Because the Landlords could obtain the relief they seek with a favorable ruling, the third standing prong is met, and the Landlords have standing.

### B.  Sovereign Immunity

The Government argues that Governor Walz and Attorney General Ellison are entitled to sovereign immunity. (ECF No. 18 at 11–13.) Because Governor Walz and

Attorney General Ellison may be proper defendants, the Court will not, at the motion to dismiss stage, conclude that they are entitled to sovereign immunity.

The Eleventh Amendment affords states sovereign immunity from suits brought by individuals. U.S. Const. amend. XI. State sovereign immunity generally extends to state officers. *Dover Elevator Co. v. Ark. State Univ.*, 64 F.3d 442, 447 (8th Cir. 1995). There are, however, some exceptions to this rule—most notably *Ex parte Young*, 209 U.S. 123 (1908). *Alden v. Maine*, 527 U.S. 706, 747–57 (1999). Under *Ex parte Young*, a plaintiff may sue a state official to "enjoin enforcement of an allegedly unconstitutional [law], provided that 'such officer [has] some connection with the enforcement of the act.'" *Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1145 (8th Cir. 2005) (citing *Ex parte Young*, 209 U.S. at 157). *Ex parte Young* only applies if state officials have enforced or threatened to enforce the allegedly unconstitutional law. *281 Care Comm. v. Arneson*, 766 F.3d 774, 797 (8th Cir. 2014) (citations omitted). If there is no "real likelihood" that the state official will enforce the challenged law, the court lacks jurisdiction over the challenge. *Id.* (citation omitted).

The Eighth Circuit has applied different standards at different stages of the proceeding to determine whether a state official is entitled to sovereign immunity. At earlier stages of the proceeding, such as on a motion to dismiss or motion for preliminary injunction, the Eighth Circuit has asked whether the state official is a "potentially proper" defendant. *281 Care Comm. v. Arneson*, 638 F.3d 621, 633 (8th Cir. 2011) (alteration omitted)

(motion to dismiss); *Reprod. Health Servs.*, 428 F.3d at 1145 (motion for preliminary injunction); *Minn. RFL Republican Farmer Lab. Caucus v. Freeman*, No. 19-CV-1949 (ECT/DTS), 2020 WL 1333154, at *2 (D. Minn. Mar. 23, 2020) (motion to dismiss). At the summary judgment stage, however, the question is no longer whether the state official is a potentially proper defendant, but rather whether the state official is "in fact [] the right party." *281 Care Comm.*, 766 F.3d at 797. As such, for the Government's motion to dismiss, the Court asks whether the Landlords have "[p]lausibly alleg[ed] some connection between the sued official[s] and enforcement of the challenged [law]." *Freeman*, 2020 WL 1333154 at *2.

Here, drawing all reasonable inferences in favor of the Landlords, they have pled facts connecting Governor Walz and Attorney General Ellison to the EOs sufficient to trigger *Ex parte Young*. The Landlords have alleged that Governor Walz issued the EOs and continues to extend the peacetime emergency that keeps the EOs in effect. (Compl. ¶¶ 8, 11, 13.) Attorney General Ellison has power to enforce the EOs, and the Landlords have alleged that he has enforced them in the past. (*Id.* ¶¶ 19, 24.) In addition, the Landlords have alleged that Attorney General Ellison was a member of the Executive Council that approved the EOs. (*Id.* ¶ 14.) The Court therefore finds that Governor Walz and Attorney General Ellison are potentially proper parties and are not entitled to sovereign immunity at this stage of the proceedings.

### C. Pennhurst *Doctrine*

Based on Eleventh Amendment principles, a federal court lacks jurisdiction to enjoin a state official's actions on the basis that the official has violated state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *Bacon v. Neer*, 631 F.3d 875, 880 (8th Cir. 2011). *Pennhurst* is an exception to *Ex parte Young*'s exception to state sovereign immunity. *Nat'l Assoc. of the Deaf v. Florida*, 980 F.3d 763, 774 (11th Cir. 2020) (referring to the *Pennhurst* doctrine as an exception to *Ex parte Young*). The justification for *Ex parte Young* is that a state official who acts in contravention of the federal Constitution is "stripped of his official or representative character"—he or she cannot be acting lawfully on behalf of the state when he or she acts unconstitutionally. *Ex parte Young*, 209 U.S. at 160. *Ex parte Young* serves to "permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Pennhurst*, 465 U.S. at 105 (quoting *Ex parte Young*, 209 U.S. at 160). That justification does not hold, however, when a litigant claims that a state official violated state law, because enjoining the state official on this basis would not "vindicate the supreme authority of federal law." *Id.* at 106. Not only that, but so enjoining a state official would run afoul the purpose of sovereign immunity—preserving state sovereignty. *Id.*

Here, the Landlords' *ultra vires* claim against Governor Walz is plainly a claim that seeks to enjoin a state official on the basis of state law. (Compl. ¶¶ 74–81.) The Landlords

16

claim that Governor Walz acted in excess of his delegated powers and that he violated the Minnesota Constitution. (*Id.*) As such, Governor Walz is entitled to sovereign immunity for the *ultra vires* claim. *Pennhurst*, 465 U.S. at 106, 124–25.

The Landlords' sole argument against the application of *Pennhurst* is that *Pennhurst* does not apply when the state law claim is that a state official acted *ultra vires*—that is, without any power whatsoever. (ECF No. 28 at 5–6.) When a litigant claims that a state official lacks delegated power to do something, such a claim is not considered to be against a sovereign because an official acting outside his or her constitutional authority cannot be acting for the state, and the official is therefore not immune. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–90 (1949); *Pennhurst*, 465 U.S. at 101 n.11. A state officer is only considered to have acted *ultra vires* if he or she lacks "any authority whatsoever." *Pennhurst*, 465 U.S. at 101 n.11 (citing *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697 (1982)). The test to determine whether a state official has acted *ultra vires* is whether the state official had a "colorable basis for the exercise of authority." *Id.* (quoting *Treasure Salvors*, 458 U.S. at 716 (White, J., concurring in the judgment in part and dissenting in part)).

Here, though styled as an *ultra vires* claim, Count VI cannot be construed to be a claim that Governor Walz acted without any authority whatsoever when he issued the EOs. Count VI itself recognizes that Governor Walz possesses authority to issue EOs in certain circumstances. (Compl. ¶ 75; *see also* ECF No. 28 at 5.) The Landlords make the

more specific argument that Governor Walz lacked authority to act in a purely legislative or judicial capacity. (ECF No. 28 at 6.) In other words, the Landlords accept that Governor Walz had the authority to issue EOs generally but argue that he lacked authority to include specific aspects of the EOs at issue here. (*Id.* at 5–6.) The EOs are properly considered as a whole, rather than examined in part and in isolation. Governor Walz had a colorable basis on which to issue these EOs. *Pennhurst*, 465 U.S. at 101 n.11. Because the issuance of these EOs was not an *ultra vires* act, *Pennhurst* applies, and Governor Walz is entitled to sovereign immunity as to Count VI.

### D. Abstention

In the Government's view, the Court should abstain from deciding either the whole case under *Pullman*, or only the *ultra vires* claim under *Colorado River*. (ECF No. 18 at 13–18.) Finding no unsettled question of state law, the Court declines to abstain based on *Pullman*. And there is no parallel proceeding in state courts, so *Colorado River* does not apply either. These conclusions are consistent with federal courts' "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

#### 1. Pullman *Abstention*

Under *Pullman*, a federal court should abstain from hearing a case when it presents an unsettled question of state law, and a state court's resolution of that question may "avoid or materially alter the need for a decision on federal constitutional grounds." *Doe*

*v. McCulloch*, 835 F.3d 785, 788 (8th Cir. 2016) (citation omitted). For an issue of state law to be unsettled, it must be "of an uncertain nature" and there must be a feasible limiting construction to the law. *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 237 (1984). The mere fact that state courts have not addressed a certain issue does not make an issue of state law unsettled and is not a sufficient reason for a federal court to invoke *Pullman* abstention. *Wisconsin v. Constantineau*, 400 U.S. 433, 439 (1971). And "the relevant inquiry is not whether there is a bare, though unlikely, possibility that state courts might render adjudication of the federal question unnecessary." *Midkiff*, 467 U.S. at 237. Rather, resolution of the issue of state law must be "sufficiently likely" to modify the federal constitutional questions or to obviate the need to decide them. *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 512 (1972).

The first question, then, is whether the Landlords' claims raise an unsettled issue of state law. Typically, this inquiry focuses on the challenged law itself. *See, e.g., id.* at 510 ("The paradigm case for abstention arises when the challenged state statute is susceptible of a construction by the state courts that would avoid or modify the (federal) constitutional question.") (internal quotations omitted). Here, neither party argues that the EOs, on their face, are unclear. Rather, the Government claims that the scope of the Minnesota governor's powers during a public health emergency, which depends on the Minnesota Constitution and the Minnesota Emergency Management Act, is unclear. (ECF No. 18 at 14–15; *cf.* ECF No. 33 at 3 (noting that resolution of the Landlords' *ultra vires*

claim would require the Court to determine the scope of the Minnesota Emergency Management Act as well as to delineate each branch's powers under the Minnesota Constitution).)

The Court sees no reason to believe that an unsettled issue of state law must stem from an ambiguity on the face of the challenged law. *See, e.g.*, *Beavers v. Ark. State Bd. of Dental Exam'rs*, 151 F.3d 838, 841 (8th Cir. 1998) (finding an unsettled issue of state law in the scope of the agency's authority under its organic statute even though plaintiff challenged an agency regulation). The Government contends that the unsettled issue of state law here is whether Governor Walz had authority to issue these EOs, which the Landlords raised in their *ultra vires* claim. (ECF No. 18 at 14; Compl. ¶¶ 74–81.) The Court does not view this issue as unsettled. State law explicitly authorizes Governor Walz to issue EOs during an emergency. Minn. Stat. § 12.21, subd. 3; *id.* § 12.32. Although it is theoretically possible that a state court would conclude that Governor Walz lacked authority to issue these EOs, such speculation is not enough to make an issue of state law unsettled for purposes of *Pullman*. *Midkiff*, 467 U.S. at 237.

2.   Colorado River *Abstention*

Under *Colorado River*, a federal court may abstain from hearing a case when there are parallel proceedings in state court and "exceptional circumstances warrant abstention." *Fru-Con Constr. Corp. v. Controlled Air, Inc.*, 574 F.3d 527, 534 (8th Cir. 2009) (citing *Colo. River*, 424 U.S. at 817–18). In the Eighth Circuit, suits are parallel when

"'substantially the same parties litigate substantially the same issues in different forums.'" *Lexington Ins. Co. v. Integrity Land Title Co.*, 721 F.3d 958, 968 (8th Cir. 2013) (citation omitted). Suits are substantially similar when "there is a substantial likelihood that the state proceeding will fully dispose of the claims presented in the federal court." *Cottrell v. Duke*, 737 F.3d 1238, 1245 (8th Cir. 2013) (citation omitted). If there is any doubt regarding whether two suits are parallel, a federal court should not abstain. *Fru-Con*, 574 F.3d at 535.

Here, there are no ongoing state cases paralleling this suit. The Government asserts that this suit is parallel to *Free Minn. Small Bus. Coal. v. Walz*, No. 62-CV-20-3507 (Minn. Dist. Ct. 2020), but this argument is misplaced. (ECF No. 18 at 14.) First, the parties in that case are not "substantially the same" as the parties here. *Lexington Ins.*, 721 F.3d at 968. The plaintiffs in *Free Minnesota* are a small business coalition, several state legislators, and numerous Minnesota businesses. (ECF No. 13-10 ("Goodwin Decl., Ex. 10") at 6.) Governor Walz is the sole defendant. Heights Apartments, Walnut Trails, and Attorney General Ellison are not parties in *Free Minnesota*. So the parties are not substantially the same, and *Free Minnesota* is not parallel to this case for purposes of *Colorado River*.

Further, it is unlikely that resolution of the issues in *Free Minnesota* will fully dispose of the Landlords' claims here. *Cottrell*, 737 F.3d at 1245. In *Free Minnesota*, plaintiffs claim that Governor Walz's executive orders violate the Minnesota Constitution's non-delegation doctrine; the Minnesota Emergency Management Act

authorizes a legislative veto, which the Minnesota Constitution does not permit; and Governor Walz exceed his authority by invoking his emergency powers. (Goodwin Decl., Ex. 10 at 1.) Here, however, the Landlords concede that the Minnesota Emergency Management Act validly delegated Governor Walz some power, but they argue that parts of these specific EOs constitute legislative and judicial acts, thereby violating the separation of powers. (Compl. ¶¶ 75–76; ECF No. 28 at 8.) Hence, there is some overlap between the claims in *Free Minnesota* and the claims here, but not enough for the Court to say that resolution of *Free Minnesota* is likely to fully dispose of the Landlords' claims. *Cottrell*, 737 F.3d at 1245.

## IV.    The Landlords' Constitutional Claims

Since the Court has determined that it has jurisdiction to decide all but one of the Landlords' claims, it needs to consider whether the Landlords have stated a claim upon which relief may be granted. First, though, the Court must determine the lens through which to view the claims; that is, which standard of constitutional analysis applies. Specifically, the question is whether the standard from *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), which is used to determine the constitutionality of government actions in a public health crisis, applies to the Landlords' constitutional claims.

### A.  Jacobson

The *Jacobson* standard affords a significant degree of deference to government action during a public health crisis. 197 U.S. at 11. Under *Jacobson*, a state law enacted

during a public health crisis is not subject to constitutional challenge unless it "has no real or substantial relation" to protecting the public health or is "beyond all question[] a plain, palpable invasion" of fundamental rights. *Id.* at 31; *In re Rutledge*, 956 F.3d 1018, 1027–28 (8th Cir. 2020).

In April, approximately one month after states began to impose protective measures in response to the pandemic, the Eighth Circuit held that it was an abuse of discretion for the district court *not* to apply *Jacobson* to Arkansas's postponement of all non-medically necessary surgeries. *Rutledge*, 956 F.3d at 1028. Because the Court is bound by the Eighth Circuit's holding that it was an abuse of discretion for the district court not to apply *Jacobson*, the Court will assess the Landlords' claims under this standard.[7] Other district courts, citing *Rutledge*, have done similarly. *E.g.*, *Minn. Voters All. v. Walz*, No. 20-CV-1688 (PJS/ECW), 2020 WL 5869425, at *12 (D. Minn. Oct. 2, 2020).

The Court notes, however, that although *Rutledge* instructs that *Jacobson* applies here, there are a number of factors that muddy the waters. First is timing. As noted above, *Rutledge* was decided relatively early in the pandemic; the directive at issue in that case was issued fewer than three weeks before the Eighth Circuit decided *Rutledge*, and

---

[7] Courts have applied the *Jacobson* standard at the motion to dismiss stage. *E.g.*, *Page v. Cuomo*, No. 1:20-CV-732, 2020 WL 4589329, at *10–*12 (N.D.N.Y. Aug. 11, 2020); *McDougall v. Cnty. of Ventura*, No. 2:20-cv-2927-CBM-AS, 2020 WL 6532871, at *5–*8 (C.D. Cal. Oct. 21, 2020); *Hund v. Cuomo*, No. 20-cv-1176 (JLS), 2020 WL 6699524, at *7–*8 (W.D.N.Y. Nov. 13, 2020).

Arkansas's Governor had declared a state of emergency only seven weeks prior. *Rutledge*, 956 F.3d at 1023; Ark. Exec. Order No. 20-03. In contrast, more than nine months have now elapsed since Governor Walz declared a peacetime emergency and issued the first eviction moratorium EO. Exec. Order Nos. 20-01, 20-14. As time goes on, the rationale for applying *Jacobson*—that the government has more latitude to act during a public health emergency—becomes less and less convincing.[8] *See Cnty. of Butler v. Wolf*, No. 20-cv-677, 2020 WL 5510690, at *8–*9 (W.D. Pa. Sept. 14, 2020) (explaining how it can be problematic to continue to afford deference to "temporary measures aimed at remedying a fleeting crisis") (citation omitted). That so much time has passed underscores another concern here: the Minnesota Legislature has had time to craft and enact legislation on eviction standards during the pandemic, and it has not done so.

Another concern is a perceived shift in courts' treatment of *Jacobson*. The Supreme Court recently considered a case challenging New York Governor Andrew Cuomo's Executive Order that limited attendance at religious services. *Roman Cath. Diocese of*

---

[8] It is important to note that the Court's analysis here is solely focused on the temporal aspect of the measures. The Court recognizes that in Minnesota, November and December have been the worst months of the pandemic so far—the state has seen the more cases, hospitalizations, and deaths in these two months than at any other time during the pandemic. *Situation Update for COVID-19*, Minn. Dep't of Health, https://www.health.state.mn.us/diseases/coronavirus/situation.html (last visited Dec. 29, 2020). Thus, in the abstract, the need to take measures to protect the public health has never been greater. The fact remains, however, that the longer these emergency measures are in place, the more they begin to look like "measures of indefinite duration." *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (2020) (Alito, J., dissenting from the denial of an application for injunctive relief).

*Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020). The Supreme Court, in a *per curiam* opinion, eschewed *Jacobson* and instead applied strict scrutiny. *Id.* at 67. Earlier in the pandemic, the Supreme Court had been more deferential to state measures designed to protect public health. *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, J., concurring in the denial of an application for injunctive relief) (explaining that courts should not second-guess public health measures instituted by state elected officials). *Roman Catholic Diocese*, then, may signal an end to the viability of the *Jacobson* standard.

Justice Gorsuch, in a concurring opinion in *Roman Catholic Diocese*, explicitly criticized the *Jacobson* standard. *Roman Catholic Diocese*, 141 S. Ct. at 70–71 (Gorsuch, J., concurring). He noted that the modern tiers of scrutiny were not yet developed when *Jacobson* was decided, and that the *Jacobson* Court essentially applied rational basis review—the same level of scrutiny that would be applied to Jacobson's claim if it were brought today. *Id.* at 70. In Justice Gorsuch's view, "*Jacobson* didn't seek to depart from normal legal rules during a pandemic, and it supplies no precedent for doing so." *Id.* Instead, *Jacobson* was a "modest decision" that has been mistaken for a "towering authority that overshadows the Constitution during a pandemic." *Id.* at 71.

Justice Gorsuch's concurrence expressly criticizes Chief Justice Robert's perceived reliance on *Jacobson* in the Chief Justice's concurrence in *South Bay*. *Id.* at 71. In response, Chief Justice Roberts distanced himself from his citation to *Jacobson*, claiming he only

cited it for a narrow, uncontroversial proposition. *Id.* at 75–76 (Roberts, C.J., dissenting). Thus, in light of *Roman Catholic Diocese*, the Court harbors doubts about how much of the *Jacobson* standard is left to apply today.

Another federal district court, when considering whether to apply *Jacobson*, noted that "[i]n the eleven decades since *Jacobson*, the Supreme Court refined its approach for the review of state action that burdens constitutional rights." *Bayley's Campground Inc. v. Mills*, 463 F. Supp. 3d 22, 31 (D. Me. 2020). Based, in part, on the establishment of traditional tiers of constitutional scrutiny, the court refused to apply the *Jacobson* standard. *Id.* at 32. Scholars, too, have criticized the *Jacobson* standard. *See* Lindsay F. Wiley & Stephen I. Vladeck, *Coronavirus, Civil Liberties, and the Courts: The Case Against "Suspending" Judicial Review*, 133 Harv. L. Rev. F. 179 (2020) (arguing against the application of more deferential standards, such as *Jacobson*, during emergencies).

So, in sum, the Court will apply *Jacobson*, but it does so bearing in mind the many arguments against doing so. And ultimately, whether the Court applies *Jacobson* is not outcome-determinative; the Court finds that the Landlords' claims fail as a matter of law under either *Jacobson* or the ordinary analysis that would apply absent a pandemic. For the sake of completeness, the Court will analyze each of the Landlords' claims under both *Jacobson* and ordinary constitutional analysis.

### B. *Contracts Clause Claim*

The Landlords assert that the eviction moratorium EOs violate the Contracts Clause. (Compl. ¶¶ 44–50.) By issuing the EOs, the Landlords argue, Governor Walz has impaired their ability to enforce their contracts with tenants. (*Id.*) This claim fails both under *Jacobson* and ordinary Contracts Clause analysis.

### 1. *Contracts Clause Analysis*

The Landlords' Contract Clause claim must be dismissed. The first question for a Contracts Clause claim is whether the state law has substantially impaired a contractual relationship. *Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018). To assess whether an impairment is substantial, the Court considers "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id.* at 1822. The EOs here do not substantially impair the Landlords' contracts. That is not to say that the Landlords have suffered no impairment of their contractual rights.[9] By being unable to terminate tenants'

---

[9] The Court harbors doubts about whether many of the "contractual rights" the Landlords point to are actually contractual rights, rather than statutory rights. For instance, in the Complaint, the Landlords note that the right to evict tenants is based on two state statutes. (Compl. ¶ 46 (citing Minn. Stat. §§ 504B.285, 504B.291).) As another court recently explained, whether these statutory rights can be the basis for a Contract Clause claim may depend on whether the right to evict under state law is express or implied. *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 171–72 (S.D.N.Y. 2020). Generally, "laws which subsist at the time and place of the making of a contract . . . enter into and form a part of it" as if they were expressly incorporated in the contract's terms. *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 429–30 (1934) (citation omitted). "However, the implied contractual rights conferred by state laws, including judicial remedies such

leases or file eviction actions, the EOs have circumscribed the Landlords' ability to enforce their leases.[10]

But the fundamental nature of a lease of a residential unit is that the landlord provides the tenant a place to live; the tenant, in turn, pays the landlord rent. The landlord's end of the contractual bargain is receiving rent payments. Nothing in the EOs interferes with that right, and each of the eviction moratoria clearly states that it does not affect a tenant's obligation to pay rent. (*E.g.*, EO 20-79 ¶ 2.) And although, under the EOs, a landlord cannot enforce its contractual right to rent through an eviction proceeding, it can still sue tenants for rent owed.

Even if the EOs did substantially impair the Landlords' contractual rights, their claim would also fail the second prong of Contracts Clause analysis, because the EOs reasonably and appropriately advance "a significant and legitimate public purpose." *Sveen*, 138 S. Ct. at 1822 (citation omitted). This prong ensures that the government is exercising its police power to address a social or economic problem, rather than benefitting a special interest. *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S.

---

as eviction, may be the subject of a Contracts Clause claim 'only when those laws affect the validity, construction, and enforcement of contracts.'" *Elmsford*, 469 F. Supp. 3d at 172 (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 189 (1992)). At the motion to dismiss stage, the Court will assume that the right to evict is a contractual right sufficient to serve as the basis for a Contract Clause claim.

[10] Although there are no leases in the record, the Landlords have pled that the EOs have interfered with their rights under the leases. (*E.g.*, Compl. ¶ 48.)

400, 412 (1983). As the Landlords acknowledge, the EOs advance an important and legitimate state interest—preventing the spread of COVID-19. (ECF No. 28 at 1.) The closer question is whether the EOs appropriately and reasonably advance that interest, and they do. Although the earlier eviction moratorium EOs only permitted eviction in narrow circumstances, as Minnesota eased other restrictions, Governor Walz broadened the circumstances under which landlords may evict tenants. (EO 20-79 ¶ 2.) EO 20-79 reasonably balances protection of public health (by keeping people in their homes and preventing the spread of COVID-19) with a landlord's legitimate need, in some circumstances, to evict a tenant. To completely prohibit evictions would *not* reasonably advance the state's interest in protecting public health. But EO 20-79 is a far cry from a total prohibition on evictions; landlords are permitted to evict tenants in instances where tenants pose the greatest risk, such as to other residents or by engaging in dangerous criminal activity. (*Id.*)

The Landlords point to the CDC Moratorium to highlight how the EOs are not drawn reasonably and appropriately to promote public health. (ECF No. 28 at 22.) In their view, the CDC Moratorium, compared to the EOs, more appropriately balances the interests of landlords and tenants. (*Id.*) But the EOs need not be drawn with surgical precision to avoid constitutional infirmity. Contracts Clause analysis is not, after all, strict scrutiny. *See Baptiste v. Kennealy*, No. 20-cv-11335-MLW, 2020 WL 5751572, at *17–*18 & n.10 (D. Mass. Sept. 25, 2020) (noting that where the government is not a party to the

contract, there must have been a rational basis for the legislation that allegedly impairs contracts). The EOs need not be narrowly tailored to prevent the spread of COVID-19, nor do they even need to be "necessary." Rather, they need only be "drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose," and the Court finds that they are. *Sveen*, 138 S. Ct. at 1822 (internal quotations and citation omitted). As such, the Landlords' Contracts Clause claim fails as a matter of law.

2. Jacobson *Analysis*

Under *Jacobson*, the first question is whether the EOs have a "real or substantial relation" to the pandemic. *Rutledge*, 956 F.3d at 1028. Here, the eviction moratorium EOs do have a real and substantial relationship to the dangers posed by COVID-19. As EO 20-79 notes, the protections offered by the previous eviction moratorium EOs were "crucial" to protecting the public health. (EO 20-79 at 1.) As research shows, limiting evictions contributes to a decrease in COVID-19 infections and deaths. (ECF No. 35.)

The second question is whether the eviction moratorium EOs are "beyond all question, a plain, palpable invasion" of the Landlords' Contract Clause rights. *Rutledge*, 956 F.3d at 1028–29. Because the Court concludes that the Landlords' Contracts Clause claim fails under the traditional analysis, the Court also finds that they do not plainly or palpably infringe on the Landlords' Contracts Clause rights. As such, under *Jacobson*, the EOs do not violate the Contracts Clause.

30

### C. First Amendment Petition Clause Claim

The Landlords' next claim is that the EOs violate the First Amendment's Petition Clause, because they bar the courthouse doors to the Landlords. (Compl. ¶¶ 51–56.) Because the prohibition on filing evictions is a temporary delay and the Landlords may bring other claims against tenants, such as suits for rent owed, the EOs do not violate the Petition Clause under either *Jacobson* or ordinary constitutional analysis.

#### 1. Petition Clause Analysis

The exact provenance of the constitutional right of access to the courts is unclear. *Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) (noting that the right of access to courts has been founded in Article IV's Privileges and Immunities Clause, the First Amendment's Petition Clause, Fifth Amendment's Due Process Clause, and the Fourteenth Amendment's Due Process and Equal Protection clauses). At base, though, right-of-access claims serve to "provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Id.* at 414–15. The right of access to the courts, however, does not guarantee a plaintiff access to his or her preferred remedy. *Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 660 (1st Cir. 1997) (holding that there is no constitutional right to a specific form of relief); *Elmsford*, 469 F. Supp. 3d at 174. In the Due Process context, the Supreme Court has recognized that mere delay in accessing the courts, unlike a total deprivation of access, does not violate the Constitution. *Compare Sosna v. Iowa*, 419 U.S. 393, 410 (1975) (holding that Iowa's one-year residency

requirement to file a divorce petition was constitutional), *with Boddie v. Connecticut*, 401 U.S. 371, 380–81 (1971) (finding that Connecticut's filing fee for divorce proceedings violated due process when it prohibited those unable to pay from commencing such a proceeding).

Because the EOs foreclose the Landlords' ability to obtain only one kind of relief and only does so temporarily, the EOs do not violate the Petition Clause. The courthouse doors remain open to the Landlords. First, the EOs do not prohibit the Landlords from bringing a breach of contract claim and obtaining a money judgment in cases where tenants are not paying rent. Second, the Landlords' ability to file an eviction action is not totally foreclosed—EO 20-79 has several exceptions where a landlord may evict a tenant. Also, to the extent that the EOs do prevent the Landlords from bringing an eviction action, that delay is, at this point, best characterized as a constitutionally-permissible delay in the Landlords' ability to evict, not a constitutionally-impermissible "total deprivation."[11] *Sosna*, 419 U.S. at 410.

This conclusion is in step with other courts that have analyzed this exact issue. *See Elmsford*, 469 F. Supp. 3d at 173–75 (concluding that New York's eviction moratorium did

---

[11] Although, at this point, the EOs are best characterized as a mere delay in the Landlords' ability to file an eviction action, the EOs' prohibitions may eventually ripen into an unconstitutional "total deprivation." The Court need not decide at what point the EOs would cross the line from mere delay to total deprivation, but, as the Government noted at the hearing, the Supreme Court in *Sosna* held that a one-year delay in being able to file a suit was constitutional.

not violate the Petition Clause because the moratorium was a mere delay, and landlords had other avenues of redress available); *Baptiste*, 2020 WL 5751572, at \*25–\*26 (applying Due Process analysis to plaintiffs' Petition Clause claim and finding that the eviction moratorium satisfied rational basis review); *Brown*, 2020 WL 6364310, at \*14–\*17 (upholding the CDC Moratorium because plaintiffs could bring a breach of contract claim and because the moratorium was a mere delay). Because the Landlords still have the ability to evict tenants in some cases and to bring breach of contract claims, and because the Landlords' ability to file eviction actions generally is merely delayed, the Landlords' Petition Clause claim fails.

2.  Jacobson *Analysis*

As discussed above, the EOs have a real and substantial relation to the pandemic. *See supra* Analysis IV.B.2. Because the EOs do not infringe on the Landlords' Petition Clause rights under the ordinary analysis, they similarly do not plainly and palpably infringe on the Landlords' rights.

**D. Takings Clause Claim**

The Landlords argue that the EOs violate the Takings Clause because the EOs constitute a taking for which compensation has not been paid. (Compl. ¶¶ 57–63.) Because the EOs are neither a physical nor a regulatory taking, this claim fails under *Jacobson* and traditional Takings Clause analysis.

1.   *Takings Clause Analysis*

To sustain a Takings Clause claim, the plaintiff must first demonstrate that they have a property interest that the Takings Clause protects. *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 439 (8th Cir. 2007). Here, the Landlords have alleged they have property interests in their apartment buildings. (Compl. ¶¶ 28, 38.)

The next question is whether the Landlords have suffered a taking. *Hawkeye*, 486 F.3d at 440. A taking may be a physical taking—where the government directly appropriates private property or forces a physical invasion of it—or a regulatory taking— "where a regulation affecting private property 'goes too far.'" *Id.* (citation omitted). The EOs constitute neither a physical nor a regulatory taking.

a.   <u>Physical Taking</u>

A physical taking occurs when the government subjects a property owner to a "permanent physical occupation" of the owner's property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35 (1982). "The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992) (emphasis in original). The EOs do not constitute a physical taking. As in *Yee*, where the Supreme Court held there was no taking, the Landlords voluntarily rented units in their buildings to their tenants. *Id.* Because the "tenants were invited by [the Landlords], not forced upon them by the government," there has been no physical taking. *Id.* at 528.

34

The Landlords seek to distinguish this case from *Yee* on the basis that the Supreme Court held there was no taking based, in part, on the fact that mobile home park owners were permitted to evict tenants. (ECF No. 28 at 24.) Although the Supreme Court relied on this as evidence that the regulatory scheme at issue did not compel the mobile home park owners to continue renting to tenants, the factual distinction the Landlords advance is not persuasive. In *Yee*, the California Mobilehome Residency Law only permitted the park owner to evict a tenant in a narrow circumstance—when the park owner wanted to change the use of his or her land. 503 U.S. at 528. Even then, the park owner was required to give six or twelve months' notice. *Id.* The Landlords claim that the situation here is different, since, under the EOs, they "are indefinitely prevented from evicting their tenants." (ECF No. 28 at 24.) Not so. EO 20-79 permits a landlord to evict a tenant in a number of circumstances. (EO 20-79 ¶ 2(a)–(d).) Additionally, landlords may terminate or decline to renew leases when they wish to occupy the units themselves or have their families occupy them. (*Id.* ¶ 4.) The Landlords' effort to distinguish this case from *Yee* fails, and the Court finds the EOs are not a physical taking.[12]

---

[12] Again, this conclusion is consistent with other courts that have considered this exact issue. *See Auracle Homes, LLC v. Lamont*, No. 3:20-cv-829 (VAB), 2020 WL 4558682, at *13–*14 (D. Conn. Aug. 7, 2020); *Baptiste*, 2020 WL 5751572, at *20; *Elmsford*, 469 F. Supp. 3d at 162–64.

b. <u>Regulatory Taking</u>

Regulatory takings come in two types: categorical and non-categorical. A categorical regulatory taking occurs when the government regulation "denies all economically beneficial or productive use of land." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992). That is not the case here—among other feasible, economically beneficial uses of their properties, the Landlords are still collecting rent from some tenants. (Compl. ¶¶ 29 (noting Heights Apartments "has had no issues" with tenants in Building A), 30 (explaining that two units in Building B have paid rent regularly since EO 20-14 went into effect); 32 (stating that three units in Building C have regularly paid rent); 38–40 (implying that nearly ninety percent of residents in a 168-unit building have paid rent regularly and on time).) There has been no categorical regulatory taking.

The other kind of regulatory taking is non-categorical. To determine whether a non-categorical regulatory taking has occurred, courts engage in an "essentially ad hoc, factual inquir[y]." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 326 (2002) (citing *Lucas*, 505 U.S. at 1015). This inquiry is guided by *Penn Central*'s framework: "three factors [] have 'particular significance': (1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'" *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224–25 (1986) (quoting *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)).

To assess the economic impact of the regulation on the Landlords, the Court must "compare the value that has been taken from the property with the value that remains in the property" by considering "the parcel as a whole." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987) (citing *Penn Cent.*, 438 U.S. at 130–31). The degree to which a government regulation has economically impacted a plaintiff is not well-suited to resolution on a motion to dismiss, especially without an evidentiary hearing. *See Naegele Outdoor Advert., Inc. v. City of Durham*, 844 F.2d 172, 176–77 (4th Cir. 1988) ("Resolution of the dispute by plenary hearing rather than by summary judgment is particularly important in cases involving claims of regulatory taking."). As such, the Court will assume, at this stage, that the EOs have sufficiently economically impacted the Landlords to meet *Penn Central*'s first factor.

The next consideration is whether the EOs have interfered with the Landlords' reasonable investment-backed expectations. *Penn Cent.*, 438 U.S. at 124. Some courts have found that COVID-19-era eviction moratoria have not interfered with landlords' investment-backed expectations because, in most states, the business of renting residential property is heavily-regulated, and thus landlords could have expected additional regulation. *E.g.*, *Elmsford*, 469 F. Supp. 3d at 166–68; *Auracle Home*, 2020 WL 4558682, at *15–*16. Another court, however, concluded that, although landlords could expect some degree of regulation, no reasonable landlord could have expected a once-in-a-century pandemic and the ensuing restrictions on evictions. *Baptiste*, 2020 WL 5751572,

at *22. The Court finds the latter approach more persuasive. Making all reasonable inferences in favor of the Landlords, it is fair to say that, although they understood that they were entering a regulated industry, neither Landlord could have expected regulations of the duration and on the scale of the EOs.[13] As such, at this stage, the Court will assume that the EOs have interfered with the Landlords' investment-backed expectations.

But even assuming that point, the Landlords' claim fails on the third *Penn Central* factor. A regulation which "arises from a public program that adjusts the benefits and burdens of economic life to promote the common good . . . does not constitute a taking requiring Government compensation." *Connolly*, 475 U.S. at 225 (citations omitted). Additionally, even when a regulation circumscribes the most immediately profitable use of certain property, there is no taking. *Hawkeye*, 486 F.3d at 442. In other words, a property owner generally "possesses a full bundle of property rights, [and] the destruction of one strand of the bundle is not a taking." *Andrus v. Allard*, 444 U.S. 51, 65–66 (1979) (internal quotations omitted).

---

[13] This is perhaps slightly more difficult to say for Heights Apartments, as it closed on its properties on March 27, 2020, two weeks after Governor Walz declared a peacetime emergency and nearly a week after Governor Walz issued EO 20-14, the first eviction moratorium. (Compl. ¶ 28; EO 20-14); Exec. Order No. 20-01. Even though Heights Apartments knew of the eviction moratorium when it purchased its properties, it is possible that it did not expect the prohibition to last for as long as it has. For this reason, the Court will assume that the EOs have interfered with Heights Apartment's investment-backed expectations.

The EOs here are precisely the kind of public program benefitting the common good that is not a compensable taking. *Connolly*, 475 U.S. at 225. Even assuming that the EOs have affected the Landlords' property rights, they have affected only one stick in the Landlords' bundle of property rights—the ability to enforce their rights under the lease through lease termination or eviction. Even in light of the EOs, the Landlords' bundles abound with other property right "sticks": the Landlords still own their properties; they can occupy their properties; they can evict, terminate, or non-renew a tenant's lease in certain circumstances; the Landlords can still lease vacant units and collect rent; if tenants do not pay rent, the Landlords retain the right to sue tenants for rent owed; the Landlords can borrow against their properties, and they can sell their properties if they wish. And, although the EOs affect one of the Landlords' property rights, this incursion on their rights is merely temporary. Considering these factors, the Landlords' Takings Clause claim fails on the third *Penn Central* factor—the nature of the regulation.

The Landlords, quoting a 1960 Supreme Court case, contend that the EOs are a taking because they force some individuals to "bear public burdens" which, "in all fairness and justice, should be borne by the public as a whole." (ECF No. 28 at 25 (citing *Armstrong v. United States*, 364 U.S. 40, 49 (1960).) Although this is a correct statement of the general purpose of the Takings Clause, relying on this principle to establish that the EOs constitute a taking is flawed in two ways. First, the *Armstrong* principle is already reflected in the three-factor *Penn Central* analysis. *PruneYard Shopping Ctr. v. Robins*, 447

U.S. 74, 82–83 (1980) (explaining that courts must look to the three-factor analysis to determine whether a restriction on private property has forced some people to bear a burden that should be borne by the public as a whole). Second, *Armstrong* is somewhat in tension with *Connolly*'s statement that public programs that "adjust[] the benefits and burdens of economic life to promote the common good" are not takings. *Connolly*, 475 U.S. at 225. The *Connolly* Court was well aware of *Armstrong*—the Court cited *Armstrong* later in the opinion but held that *Armstrong* did not apply because the burdens in that case were more appropriately borne by the plaintiffs. *Id.* at 227. Because the EOs promote the common good and adjust the benefits and burdens of the Landlords and society at large, *Connolly* is more relevant here.

In sum, even though the Court assumes that the EOs economically impacted the Landlords and interfered with their investment-backed expectations, the Court finds that the EOs do not constitute a regulatory taking because the nature of the EOs is not consistent with finding a taking.

2.  Jacobson *Analysis*

As discussed above, the EOs have a real and substantial relation to the pandemic. *See supra* Analysis IV.B.2. Since the Court concludes that the EOs do not constitute a taking under the traditional analysis, the EOs do not plainly and palpably infringe on the Landlords' Takings Clause rights.

### E.  Due Process Claim

The Landlords argue that, aside from their claims discussed above, the whole of the Constitutional violations caused by the EOs is greater than the sum of their parts, and this amalgamation of constitutional violations constitutes a separate violation of the Landlords' substantive due process rights. (Compl. ¶¶ 64–69; ECF No. 28 at 26–27.) The Landlords, despite arguing multiple discrete Constitutional violations, claim that "the EOs here cannot be reduced down to their component violations and argued as separate and discrete infringements." (ECF No. 28 at 26.) Because substantive due process cannot be made to do the work of other parts of the Constitution, the Landlords' substantive due process claim fails. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 721 (2010).

Claims of constitutional violations cannot be aggregated and re-packaged into a separate substantive due process claim. "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Stop the Beach Renourishment*, 560 U.S. at 721 (internal quotations and citation omitted); *see Mendoza v. U.S. Immigr. & Customs Enf't*, 849 F.3d 408, 420–21 (8th Cir. 2017) (same). The Landlords have brought colorable— though ultimately unsuccessful—claims that the EOs violate the Contracts Clause, the Petition Clause, and the Takings Clause. Since the Landlords' claims can be analyzed

under these constitutional provisions, the Landlords may not bring a separate substantive due process claim.

### F.  Section 1983 Claim

The Landlords bring a separate Section 1983 claim, based on same constitutional violations they separately alleged. (Compl. ¶¶ 70–73.) But because the Landlords failed to state a claim under the Contract Clause, Petition Clause, Taking Clause, and substantive due process, their separate section 1983 claim must also be dismissed. *DuBose v. Kelly*, 187 F.3d 999, 1002 (8th Cir. 1999) (listing violation of a constitutional right as an essential element of a § 1983 claim).

The Landlords have failed to state a claim under the Contract Clause, Petition Clause, Takings Clause, and the Due Process Clauses. Therefore, the Court grants the Government's motion to dismiss and denies the Landlords' motion for preliminary injunction as moot.

### CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.     The Government's motion to dismiss (ECF No. 15) is GRANTED;

2.     The Landlords' Complaint (ECF No. 1) is DISMISSED WITHOUT PREJUDICE; and

3.    The Landlords' motion for preliminary injunction (ECF No. 5) is DENIED

AS MOOT.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: December 31, 2020                        BY THE COURT:

                                                s/Nancy E. Brasel
                                                Nancy E. Brasel
                                                United States District Judge